IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Case No. 1:20-cv-1343 |
| $4,543.79 IN FUNDS SEIZED FROM BANK | ) | |
| ACCOUNT #153568031006 IN THE NAME | ) | |
| OF CARLETON P. NELSON AND | ) | |
| AMY S. NELSON AT U.S. BANK, *et al.*, | ) | |
| | ) | |
| Defendant Properties. | ) | |

## CLAIMANTS CARLETON AND AMY NELSON'S ANSWER TO THE VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Claimants Carleton and Amy Nelson (collectively "Claimants" or "the Nelsons"), by and through counsel, file this Answer to the Verified Complaint for Forfeiture *in Rem*, and state as follows:

### PRELIMINARY STATEMENT

On April 2, 2020, FBI agents arrived unannounced at the Nelsons' Seattle, Washington home where they lived with their four young daughters, aged 5 years, 4 years, 2 years, and 9 months. Unmasked (despite a statewide "Stay Home, Stay Healthy" order due to the global COVID-19 pandemic), the agents handed Mr. Nelson a letter informing him that the United States Attorneys' Office in the Eastern District of Virginia (the "government") intended to seize funds in certain accounts, which it alleged were traceable to alleged criminal activity.

Mr. Nelson subsequently retained MoloLamken LLC ("MoloLamken," or in the complaint, "Business #1") to represent him in connection with the government's investigation. In connection

1

with that engagement, the Nelsons sent two wires totaling $750,000 for MoloLamken to hold in trust for projected attorneys' fees.  Neither wire came from any of the accounts listed in the April 2, 2020, letter.  MoloLamken informed the government on May 12, 2020, that it intended to use portions of the funds to pay for Mr. Nelson's legal fees.  The government did not object.

On May 22, 2020, the government seized $142,135.78 in funds from six bank accounts owned by the Nelsons.  The funds included $125,000 the Nelsons had set aside to pay their 2019 federal income tax returns which, due to COVID-19, were not due until July 15, 2020.

On May 26, 2020, Assistant U.S. Attorneys from the Eastern District of Virginia and FBI agents met with lawyers from MoloLamken to discuss the investigation.  None of the government representatives mentioned any prospective seizure.  Nevertheless, two days later, the government seized $750,000 from MoloLamken's client trust account.  On June 18, 2020, after MoloLamken protested that seizure, the government remitted $258,219.50 of that money.

On June 5, 2020, despite the ongoing pandemic, FBI agents again showed up unannounced at the Nelsons' home to execute a search warrant.  The agent leading the team had travelled to Seattle by air from Virginia during the pandemic despite knowing that the Nelsons' young daughter has a pre-existing medical condition putting her at heightened risk for COVID-19.  The FBI seized Mr. Nelson's phone, laptop, and paper documents, and left within an hour.

## NATURE OF THE ACTION[1]

1.    **Allegation 1.**  The United States brings this action *in rem* seeking the forfeiture of all right, title, and interest in all defendants *in rem* identified in the case caption above (collectively, the "defendant property").

**Answer.**  The Nelsons admit that this is the government's purpose but deny that the United States has grounds to do so.

2.    **Allegation 2.**  The United States' claim arises from a scheme to defraud Company #1, and the defendant property constitutes the proceeds of violations of 18 U.S.C. § 1341 (Wire Fraud and Honest Services Wire Fraud) and 18 U.S.C. § 1349 (Wire Fraud Conspiracy), as well as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), 18 U.S.C. § 1956(h) (Money Laundering Conspiracy), and 18 U.S.C. § 1957 (Unlawful Monetary Transactions), and is therefore subject to forfeiture pursuant to 18 U.S.C. §981(a)(1)(A) and § 981 (a)(1)(C).

**Answer.**  The Nelsons deny that there was any scheme to defraud or that the defendant property constitutes proceeds of any of the enumerated violations or that the defendant property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and § 981(a)(1)(C).  The Nelsons further answer that the defendant property includes: (1) Claimant Amy Nelson's ("Ms. Nelson's") entirely lawful earnings from a company where she serves as Chief Executive Officer ("CEO"); (2) wages that Claimant Carleton Nelson ("Mr. Nelson") earned from his employment at Amazon.com, Inc. ("Amazon," or as alleged in the complaint, "Company #1"); (3) proceeds from Mr. Nelson's sale

---

[1] The government's complaint fails to identify by name the companies and individuals involved in the alleged scheme.  While the Nelsons believe they well know the identities of those involved, their belief should not serve as a substitute for the government's obligations to properly plead its allegations and the Nelsons do not waive their right to challenge the government's failure to do so.

of certain Amazon stock options that were a substantial portion of Mr. Nelson's compensation during his seven-year tenure at Amazon; (4) money that the Nelsons set aside to pay their 2019 federal income taxes; and (5) consulting fees that Mr. Nelson earned after he left Amazon in June 2019.

3.    **Allegation 3.**  The defendant property was seized as follows:

a.    Defendant $4,543.79 in funds from U.S. Bank account #153568031006 seized on May 29, 2020 in the District of Minnesota;

b.    Defendant $8,388.54 in funds from Wells Fargo account #1635892407 seized on May 29, 2020 in the Eastern District of Virginia;

c.    Defendant $13,559.97 in funds from Capital One Bank account #1361410762 seized on May 29, 2020 in the Eastern District of Virginia;

d.    Defendant $25,343.01 in funds from Citibank account #145947373 seized on June 5, 2020 in the District of South Dakota;

e.    Defendant $98,358.92 in funds from Citibank account #149656681 seized on June 5, 2020 in the District of South Dakota;

f.    Defendant $491,780.50 in funds from Signature Bank account ending in 5810, held on behalf of Amy Sterner Nelson and Carleton P. Nelson, seized on June 5, 2020 in the Northern District of Illinois;

g.    Defendant $10,567.43 in funds U.S. Bank account # 104781237441 seized on May 29, 2020 in the District of Minnesota;

h.    Defendant $1,217.05 in funds from American Express National Bank account #320013539278 seized on June 9, 2020 in the Southern District of Florida; and

i.   Defendant $4,284.47 in funds from American Express National Bank account #1518835838 seized on June 9, 2020 in the Southern District of Florida.

The defendant property is currently in the possession of the United States Marshals Service in Richmond, Virginia.

**Answer.**  The Nelsons admit that the United States has seized $892,135.78 of the Nelsons' money.  The Nelsons admit that the United States seized funds from the Nelsons' bank accounts listed in 3(a), (b), (d), (e), (h) and (i) in the amounts listed.

The Nelsons deny that the government seized $491,780.92 from "Signature Bank account ending in 5810 and that the account was held on behalf of Amy Sterner Nelson and Carleton P. Nelson."  Pursuant to the government's own allegation at Paragraph No. 46, the government seized $750,000.000 from MoloLamken's Signature Bank trust account ending in 5810.

The Nelsons lack sufficient information and knowledge regarding the remaining allegations in Paragraph No. 3 and therefore deny them.

**JURISDICTION AND VENUE**

4.   **Allegation 4.**  This Court has subject matter jurisdiction over actions commenced by the United States under 28 U.S.C. § 1345, and over forfeiture actions under 28 U.S.C. § 1355(a) and (b).

**Answer.**  Admitted.

5.   **Allegation 5.**  This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

**Answer:**  The Nelsons deny that there are any acts or omissions that support the government's seizure or forfeiture of their property.

6.     **Allegation 6.**   Venue is proper within this judicial district under 28 U.S.C. § 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia.

**Answer.**   The Nelsons deny that there are any acts or omissions that support the government's seizure or forfeiture of their property.

## FACTUAL ALLEGATIONS

7.     **Allegation 7.**   The Federal Bureau of Investigation ("FBI") is investigating a fraudulent kickback scheme involving individuals employed by Company #2, a Denver, Colorado-based commercial real estate and development company, as well as Company #3, Company #4, and certain former employees at Company #1.

**Answer.**   The Nelsons deny the existence of a fraudulent kickback scheme.  The Nelsons are without information or knowledge sufficient to respond to the remaining allegations in Paragraph No. 7 and therefore deny them.

8.     **Allegation 8.**   Casey Kirschner oversaw real estate development in Northern Virginia, within the Eastern District of Virginia, for Company #1 (doing business under a third party company name) for its data centers.  Until in or around June 2019, Carleton Nelson was Casey Kirschner's supervisor at Company #1.

**Answer.**   The Nelsons admit that Amazon (Company #1) employed Mr. Nelson from May 2012 until June 11, 2019, when Amazon terminated his employment following his objections to the decisions of Amazon executives regarding certain representations in a formal bid on a contract with the federal government.  The Nelsons also admit that Mr. Nelson supervised Casey Kirschner for part of his tenure.  The Nelsons are without sufficient information or knowledge as to the remaining allegations contained in Paragraph No. 8 and therefore deny them.

9.     **Allegation 9.**   Casey Kirschner and Carleton Nelson were two of the primary Company #1 decision-makers for Northern Virginia real estate site identification and selection, as well as selection of specific developers, including Company #2.

**Answer.**  Denied.

10.     **Allegation 10.**  Since 2018, Company #1 has executed leases with Company #2 for nine Company #1 data centers in Northern Virginia, with a total approved to be spent for these deals of approximately $415.5 million.

**Answer.**    Denied.   In addition to other reasons, Amazon's filings and exhibits in *Amazon.com, Inc. v. WDC Holdings LLC dba Northstar Commercial Partners*, Case No. 1:20-CV-484-LO-TCB (E.D.Va.) (the "Amazon Lawsuit"), contradict the allegation that Amazon (Company #1) executed  any leases for data centers in Northern Virginia or elsewhere with WDC Holdings LLC d/b/a Northstar Commercial Partners ("Northstar" or "Company #2").

11.     **Allegation 11.**  The scheme involving Company #2 included referral payments it made to an entity called the Villanova Trust, which was controlled by Person #1, who is Casey Kirschner's brother, in exchange for steering Company #1 data center deals in Northern Virginia to Company #2.

**Answer.**  The Nelsons admit that Christian Kirschner ("Person #1) is Casey Kirschner's brother.  The Nelsons deny the remainder of the allegations in Paragraph No. 11.

12.     **Allegation 12.**  Person #2, who was the Chief Executive Officer of Company #2, and Person #1 had entered into a contractual agreement whereby Company #2 would pay Person #1 a portion of the various fees it received on its Company #1 data center deals in Northern Virginia. Person #1 knew a portion of the referral fees paid to Person #1 via the Villanova Trust

would be transferred to Casey Kirschner and Carleton Nelson for the purposes of securing the development deals with Company #1 in Northern Virginia.

    **Answer.**  The Nelsons admit that Brian Watson ("Mr. Watson" or, in the Complaint, "Person #2") is the CEO of Northstar (Company #2).  The Nelsons deny the remaining allegations in Paragraph No. 12.

    13.    **Allegation 13.**  From in or about March 2018 to in or about August 2019, financial records indicated that Company #2 wired the Villanova Trust approximately $5,112,983.84.

    **Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations in Paragraph No. 13 and therefore deny them.

    14.    **Allegation 14.**  In turn, from in or about August 2018 to in or about August 2019, Person #1, doing business as the Villanova Trust, wired approximately $3,375,625 to a bank account established in the name of the 2010 Irrevocable Trust, which was maintained by Person #7 on behalf of Casey Kirschner and Carleton Nelson.

    **Answer.**  The Nelsons lack sufficient information and knowledge regarding many allegations in Paragraph No. 14 and therefore deny them.  The Nelsons further deny that the 2010 Irrevocable Trust bank account was maintained on behalf of Mr. Kirschner and Mr. Nelson.

    15.    **Allegation 15.**  The investigation uncovered additional fraudulent payments that Casey Kirschner and Carleton Nelson, in conjunction with their employment with Company #1, received from at least two other real estate companies, Company #3 and Company #4.

    **Answer.**  The Nelsons deny that Mr. Nelson received any fraudulent payments in conjunction with his employment with Amazon or otherwise.  The Nelsons lack sufficient information and knowledge regarding the remaining allegations contained in Paragraph No. 15 and therefore deny them.

16.   **Allegation 16.**   Company #1 employees were not authorized to benefit from "referral fees" or other financial compensation paid by Company #2, Company #3, Company #4, or any other developers, related to Company #1's real estate development projects.

**Answer.**   The Nelsons deny that Mr. Nelson was "not authorized" to benefit from referral fees or other financial compensation paid by Northstar (Company #2) or White Peaks Capital LLC and NOVA WPC LLC (collectively "White Peaks" and, in the Complaint, "Company #3"), or Blueridge Group LLC ("Blueridge" and, in the Complaint, "Company #4"), or any other developers, related to Amazon's real estate development projects.   Rather, Mr. Nelson's employment agreement with Amazon (the "Confidentiality, Noncompetition and Invention Assignment Agreement" or "Amazon CNIAA" executed on April 2, 2012) expressly authorized Mr. Nelson, while employed by Amazon and for 18 months afterward, at least to (1) "accept or solicit employment with, or accept or solicit a consulting assignment with, or accept or solicit investment capital" from any individual or entity not invested in Amazon as well as Amazon investors whom Mr. Nelson introduced to Amazon; and (2) "accept or solicit employment with, or accept or solicit a consulting assignment with, or accept or solicit business from any individuals or entity" that is a current or prospective Amazon customer or client so long as the product or service offered by the employee to the client or customer is not the same as that offered by Amazon and "such acceptance or solicitation" would not be competitive with or otherwise deleterious to Amazon's business relationship with the customer or client.

17.   **Allegation 17.**   Casey Kirschner has admitted to accepting funds from Company #2 associated with his job with Company #1 and that the CEO of Company #2, Person #2, paid the kickbacks to the Villanova Trust associated with Company #1's development deals in Northern Virginia.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations in Paragraph No. 17 and therefore deny the same.

18.     **Allegation 18.**  In addition to the kickback payments received from Company #2 via the Villanova Trust, Casey Kirschner and Carleton Nelson received $1,000,000 in kickbacks from Company #3 and $4,818,955.50 in kickbacks from Company #4 in 2019 in exchange for Company #1 projects in Northern Virginia, as further described below.

**Answer.**  Denied.

19.     **Allegation 19.**  On or about February 18, 2019, a Company #2 employee, Person #3, doing business as Company #3, entered into a "Confidentiality, Non-Disclosure, and Non-Circumvention" agreement with Seller #1, a Loudoun County, Virginia, landowner, for the acquisition of approximately 89 acres of vacant land located in the Eastern District of Virginia. Person #3, doing business as Company #3, ended up "flipping" the land that was the subject of the agreement with Seller #1 to Company #1 for a substantial profit, as described below.

**Answer.**  Denied.

20.     **Allegation 20.**  Casey Kirschner used his position as a Company #1 employee responsible for overseeing real estate development in Northern Virginia to steer Company #1 into acquiring the land at an inflated price that Person #3, doing business as Company #3, had placed under contract with Seller #1.

**Answer.**  Denied.

21.     **Allegation 21.**  On or about May 29, 2019, Casey Kirschner submitted a written proposal to Company #1's management recommending that Company #1 acquire the land that Person #3, doing business as Company #3, had put under contract with Seller #1.   Casey

Kirschner's executive summary detailing the proposed acquisition contained materially false statements regarding the subject property.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations in Paragraph No. 21 and therefore deny them.   In addition, based on Amazon's Purchase Agreement filed in the Amazon lawsuit, the difference in the price paid by White Peaks (Company #3) to Seller #1 and the price paid by Amazon to White Peaks was disclosed to Amazon.

22.   **Allegation 22.**   On or about July 29, 2019, Company #3 acquired the land for $98,670,000 and instantly resold it, or "flipped" the property, to Company #1 for $116,389,000, which resulted in a gross profit of approximately $17,719,000 to Company #3, which was comprised of Person #3 and Person #4, who was also a Company #2 employee at the time.

**Answer.**   Denied.   In addition, the government's own allegations in Paragraph No. 19 demonstrate that White Peaks (Company #3) had an agreement with the seller dated February 18, 2019.

23.   **Allegation 23.**   Following the closing of the real estate transaction described above, Person #3 and Person #4 agreed to transfer payment to Casey Kirschner and Carleton Nelson via a wire transfer utilizing a bank account belonging to a civil engineering consultant, Person #5, who had provided consulting services for both Company #3 and Company #1 on the 89-acre real estate transaction. Person #3 wire transferred $1,000,000 to a bank account belonging to Person #5 to conceal the true purpose of the payment. Person #5 then wire transferred the funds to Person #7, who maintained the account on behalf of Casey Kirschner and Carleton Nelson.

**Answer.**   Denied.

24.   **Allegation 24.**   Specifically, on or about August 1, 2019, Person #5, doing business as E2M Properties LLC, sent Person #3 an email containing a fraudulent invoice for $983,000 for

"Inova Consulting Services."  On or about August 2, 2019, Person #5 sent Person #3 the wiring instructions associated with the wire transfer.  On or about August 8, 2019, Person #3 sent a $1,000,000 wire transfer to Person #5's E2M Properties bank account #1361410762 at Capital One Bank.  Then, on or about August 9, 2019, Person #5 sent a $1,000,000 wire to the same 2010 Irrevocable Trust bank account referenced in paragraph 14 above.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations in Paragraph No. 24 and therefore deny them.

25.   **Allegation 25.**  On or about May 29, 2019, Company #4, which was run by Person #6, put a 100-acre land parcel located in Loudoun County, Virginia, within the Eastern District of Virginia, under contract for $73 million. Records reflect that Casey Kirschner had submitted the $73 million offer on behalf of Person #6 to the seller.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations contained in Paragraph No. 25 and therefore deny them.

26.   **Allegation 26.**  On or about May 29, 2019, Casey Kirschner submitted his executive summary to Company #1 management recommending the acquisition of the 100-acre parcel for $110 million. That executive summary also indicated that Casey Kirschner and Carleton Nelson's group within Company #1 had already negotiated an agreement to purchase to the land.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations contained in Paragraph No. 26 and therefore deny them.

27.   **Allegation 27.**  On or about that same date, Casey Kirschner and Carleton Nelson documented their formal approvals with Company #1 for the acquisition of the 100-acre parcel, which Person #6 had just put under contract that day for $73 million.

**Answer.**  Denied.  In addition to other reasons, the draft document recommended that Amazon purchase the land in 2020 only if Blueridge could obtain government permits designating the land suitable for data center use.

28.    **Allegation 28.**  On or about December 3, 2019, an attorney for Person #6 forwarded to Casey Kirschner an assignment of the purchase and sale agreement for the 100-acre parcel from Company #4 to Company #1.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations contained in Paragraph No. 28 and therefore deny them.

29.    **Allegation 29.**  On or about December 9, 2019, Person #7 submitted a "Finder's Fee" agreement to an attorney for Person #6, which specified that an entity established by Person #7 would receive 50% of the net proceeds paid to Company #4 at closing "in consideration for the Finder's assisting [Company #4] and being instrumental in identifying the location of the Land and in negotiating the terms of the PSA . . . ."

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations contained in Paragraph No. 29 and therefore deny them.

30.    **Allegation 30.**  On or about December 23, 2019, a Company #1-related entity acquired the 100-acre parcel from the seller. At closing, Company #1 paid Company #4, which was run by Person #6, a $10 million assignment fee.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the allegations contained in Paragraph No. 30 and therefore deny them.

31.    **Allegation 31.**  On or about December 24, 2019, $4,818,955.50 was wire transferred from an account belonging to Person #6 to the same 2010 Irrevocable Trust bank account maintained by Person #7 on Casey Kirschner's and Carleton Nelson's behalf.

**Answer.**   The Nelsons lack sufficient information and knowledge regarding many allegations in  Paragraph No. 31, therefore deny them.  The Nelsons further deny that the 2010 Irrevocable Trust bank account was maintained on behalf of Mr. Kirschner and Mr. Nelson.

32.     **Allegation 32.**  Casey Kirschner later stated to the FBI that the payment from Company #4 was associated with a deal that Carleton Nelson had "teed up" with Company #1 before he left the company. Casey Kirschner further advised the FBI that Person #6 agreed to split the profits on the deal with Carleton Nelson, operating under a third-party company name. Casey Kirschner also confirmed to the FBI that the $4,818,955 that Company #4 wired to the 2010 Irrevocable Trust also belonged in part to him, Casey Kirschner.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the substance or veracity of any information Casey Kirschner may have provided to the FBI and therefore deny those allegations in Paragraph No. 32.  The Nelsons specifically deny the allegations in Paragraph No. 32 about Mr. Nelson.

### *Tracing of Fraud Proceeds from the 2010 Irrevocable Trust*

33.     **Allegation 33.**  During the kickback scheme involving the Company #2-developed Company #1 projects in Northern Virginia, the Villanova Trust bank account wired approximately $3,375,625 to the 2010 Irrevocable Trust bank account referenced in paragraph 14 above. The transaction between Seller #1 and Company #3 in Loudoun County, Virginia, involving Company #1 as described above, resulted in a $1,000,000 payment via wire to the 2010 Irrevocable Trust bank account. Company #4's assignment of its purchase and sale agreement to Company #1 for the 100-acre parcel of land located in Loudoun County, Virginia, as previously described above, resulted in a $4,818,955 wire transfer to the 2010 Irrevocable Trust bank account. In all, Carleton Nelson and Casey Kirschner were paid at least approximately $9,194,580 in fraud proceeds via

wire transfers to the 2010 Irrevocable Trust bank account. The 2010 Irrevocable Trust bank account was created, maintained, and controlled by Person #7. Person #7 was the sole signor on the 2010 Irrevocable Trust bank account.

**Answer.** Denied.

34.    **Allegation 34.** On or about August 7, 2018, approximately $384,640.00 was sent via wire transfer from the 2010 Irrevocable Trust First bank account to account #153568031006 held at US Bank, which was held in the name of "Carleton P. Nelson, JOF, Amy S. Nelson, JOO." Carleton Nelson was the sole signor on the account.

**Answer.** Admitted.

35.    **Allegation 35.** Between 2018 and 2020, Person #7 transferred approximately $6,244,442 from the 2010 Irrevocable Trust bank account to another bank account under Person #7's control in the name CTBSRM, Inc. From the CTBSRM, Inc. account, Person #7 then transferred approximately $272,000 to Casey Kirschner's US Bank account #104781237441, co-owned with Devon M. Kirschner.

**Answer.** The Nelsons lack sufficient information and knowledge regarding the allegations contained in Paragraph No. 35 and therefore deny them.

36.    **Allegation 36.** During that same time frame, 2018 to 2020, Person #7 also transferred approximately $2,017,152.37 from the CTBSRM, Inc. account to a bank account in the name Renrets LLC, which is controlled by Person #8. Typically, within days of receiving the wires from the CTBSRM, Inc. bank account, Person #8 transferred the funds, which in sum totaled approximately $1,948,011, to Carleton Nelson's personal account #1518835838 at American Express Bank, co-owned with Amy S. Nelson. Carleton Nelson subsequently transferred the funds he received from Person #8 to various other bank accounts, which Carleton Nelson controlled.

**Answer.**  The Nelsons lack sufficient information and knowledge regarding the transfers from Person #7 to Person #8, including control of the accounts, and typical activity of Person #8, and therefore deny those allegations in Paragraph No. 36.  The Nelsons admit that they had a high yield American Express Savings Account from which they would transfer funds to checking accounts to pay their bills.

37.  **Allegation 37.**  Between January 2018 and March 2020, approximately $1,042,897.77 was transferred from Carleton Nelson's American Express account #1518835838 to a US Bank account ending 9881, which was held jointly between Carleton Nelson and Person #9. This occurred over the course of approximately 43 transfers.

**Answer.**  The Nelsons admit they had a high yield American Express savings account from which they would transfer funds to checking accounts to pay their bills.

38.  **Allegation 38.**  On or about August 28, 2019, $12,000.00 was transferred from Carleton Nelson and Person #9's US Bank account ending 9981 to an account Carleton Nelson held at Citibank with account # 145947373.

**Answer.**  The Nelsons admit they had a high yield American Express savings account from which they would transfer funds to checking accounts to pay their bills.

39.  **Allegation 39.**  On April 5, 2020, Carleton Nelson transferred approximately $800,000.00 from his personal American Express account #I518835838 into American Express account # 320013539278, which Carleton Nelson and Amy S. Nelson jointly owned.

**Answer.**  The Nelsons admit they had a high yield American Express savings account from which they would transfer funds to checking accounts to pay their bills.

40.  **Allegation 40.**  Between January 2018 and October 2018, Amy Nelson's Wells Fargo account #1635892407 received approximately $66,000.00 over the course of approximately

six wire transfers, which originated from Carleton Nelson's American Express account #1518835838. Three of the transfers were made in amounts of $10,000.00 or greater.

**Answer.** The Nelsons admit they had a high yield American Express savings account from which they would transfer funds to checking accounts to pay their bills.

41. **Allegation 41.** Additionally, on or about April 7, 2020, and April 10, 2020, $250,000.00 and $150,000.00 respectively, was transferred from Carleton and Amy Nelson's American Express account #320013539278 to Amy Nelson's Wells Fargo account #1635892407.

**Answer.** The Nelsons admit they had a high yield American Express savings account from which they would transfer funds to checking accounts to pay their bills..

42. **Allegation 42.** On or about April 20, 2020, approximately $399,000.00 was transferred from Carleton and Amy Nelson's American Express account #320013539278 to Carleton Nelson's Citibank account #149656681.

**Answer.** The Nelsons admit they had a high yield American Express savings account from which they would transfer funds to checking accounts to pay their bills.

43. **Allegation 43.** On or about April 15, 2020, a $400,000.00 wire transfer was sent from Amy Nelson's Wells Fargo Bank account #1635892407 to an account ending 5810 held at Signature Bank in the name of Business #1, which was retained to provide services to Carleton Nelson.

**Answer.** The Nelsons admit they transferred funds from the Wells Fargo Bank account to pay legal fees and that they lack sufficient information and knowledge regarding the ownership or purpose of the Signature Bank account and therefore deny those allegations in Paragraph No. 43.

44.   **Allegation 44.**  On or about April 24, 2020, a $350,000.00 wire transfer was made from Carleton Nelson's Citibank account #149656681 to the same Signature Bank account ending 5810 held by Business #1.

**Answer.**  Admitted.

45.   **Allegation 45.**  The $750,000.00 in wire transfers sent to Business #1's Signature Bank account ending in 5810, as described in paragraphs 43 and 44 above, is entirely traceable to fraud.

**Answer.**  The Nelsons deny that any fraud occurred and that any funds are traceable to fraud.  The Nelsons lack sufficient information and knowledge regarding the remaining allegations contained in Paragraph No. 45 and therefore deny them.

46.   **Allegation 46.**  On May 28, 2020, the United States seized $750,000.00 from Business #1's Signature Bank account ending in 5810.

**Answer.**  Admitted.

47.   **Allegation 47.**  On June 3, 2020, Business #1 provided the United States with documentation indicating that Business #1 had earned $258,219.50 of the $750,000.00 described in paragraph 44 above.

**Answer.**  Admitted.

48.   **Allegation 48.**  On June 18, 2020, the United States remitted $258,219.50 of the $750,000.00 described above to Business #1, leaving the remainder seized at $491,780.50.

**Answer.**  Admitted.

## FIRST CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. §§ 981(a)(1)(C))

49.   **Allegation 49.**  The United States incorporates by reference paragraphs 1 through 48 above as if fully set forth herein.

**Answer.**   The Nelsons reallege and incorporate all of their responses to Paragraphs 1 through 48 of the Complaint.

50.    **Allegation 50.**   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title) or a conspiracy to commit such an offense."

**Answer:**  Paragraph No. 50 contains a legal conclusion to which no response is necessary.

51.    **Allegation 51.**   Title 18, United States Code, Section 1956(c)(7)(D) provides that the term "specified unlawful activity" includes "an offense under ... section 1343 (relating to wire fraud)." Title 18, United States Code, Section 1346 also provides that a wire fraud scheme "includes a scheme or artifice to deprive another of the intangible right of honest services."

**Answer.**  Paragraph No. 51 contains a legal conclusion to which no response is necessary.

52.    **Allegation 52.**   As set forth above, the defendant property constitutes criminal proceeds of the wire fraud and wire fraud conspiracy.

**Answer.**   The Nelsons deny the existence of a wire fraud or a wire fraud conspiracy, or any crime.  The Nelsons further deny that the defendant property constitutes criminal proceeds.

53.    **Allegation 53.**  As such, the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**Answer.**   The Nelsons deny that there are any acts or omissions that support the government's seizure or forfeiture of their property.

**SECOND CLAIM FOR RELIEF**
**(Forfeiture under 18 U.S.C. §§ 981(a)(1)(A))**

54.    **Allegation 54.**  The United States incorporates by reference paragraphs 1 through 48 above as if fully set forth herein.

**Answer.** The Nelsons reallege and incorporate all of their responses to Paragraphs 1 through 48 of the Complaint.

55. **Allegation 55.** Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 [or] 1957. . . of this title, or any property traceable to such property."

**Answer.** Paragraph No. 55 contains a legal conclusion to which no response is necessary.

56. **Allegation 56.** Title 18, United States Code, Section 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (B)     knowing that the transaction is designed in whole or in part—
>
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

**Answer.** Paragraph No. 56 contains a legal conclusion to which no response is necessary.

57. **Allegation 57.** Title 18, United States Code, Section 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." A "monetary transaction" includes the "deposit, withdrawal, transfer or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1).

**Answer.** Paragraph No. 57 contains a legal conclusion to which no response is necessary.

58.   **Allegation 58.**   Title 18, United States Code, Section 1956(h) imposes a criminal penalty on any person who conspires to commit any offense defined in 18 U.S.C. §§ 1956 or 1957.

**Answer.**   Paragraph No. 58 contains a legal conclusion to which no response is necessary.

59.   **Allegation 59.**   As noted above, "specified unlawful activity" includes wire fraud, which also encompasses honest services wire fraud.

**Answer.**   Paragraph No. 59 contains a legal conclusion to which no response is necessary.

60.   **Allegation 60.**   As set forth above, the defendant property constitutes property involved in money laundering transactions in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(B)(i), and 1957, and is therefore subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

**Answer.**   The Nelsons deny that there are any acts or omissions that support the government seizure or forfeiture of their property pursuant to any statute.

## PRAYER FOR RELIEF

The remainder of the government's Complaint, beginning with the word "WHEREFORE," constitutes a prayer for specific relief to which no answer is required.  To the extent a response is appropriate, the Nelsons deny that the facts of this case justify any relief.

## AFFIRMATIVE DEFENSES

The Nelsons assert the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE
*Failure to State a Claim*

The government's Complaint fails to state claims upon which relief may be granted. Despite months of investigation, the government is unable to articulate any wire fraud theory or any nexus between the seized funds and illicit conduct.  The Complaint contains no information linking Mr. Nelson to any violation of a duty to Amazon as required for honest services fraud, and likewise contains no allegations that Mr. Nelson made any material misstatements or omissions.

The Complaint thus fails to allege sufficient facts to establish the requisite suspicious underlying activity required for money laundering.

## SECOND AFFIRMATIVE DEFENSE
*Failure to Comply with Supplemental Rule G*

The government's Complaint does not comply with the requirement of Supplemental Rule G to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Indeed, apart from conclusory statements that certain wires somehow constitute fraudulent activity, the Complaint contains no allegations concerning the facts allegedly supporting forfeiture of the Nelsons' property.

## THIRD AFFIRMATIVE DEFENSE
*Violation of Fourth Amendment*

The government's seizure of the Nelsons' property violates the Nelsons' Fourth Amendment right to be free from illegal searches and seizures.  Plaintiff did not have probable cause to seize the Nelsons' property and  have failed to present probable cause to link the bank accounts or the funds they contained to any fraudulent activity or money laundering.

## FOURTH AFFIRMATIVE DEFENSE
*Violation of Fourth Amendment*

The government obtained the seizure warrants through incorrect, misleading, or incomplete allegations.  The government knowingly, intentionally, or with a reckless disregard for the truth included material false statements or made material omissions in the affidavits that the government presented to the court as part of its application for warrants to seize the property.

## FIFTH AFFIRMATIVE DEFENSE
*Violation of Eighth Amendment*

The forfeiture that  the government seeks would violate the Eight Amendment's excessive fines clause.   Seizure of Claimant's entire savings is excessive and includes funds from

transactions that the government fails even to allege were unlawful.  The government seeks forfeiture that would be unconstitutionally disproportionate.

## RESERVATION OF RIGHTS

The Nelsons reserve the right to assert additional affirmative defenses or amend these affirmative defenses as discovery warrants.

## DEMAND FOR JURY TRIAL

The Nelsons demand a trial by jury of all issues so triable.

**WHEREFORE**, the Nelsons demand that the Court:

1.  Deny the government's claim for forfeiture of the defendant property;

2.  Order the government to return the defendant property to the Nelsons;

3.  Order the government to pay the Nelsons' attorneys' fees and costs pursuant to 28 U.S.C. § 2465(b)(1)(A);

4.  Order that the government pay pre- and post-judgment interest on the defendant currency to the Nelsons pursuant to 28 U.S.C. § 2465(b)(1)(B)-(C); and

5.  Enter such other relief as the Court deems just and proper.

January 22, 2021                              Respectfully submitted,


                                             /s/ Preston Smith
                                             Preston Smith (VA Bar No. 86908)
                                             Suneeta Hazra (*pro hac vice*)
                                             Paul J. Fishman (*pro hac vice* admission
                                             pending)
                                             ARNOLD & PORTER KAYE SCHOLER LLP
                                             601 Massachusetts Ave., N.W.
                                             Washington, D.C.  20001-3743
                                             Telephone:  +1 202.942.5000
                                             Facsimile:  +1 202.942.5999
                                             E-mail:  preston.smith@arnoldporter.com
                                             E-mail:  suneeta.hazra@arnoldporter.com
                                             E-mail:  paul.fishman@arnoldporter.com

                                             *Counsel for Claimants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on January 22, 2021, I electronically filed the Answer to the Verified Complaint for Forfeiture *in Rem* via ECF, which caused a copy of the Answer to the Verified Complaint for Forfeiture *in Rem* to be served on all counsel of record.


/s/ Preston Smith
Preston Smith (VA Bar No. 86908)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-6544
Email: preston.smith@arnoldporter.com

*Counsel for Claimants*