# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| AMAZON.COM, INC. and AMAZON DATA SERVICES, INC., | |
| Plaintiffs, | |
| v. | CASE NO. 1:20-CV-484 |
| WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; CARLETON NELSON; CASEY KIRSCHNER; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; CHESHIRE VENTURES LLC; JOHN DOES 1-20, | **VERIFIED SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

## PLAINTIFFS' VERIFIED SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

PARTIES ..................................................................................................... 6

SUBJECT MATTER JURISDICTION AND VENUE ............................. 10

PERSONAL JURISDICTION................................................................... 11

FACTUAL ALLEGATIONS..................................................................... 12

I. AMAZON REAL ESTATE INVESTMENTS......................................... 13

II.     THE TM DEFENDANTS' PAY-TO-PLAY SCHEME ............................. 14

     A.    TM Defendant Nelson Recruits Casey Kirschner to Amazon ............................ 14

     B.    The TM Defendants Create a Pay-to-Play Scheme for Amazon Work ............... 15

     C.    Confidential Informant 1 Reports Defendants' Kickback Scheme..................... 22

     D.    The TM Defendants' Pay-To-Play Scheme Furthered the Unlawful RICO Enterprise ..................................................................................................... 24

III.    THE LEASE TRANSACTION CONDUCT ............................................ 35

     A.    The TM Defendants Solicit Rigged Northstar Bids for Virginia Leases............. 35

     B.    The TM Defendants Secure Approval of the Rigged Northstar Bids.................. 39

     C.    The Northstar and TM Defendants Conspire on Lease Execution ..................... 46

     D.    2020 Corroboration of the RICO Enterprise from Northstar COO Timothy Lorman and IPI Vice President Luke Gilpin ..................................................... 51

     **E.**    Northstar's April 2, 2020 Termination from the Lease Transactions................. 57

     F.    June 2020 Federal Forfeiture Action and May 2020 Forfeiture Notices ............. 59

IV.    THE DIRECT PURCHASE CONDUCT ................................................ 61

     A.    The White Peaks Transaction ........................................................................ 62

     B.    Other Land Acquisitions in Northern Virginia ................................................. 65

V.     THE RICO DEFENDANTS' ONGOING MISCONDUCT, DAMAGE, AND THREATS OF IRREPARABLE HARM ................................................... 67

# TABLE OF CONTENTS
(continued)

A. The Northstar Defendants ....................................................................... 67

B. The TM Defendants and Defendants AllCore Development LLC, Cheshire Ventures LLC, and Finbrit Holdings LLC ................................................ 70

C. Villanova Trust ......................................................................................... 72

D. The White Peaks Defendants .................................................................... 73

**COUNT I** ......................................................................................................... 74

**COUNT II** ........................................................................................................ 92

**COUNT III** ...................................................................................................... 96

**COUNT IV** ...................................................................................................... 99

**COUNT V** ...................................................................................................... 101

**COUNT VI** ..................................................................................................... 102

**COUNT VII** ................................................................................................... 107

**COUNT VIII** .................................................................................................. 112

**COUNT IX** ..................................................................................................... 114

**COUNT X** ...................................................................................................... 115

**COUNT XI** ..................................................................................................... 118

**COUNT XII** .................................................................................................... 120

**PRAYER FOR RELIEF** ................................................................................ 122

Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc. (collectively "Plaintiffs" or "Amazon"), hereby allege the following in support of this action for preliminary injunctive relief and other legal and equitable remedies for harm caused and imminently threatened by Defendants.

## PRELIMINARY STATEMENT

1.      This case is about a massive fraud and kickback scheme to obtain illegal profits on over $500 million in Amazon development projects in this District alone.  The defendants are sophisticated professionals who used commercial real estate transactions and a web of shell entities to hide their criminal enterprise, which is the subject of ongoing internal and federal investigations.

2.      Amazon's investigation began late last year, when one defendant's former employee reported the scheme to the company.  Until then, the defendants were able to conceal their misconduct because, in part, two of their leaders are former managers in Amazon's real estate division.

3.      For at least two years, these former transaction managers ("TMs") Carleton Nelson and Casey Kirschner (the "TM Defendants") colluded with a broad network of real estate developers, LLCs, and other co-conspirators (the "RICO Defendants"[1]), to commit wire fraud, honest services fraud, money laundering, and other unlawful acts.

4.      The RICO Defendants engaged in these acts under cover of at least 11 commercial real estate lease and purchase transactions in Northern Virginia, all of which the TM Defendants shepherded through Amazon's internal approval process in exchange for multi-million dollar

---

[1]  The "RICO Defendants" include at least Defendants WDC Holdings LLC dba Northstar Commercial Partners, Northstar's founder and CEO Brian Watson, Sterling NCP FF, LLC, Manassas NCP FF, LLC, NSIPI Administrative Manager, NOVA WPC LLC, White Peaks Capital LLC, Villanova Trust, Carleton Nelson, Casey Kirschner, AllCore Development LLC, Finbrit Holdings LLC, Cheshire Ventures LLC, and John Does 1-20.

kickbacks and bribes.  The TM Defendants were at the center of the overall scheme (the "RICO Enterprise") covering both lease and purchase transactions.  Amazon previously described these transactions as comprising the Lease Transaction Enterprise and the Direct Purchase Enterprise. But Amazon's ongoing investigation and public government filings have uncovered evidence that all of these transactions are part of a broader enterprise scheme centered around the TM Defendants. This RICO Enterprise involved multiple unlawful acts undertaken in furtherance of a common purpose over a period of several years that included recurring kickbacks and bribes on Amazon lease and purchase transactions in Virginia, as well as use of the unlawful proceeds to continue and broaden the enterprise to target additional transactions with Amazon, its business partners, and other victims and markets.  Accordingly, this complaint uses the terms "Lease Transactions" and "Direct Purchases" to describe the previously alleged Virginia lease and purchase transactions, as well as the additional transactions and conduct alleged herein as part of the broader RICO Enterprise.

5.      The scope and persistence of this RICO Enterprise spanned several jurisdictions, scores of entities and transactions in interstate commerce, and development projects worth more than half a billion dollars.  All of the affected transactions unlawfully and unjustly benefitted the RICO Defendants at the expense of Amazon, its business partners, and innocent investors. And Plaintiffs and their partners reasonably and detrimentally relied on the RICO Defendants' unlawful statements, omissions, and conduct concerning deal terms, opportunities, relationships, costs, fees, and market data for years.  This and other misconduct by the RICO Defendants proximately caused Plaintiffs to suffer direct financial harm from project costs inflated by at least kickbacks, fraud, and mismanagement, irreparable injury resulting from site and relationship disruptions, and

ongoing harm from the RICO Defendants' anti-competitive manipulation and inflation of relevant market data.

6.     In the Lease Transaction portion of the RICO Enterprises, the TM Defendants received kickbacks in exchange for rigging Amazon's award of at least nine major commercial lease transactions to other RICO Defendants, most notably corrupt developer Brian Watson and Northstar Commercial Partners ("Northstar Defendants"[2]). The Northstar Defendants alone expected to make "over $60 million" on these transactions, for which they agreed to pay the TM Defendants tens of millions in kickbacks.  The kickbacks were laundered through all or some of Defendants Villanova Trust, AllCore Development LLC, Finbrit Holdings LLC, Cheshire Ventures LLC, as well as through non-defendant trusts and accounts held or created by the TM Defendants and/or their lawyer, Rodney Atherton of Ergo Law in Arvada, Colorado.

7.     In the Direct Purchase portion of the RICO Enterprise, the TM Defendants received seven-figure kickbacks on at least two transactions collectively worth nearly $200 million.  In the first transaction, defendants White Peaks Capital and NOVA WPC LLC (the "White Peaks Defendants") realized approximately $18 million in unjust and inflated profits from a so-called $116 million "flip sale" to Amazon in mid-2019, ("White Peaks Purchase"), Ex. 1.  On information and belief, the TM Defendants and Northstar Defendants together received at least $6 million of the unjust gains from this "flip sale" in kickback payments.  On the second transaction, the TM Defendants and their accomplices inflated by at least $10 million the price of a property ("the Blueridge Property") Amazon purchased in late-2019 for $83 million.  To facilitate the inflated

---

[2]  The "Northstar Defendants" include Defendants WDC Holdings LLC dba Northstar Commercial Partners LLC, Northstar's founder and CEO Brian Watson, and at least the following Defendant LLCs they created to facilitate the transactions at issue in this suit:  Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager LLC.

sale and launder their kickbacks and other illicit gains on this transaction ("Blueridge Sale"), the TM Defendants interposed an investment company called the Blueridge Group, owned by TM Defendant Nelson's contact Herb Glimcher, to buy the property for $73 million before flipping it to Amazon for $83 million. On information and belief, portions of the $10 million in unjustly inflated "flip" proceeds were subsequently paid to the TM Defendants and their co-conspirator LLCs, including Nelson-controlled entities AllCore and Cheshire Ventures. Both of the Direct Purchase transactions were procured or otherwise tainted by the TM Defendants' self-dealing in furtherance of an ongoing scheme to defraud Amazon or otherwise unlawfully coopt its business opportunities.

8.     In December 2019, a former Northstar employee blew the whistle on Defendants' RICO Enterprise, which Amazon and federal prosecutors continue to investigate. Ex. 2. Amazon filed this action for emergency relief in late April based on information that Northstar's CEO, Defendant Brian Watson, presented an imminent threat to the preservation of evidence and assets central to this case after the FBI executed a warrant at his home. Ex. 3. This evidence resulted in the Court's April 28 Temporary Restraining Order and June 5 Preliminary Injunction in this action.

9.     As detailed below, several defendants have defied the Court's injunction even as the information about government proceedings proliferate and evidence of the RICO Defendants' unlawful activities continues to grow. Amazon's prior complaints and the Court's Preliminary Injunction were based on several incriminating conversations and files, including a recovered file that Casey Kirschner tried to delete from his company laptop, evidencing the kickback scheme underlying the Lease Transaction portion of the RICO Enterprise. Amazon has since obtained further evidence of the Direct Purchase portion of the RICO Enterprise. Exs. 5–7, 9. And

Amazon's continuing investigation as well as public government forfeiture filings have recently elucidated the RICO Defendants' use of wire transfers and various co-defendant LLCs, as well as trust and other accounts controlled by attorney Atherton, to further, and conceal, criminal acts as well as violations of civil law including fraud, market manipulation, and breach of fiduciary and contractual duties in violation of federal statutes, state law, and the RICO Defendants' contracts with Amazon.

10.     Notably, public government forfeiture filings this summer [3] show that, between "August 2018 and December 2019, $9,194,580.50 in fraud proceeds were" laundered through Villanova Trust and/or other entities, and "credited to a First Western Trust Bank account ending in 3698 maintained for" the benefit of the TM Defendants. Ex. 12 ¶ 15. Amazon's investigation also revealed information that the TM Defendants used a Virginia civil engineering consultant Johnny Lim and his company, E2M Properties LLC, as a conduit for the seven-figure kickback they received on the White Peaks transaction. And it revealed the TM Defendants' use of Blueridge Group to facilitate Amazon's purchase of the artificially price-inflated Blueridge Property. Further, Amazon's internal investigation uncovered evidence that the TM Defendants have used at least co-defendant LLCs AllCore and Cheshire to perpetuate the RICO Enterprise since TM Defendant Nelson was terminated from Amazon in June 2019.

11.     Among other things, Amazon's ongoing investigation has also uncovered evidence that the TM Defendants received or sought prohibited gifts and benefits, including kickbacks, from Northstar, White Peaks, and other third parties in exchange for the TM Defendants' steering

---

[3] *See* No. 1:20-cv-613, *UniREV00010529ted States v. Real Property &Improvements Known as 35 Queensland Lane North, Plymouth, Minnesota, 55447* (describing financial tracing of kickbacks on a fraudulent scheme on a "Denver, Colorado-based commercial real estate and development company" (Northstar) executed with assistance from two former employees of the defrauded company (Amazon)). Ex. 12.

Amazon opportunities to them, and utilized the proceeds of their unlawful activities for personal gain.

12.     On information and belief, the TM Defendants also had responsibility or influence at Amazon over other commercial real estate opportunities that Amazon engaged or explored in other states, including Ohio, South Carolina, and Tennessee.  These opportunities, and other aspects of the ███████ as yet unknown to Amazon, remain the subject of Amazon's ongoing investigation.  In the meantime, the amended claims herein address all of the foregoing misconduct, which supports maintaining—and potentially expanding—the preliminary injunction the Court entered on June 5, 2020.

## PARTIES

13.     Plaintiff Amazon.com, Inc. is located at 410 Terry Avenue North, Seattle, WA, 98109, and through its subsidiaries employs more than 10,000 individuals (with plans for many more) and has extensive investments and assets in the Commonwealth.

14.     Plaintiff Amazon Data Services, Inc., a subsidiary of Amazon.com, Inc., is a Delaware corporation located at 410 Terry Avenue North, Seattle, WA 98109, and among other things operates many large Amazon facilities in Virginia and other U.S. states.

15.     Northstar is a "privately held, full-service real estate investment and asset management company headquartered in Denver, Colorado, USA, specializing in the development, acquisition, and redevelopment of commercial real estate assets throughout the United States."  Ex. 13.  Northstar is located at 1999 N. Broadway, Suite 3500, Denver, CO 80202.

16.     Defendant Brian Watson is the Founder and Chief Executive Officer of defendant Northstar Commercial Partners.  On information and belief, Watson resides at 8 Churchill Drive, Englewood, CO 80113.

17.     Defendant Casey Kirschner is a former Real Estate Transaction Manager for Amazon.

18.     On information and belief, Casey Kirschner resides at 635 Alvarado Ln. North, Minneapolis, MN 55447.

19.     Defendant Carleton Nelson is a former Real Estate Transaction Manager for Amazon and was Casey Kirschner's supervisor at Amazon.

20.     On information and belief, Nelson resides at 4025 S.W. Thistle Street, Seattle, WA 98136-2368.

21.     Defendant Nelson goes by the names of "Carleton" and "Carl." *See, e.g.*, Ex. 1 at 2; Dkt. 135-4.

22.     Defendants Sterling NCP FF, LLC, Manassas NCP FF, LLC and NSIPI Administrative Manager are entities formed and controlled by Defendants Watson and Northstar for purposes of executing the Virginia site transactions at issue in this suit.

23.     Defendants Sterling NCP FF, LLC and Manassas NCP FF, LLC are limited liability companies formed and existing in the Commonwealth of Virginia.

24.     Defendant Villanova Trust is a trust formed and existing in the State of Tennessee. On information and belief, Villanova Trust was formed by Rodney Atherton, an attorney doing business at ErgoLaw, located at 6870 W. 52nd Ave., Suite 203, Arvada, CO 80002.

25.     On information and belief, the Villanova Trust was formed by Mr. Atherton to facilitate the transfer of funds to the TM Defendants from Northstar in return for their role in assisting Northstar to obtain the Lease Transactions, and to conceal from Amazon the TM Defendants' receipt of fees derived from the Lease Transactions.

26.     On information and belief, Villanova Trust, which was previously located at 16 Compton Trace, Nashville, TN 37215, Ex. 14, is now located at 3924 Wallace Lane, Nashville, TN 37215.

27.     Villanova Trust received payments from Defendant Northstar related to the RICO Enterprise while the TM Defendants were employed by Amazon.

28.     During the period in suit, the TM Defendants had primary responsibility for directing Amazon real estate site identification and selection in Virginia, including on the Lease Transaction and Direct Purchase deals at issue in this suit.

29.     Amazon terminated Nelson's employment in June 2019 based on violations of Amazon's Code of Conduct, unrelated to this litigation.

30.     On information and belief, at the time of his termination from Amazon, Nelson was under financial stress.

31.     The conduct that led to Nelson's termination was not his first offense.  In October 2017, Nelson was given a warning for violating Amazon's policies.  Despite this warning, Nelson, who was by then certainly aware of the policies, engaged in professional misconduct leading to an investigation that resulted in his termination from Amazon.

32.     Amazon terminated Casey Kirschner's employment in April 2020 based on its investigation to that point substantiating the 2019 whistleblower report from a former Northstar affiliate alleging his participation in the kickback scheme that is the subject of this suit.

33.     Defendants White Peaks Capital LLC and NOVA WPC LLC are Delaware limited liability companies that on information and belief are located at 11364 Mesa Verde Lane, Parker, CO 80138, potentially with subsequent or additional locations in Henderson, NV.

34. Two former Northstar employees, Kyle Ramstetter and Will Camenson, served, respectively, as Managing Director and Manager of White Peaks Capital LLC and NOVA WPC LLC.

35. White Peaks Capital LLC and NOVA WPC LLC were used to effectuate the White Peaks Purchase with Amazon as part of the Direct Purchase conduct at issue in this suit.

36. Defendant AllCore Development LLC is a limited liability company organized and registered in Wyoming on March 27, 2018, with a principal and mailing address of 6870 W 52nd Avenue, Suite 203, Arvada, CO 80002.

37. AllCore was organized by, and remains registered to, Mr. Atherton, an attorney doing business at ErgoLaw at the Colorado address above.

38. On information and belief, the TM Defendants retained or otherwise engaged Mr. Atherton to organize AllCore Development LLC for the benefit of the TM Defendants and to facilitate and conceal their illicit gains. On information and belief, after his termination from Amazon, Defendant Nelson directed Mr. Atherton to organize two other LLCs, which are also Defendants in this action, Cheshire Ventures LLC and Finbrit LLC.

39. Defendant Cheshire Ventures LLC is a limited liability company formed and organized in Wyoming on June 27, 2019, with a principal office address of 1908 Thomes Avenue, Cheyenne, WY 82001, and a mailing address of 6870 W 52nd Avenue, Suite 203, Arvada, CO 80002.

40. Cheshire Ventures was organized by, and remains registered to, Rodney Atherton, an attorney doing business at ErgoLaw at the Colorado address above.

41.     On information and belief, Mr. Atherton was retained or otherwise engaged to organize Cheshire Ventures LLC for the benefit of the TM Defendants and to facilitate and conceal their illicit gains.

42.     Defendant Finbrit Holdings LLC is a limited liability company formed and organized in Wyoming on September 3, 2019, with a principal office address of 1740 Dell Range, Suite H414, Cheyenne, WY 82009, and a mailing address of 6870 W 52nd Avenue, Suite 203, Arvada, CO 80002.

43.     Finbrit Holdings LLC is organized by, and remains registered to, Mr. Atherton, an attorney doing business at ErgoLaw at the Colorado address above.

44.     On information and belief, Mr. Atherton was retained or otherwise engaged to organize Finbrit Holdings LLC for the benefit of the TM Defendants and to facilitate and conceal their illicit gains.

45.     Doe Defendants 1–20 are individuals and/or entities responsible for some or all of the practices, acts, conduct, and occurrences alleged herein, either as actual perpetrators or co-conspirators, aiders and abettors, officers, directors, and/or managing agents with the knowledge, control, authority, direction, and/or ratification of the other RICO Defendants.  Plaintiffs will propose further amendments to this Complaint alleging the true names and capacities of the DOE Defendants, and the roles they played, once further information about their participation in the RICO Enterprise is ascertained.

## SUBJECT MATTER JURISDICTION AND VENUE

46.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the case arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*., the Robinson-Patman Act, 15 U.S.C. § 13, and Article III, section 2, clause 1, of the U.S. Constitution, which extends federal judicial power to

"all Cases, in Law and Equity, arising under this Constitution [or] the Laws of the United States," including the grant in Section 11 of the Judiciary Act of 1789 of original federal equity jurisdiction over cases involving more than $500 between a citizen of the state where suit was brought and a citizen of a different state.

47.     The Court has supplemental jurisdiction over all of Plaintiffs' state law claims under 28 U.S.C. § 1367 because they arise from, and constitute part of, the same case or controversy that gives rise to Plaintiffs' federal claims.

48.     This Court may declare the legal rights and obligations of the parties in this action under 28 U.S.C. § 2201 because this action presents an actual controversy within the Court's subject matter jurisdiction.

49.     Venue is proper in this district under 28 U.S.C. § 1391(b) because it is a district in which Plaintiff maintains headquarters and/or substantial business operations, is the district in which all or many of the affected properties are located, and is the district in which a substantial or significant number of the acts giving rise to the action occurred.

50.     Venue is also proper in this judicial district under 28 U.S.C. § 1391(c) because Defendants are subject to personal jurisdiction here.

## PERSONAL JURISDICTION

51.     Exercise of jurisdiction over Defendants Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NOVA WPC, LLC is reasonable and proper in this District because these Defendants are citizens of the Commonwealth of Virginia and because they conduct extensive business activities within Virginia.  For Amazon's claims for violations of 18 U.S.C. § 1962 and Virginia state law, exercise of jurisdiction over these Defendants is proper pursuant to 18 U.S.C. § 1965(a).

52.     Exercise of jurisdiction over Defendants WDC Holdings LLC, Brian Watson, NSIPI Administrative Manager, White Peaks Capital LLC, Villanova Trust, Carleton Nelson,

Casey Kirschner, AllCore Development, LLC, Finbrit Holdings LLC and Cheshire Ventures, LLC is reasonable and proper in this District pursuant to 18 U.S.C. § 1965(b).  The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of these Defendants could otherwise be tried together. For Amazon's state claims, exercise of jurisdiction over these Defendants is proper pursuant to Va. Code Ann. § 8.01-328.1.  These Defendants have knowingly and purposefully transacted business in the Commonwealth of Virginia, contracted to supply services or things in Virginia, caused tortious injury in Virginia by acts or omissions in and out of Virginia, and have an interest in real property in Virginia.  Further, there is substantial nexus between their purposeful availment of the Virginia forum and Amazon's claims.  Ex. 15.  Notably, several Defendants visited Virginia to view potential and actual Amazon real property sites as well as review and execute lease contracts, and utilized instrumentalities located in Virginia and the Eastern District of Virginia to carry out the acts of which Amazon complains.  Defendants thereafter affirmatively directed actions at Virginia and the Eastern District of Virginia by making payments and maintaining business operations here to obtain illicit investment, management, and other benefits on several Virginia commercial development projects.

## FACTUAL ALLEGATIONS

53.    This Second Amended Complaint details how two Amazon former TMs, together with various real estate developers and LLCs, abused their positions and conspired to cheat Amazon out of millions of dollars by coordinating a far-reaching RICO Enterprise with numerous co-conspirators and victims, all for their own personal financial gain.

# I.      AMAZON REAL ESTATE INVESTMENTS

54.     As relevant here, Amazon carefully selects and develops real estate locations that will support its various supply chain and other business operations, including ███████ and warehouses.

55.     During the period in suit, Amazon has invested heavily in sites in Virginia as well as Ohio and California.

56.     Amazon has also executed or explored real estate transactions in other states in which Defendants have had access to company information and initiatives.

57.     A large collection of the sites at issue in this suit are located in this District in Northern Virginia, where Amazon has invested heavily in acquiring and developing new facilities on land that Amazon has either purchased or leased with the assistance of third parties involved in various commercial real estate activities.

58.     Amazon has obtained real estate in and around Dulles, Virginia through two customary real estate deal structures: (i) build-to-suit lease transactions; and (ii) direct purchase transactions.

59.     In build-to-suit lease transactions, Amazon identifies the type of location that would be suitable for an Amazon facility and partners with a commercial real estate developer that is willing to find, acquire, and develop the land for Amazon.  Typically the developer purchases the land and builds the basic shell of the facility (*i.e.*, the external structure), and Amazon then leases the land and shell from the developer for a period of years and designs, builds, and operates the inside of the facility to suit its relevant business needs.

60.     The total lease payments to the landlord-developer are typically calculated to compensate the developer for:  (i) the cost of the land; (ii) the construction cost of the shell; (iii) a

negotiated percentage yield on the cost of the land and shell; and (iv) the developer's operating expenses to act as landlord.

61.     Amazon and/or its affiliates also purchase land outright and subsequently build Amazon facilities on these sites.

62.     Amazon has a multi-step process for selecting suitable land for both lease and purchase transactions that relies on market and internal diligence by Amazon real estate TMs such as Casey Kirschner and Nelson.

63.     Following extensive initial site diligence, an Amazon TM will present the site and financials for "spend" approval based on evidence and representations that the site meets relevant business needs and that its price aligns with relevant market norms.

## II.      THE TM DEFENDANTS' PAY-TO-PLAY SCHEME

64.     The TM Defendants abused their positions of trust at Amazon by steering lucrative contracts and/or business opportunities to co-conspirators in exchange for kickbacks and other benefits they concealed from Amazon in violation of the law and company contracts and policies.

65.     The RICO Defendants are commercial real estate companies and professionals that include at least one investment firm (WDC Holdings, d/b/a Northstar, as well as its owner and alter ego, Brian Watson), various limited liability companies (Defendants Sterling NCP FF LLC, Manassas NCP FF LLC, White Peaks Capital LLC, NOVA WPC LLC, AllCore Development LLC, Finbrit Holdings LLC, Cheshire Ventures LLC, E2M Properties LLC), and a bank trust (Villanova Trust), that conspired with the TM Defendants to exploit Amazon real estate transactions to derive illicit financial gains at the expense of Amazon and its partners and investors.

### A.      TM Defendant Nelson Recruits Casey Kirschner to Amazon

66.     During the period in suit, the TM Defendants served as Amazon's two primary TMs for real estate site identification and selection in Virginia.

67.     Nelson also had responsibility for real estate site identification in other geographies across the Americas (the United States, Canada, and Central/South America).

68.     The TM Defendants previously worked together at the Royal Bank of Canada, and Nelson recruited Casey Kirschner to Amazon's real estate group and served as his mentor and supervisor.

69.     Casey Kirschner reported exclusively to Nelson from November 8, 2017 until June 15, 2019, when Nelson was terminated for misconduct.

70.     Throughout his tenure at Amazon, Casey Kirschner's responsibilities included selecting commercial real estate development partners for Amazon projects, including and specifically Defendant Northstar for the Virginia lease projects at issue in this suit.

71.     At the time of Nelson's termination, Casey Kirschner served as a Principal Real Estate Manager with primary responsibility for Amazon's portfolio in Northern Virginia. *See* Ex. 16.

72.     As detailed below, these comments—combined with reports from a confidential informant that the TM Defendants' misconduct included an elaborate kickback scheme involving Casey Kirschner's brother Christian—identified Casey Kirschner as a significant risk to the company and the integrity of ongoing investigations into the Defendants' unlawful activities. Amazon thus kept its internal investigation highly confidential and arranged for Casey Kirschner to transition his responsibilities to other personnel before his employment was terminated on April 2, 2020.

**B.     The TM Defendants Create a Pay-to-Play Scheme for Amazon Work**

73.     While at Amazon, the TM Defendants conspired to steer lucrative company contracts, business opportunities, and proprietary or otherwise competitively sensitive business information to third parties who provided or agreed to provide the TM Defendants with personal

benefits in exchange thereof.

74.    On information and belief, Nelson continued to work with Casey Kirschner to steer Amazon contracts, business opportunities, and proprietary or otherwise competitively sensitive information to third parties after his termination from Amazon.

75.    The benefits the TM Defendants received as a result of their unlawful conduct took many forms, including kickbacks benchmarked to various transaction fees and funneled through multiple shell entities, disguised lump sum payouts on Amazon transactions, and lavish trips or reciprocal agreements to steer real estate sale or development opportunities to the TM Defendants and their affiliates.

76.    The full scope of the TM Defendants' misconduct is not yet known, but centered around abusing their positions with Amazon to establish a pay-to-play platform for directing company business and resources to third parties who would provide them with personal benefits they concealed from Amazon and its partners.

77.    The TM Defendants were able to conceal their unlawful activities because they exploited their positions to evade company controls on transaction approvals, by knowingly misrepresenting the transactions and concealing kickbacks they had embedded into the deals.

78.    Site diligence is conducted largely through external brokers and agents who report property and market details to Amazon real estate TMs—here the TM Defendants for the period and transactions in suit.

79.    As noted, Amazon TMs have primary responsibility for presenting site diligence and financials for transactional "spend" approval based on evidence and representations that a site meets relevant business needs and its price aligns with relevant market norms.

80.     On information and belief, the TM Defendants exploited this process and abused their positions to conspire with third parties on site diligence inputs, and then manipulated the site presentations within Amazon to secure approval for steering contracts, transactions, and business opportunities to co-conspirators who would provide the TM Defendants with payments or other personal benefits.

81.     For example, the TM Defendants' presentations on several of the Northstar sites represented that the proposed prices were "below market" based on data points the TM Defendants selected, including what they described as "recent site acquisitions made by [Amazon] competitors and other [relevant] developers."

82.     The TM Defendants were able to do this because the lease and purchase transactions involved in their scheme are complex and involve months of diligence and a multitude of data points, contracts, and fee structures linked to dynamic markets and business needs the TM Defendants were in a position to manipulate based on their inside knowledge of Amazon's confidential information, business records, controls, and processes.

83.     The Northstar Lease Transactions alone involved the purchase, development, and lease of nine different properties over a two-year period based on pricing data the TM Defendants were in a position to influence directly, through third parties, and through the selection of prior market "comparables" that, on information and belief, may themselves have been inflated or otherwise tainted by Defendants' unlawful schemes.  The TM Defendants knew this, and, thus, on information and belief, the use of those certain, selected "comparables" by the TM Defendants caused Amazon to pay inflated prices for the properties at issue.

84.     Each of these properties was in turn subject to a host of contracts and development budgets that provided the TM Defendants with opportunities to conceal improper payments in the

form of leasing, development, acquisition, management, or other fees or invoices related to Amazon's overall project cost and expenditures.

85.     These contracts just on the Northstar Lease Transactions involved no less than 50 different parties involved in project development, project finance, tenancy, and miscellaneous project support services (such as insurance and site maintenance) over a multi-year period.[4]

86.     Amazon's investigation of these transactions is ongoing, but has already revealed evidence that the TM Defendants and their co-conspirators successfully concealed their use of certain contracts and fees to execute their unlawful schemes.

87.     Notably and as detailed below, Defendants used acquisition, broker, development, management, and other project fees to fund kickbacks to Villanova Trust that Defendants were able to conceal as a result of the TM Defendants' position with Amazon.

88.     For example, Northstar's equity partner IPI questioned some of the fee provisions in the Northstar Leases as unusual, but the Northstar Defendants represented that the structure reflected Amazon's approval and preferences.

89.     IPI did not have a reason to contest the Northstar Defendants' position until Northstar's COO approached IPI earlier this year to report the concerns that IPI relayed to contacts within Amazon independent of the TM Defendants.  *See* Ex. 32 ("Gilpin Decl.") ¶ 5.

90.     These and other reports of the Defendants' conspiracy revealed that the TM Defendants misrepresented and/or concealed from Amazon their receipt of kickbacks, post-closing payments, fee shares, and other valuable benefits they obtained by abusing their positions within

---

[4]     Notices of Northstar's April 2, 2020 termination from the lease projects were sent to county officials as well as approximately ten construction partners, nine financial institutions and their counsel, and over thirty different entities involved as Lease parties, Tenant Construction Representatives, Guarantors, and project support firms.

the company and converting corporate funds and opportunities to benefit themselves and their co-Defendants.

91.    The TM Defendants' internal recommendations and valuation assessments of the properties at issue in this suit were thus all necessarily infected by material misrepresentations and omissions flowing from the TM Defendants' misrepresentation or concealment of their personal benefits or "shares" in the transactions.

92.    These fraudulent aspects of the transactions caused harm to Amazon wholly apart from any discrete misrepresentations or omissions the TM Defendants made about the market price, market comparables, or acquisition terms on the parcels and contracts in issue.

93.    Amazon would not, under any circumstances, have approved the real estate transactions it entered into with the Defendants had Amazon been aware of their undisclosed conflicts of interests and unlawful referral and other arrangements.

94.    The TM Defendants concealed their communications evidencing their misuse of corporate information and opportunities and their receipt of prohibited personal benefits through the use of personal emails and chats, meetings and trips, and assistance from third parties, including Mr. Atherton and a network of shell entities.

95.    On information and belief, the TM Defendants used the proceeds of their unlawful enterprise, laundered through various trust and third party accounts, to support some or all of three Wyoming limited liability companies—Defendants AllCore, Finbrit, and Cheshire Ventures—they formed while at least one of them was still employed at Amazon.

96.    On information and belief, AllCore received proceeds from the unlawful enterprise and the TM Defendants in turn used funds from AllCore for their personal benefit.

97.     On information and belief, AllCore was formed for the purpose of allowing the TM Defendants to receive funds that flowed through the Villanova Trust, and from Villanova Trust through various entities into AllCore and related entities—all to facilitate the TM Defendants to access the Northstar kickbacks while employees of Amazon.

98.     On information and belief, the TM Defendants' share of the kickbacks received from Northstar were wired through Villanova Trust to another trust organized by Mr. Atherton and ultimately to Defendant AllCore, through which the TM Defendants used the Northstar funds for their personal benefit and accessed at least some funds under the guise of loans.

99.     Mr. Atherton is an attorney barred in Colorado who was previously suspended from practice from November 15, 2013 to February 25, 2014, Ex. 50, due to violations of five separate Colorado Rules of Professional Conduct in connection with financial transactions.[5] Mr. Atherton reportedly assisted clients to exploit a Colorado conservation easement program to obtain millions of dollars in state and federal tax credits.  See Ex. 51.  Bank accounts held in Mr. Atherton's name also have been the subject of forfeitures related to the government's investigation into the scheme that is the subject of this suit.  See Ex. 52.

100.   On information and belief, the TM Defendants knowingly participated in this scheme and hired Mr. Atherton specifically to facilitate this scheme.

---

[5]  Mr. Atherton violated Colo. RPC 1.7(a)-(b) (Version 2002) (limiting a lawyer's permission to represent a client where the representation is directly adverse to another client, or where the representation may be materially limited by the lawyer's responsibilities or interests); 1.8(a) and (f) (Version 2002) (restricting the circumstances in which a lawyer may enter into a business transaction with a client or knowingly acquire a pecuniary interest adverse to the client, and the circumstances in which a lawyer may accept fees for representing a client from one other than the client); 1.3 (Version 2002) (a lawyer shall exercise reasonable diligence and promptness); 1.4(a)-(b) (Version 2002) (a lawyer shall keep a client reasonably informed about the status of a matter, promptly comply with reasonable requests for information, and explain a matter so that a client can make informed decisions); and 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).

101.   The TM Defendants did not disclose the existence of these entities—AllCore, Finbrit and Cheshire Ventures—to Amazon.

102.   The TM Defendants concealed their affiliation to AllCore, Finbrit and Cheshire Ventures by engaging Mr. Atherton to organize them and appear as the sole contact on their registration documents.

103.   Defendant AllCore LLC was formed in March 2018, shortly after the TM Defendants facilitated the award of at least two Virginia lease contracts to Northstar, and Defendant Watson reformed his referral agreement with Casey Kirschner's brother Christian to require "referral" payments on the lease transactions to be paid directly to Defendant Villanova Trust.

104.   The Cheshire Ventures and Finbrit LLCs were likewise formed in Wyoming in June 2019 and September 2019, respectively, immediately following Nelson's termination from Amazon and Casey Kirschner's assumption of Nelson's portfolio and responsibilities in Amazon's real estate division.

105.   All three Wyoming LLCs—AllCore, Finbrit, and Cheshire Ventures—were formed and organized by Mr. Atherton.

106.   On information and belief, one or both of the TM Defendants had a preexisting relationship with Mr. Atherton and retained or otherwise engaged him to organize the LLCs for the TMs' benefit.

107.   On information and belief, the TM Defendants planned to use AllCore to continue misappropriating Amazon information or opportunities for their own benefit after they were terminated from Amazon, and used the proceeds of their unlawful activities to fund AllCore, Finbrit, and/or Cheshire as vehicles for their personal gain and platforms for soliciting and

rewarding co-conspirators who helped them profit from Amazon information or opportunities at the company's expense.

108.   Due to the nature of their positions with the company and the transactions they handled, the TM Defendants were able to conceal all of these activities from Amazon until a confidential informant formerly associated with Defendant Northstar exposed part of their scheme in December 2019.

### C.   Confidential Informant 1 Reports Defendants' Kickback Scheme

109.   On or about December 2, 2019, an individual formerly affiliated with Defendant Northstar ("Informant 1") emailed an Amazon executive and asked whether Amazon "[w]ould . . . care to hear about a couple of [Amazon] employees who have taken kick backs in excess of $8,000,000 maybe as high as $50,000,000[?]"  Ex. 2.

110.   During a series of phone calls with members of Amazon's legal compliance team in late 2019 and early 2020, Informant 1 claimed to have personal knowledge of Northstar's payment of millions of dollars in kickbacks on Defendants' real estate transactions with Amazon, and stated his belief that the scheme had been ongoing since January 2018.

111.   Informant 1 specifically alleged that Defendants Watson and Northstar agreed to pay a percentage of all revenue Northstar received on Amazon deals to Villanova Trust, of which TM Defendant Casey Kirschner's brother, Christian Kirschner, was the trustee.

112.   The payments from Northstar to Villanova Trust were made pursuant to a kickback agreement, styled as a "referral agreement," executed by Northstar's CEO Brian Watson and Christian Kirschner.  Informant 1 also specifically alleged that Northstar, at the direction of its CEO Brian Watson, had caused payments to be made to the TM Defendants in return for their directing certain lease transactions to Northstar, under which Northstar would act as Amazon's commercial real estate development partner for those transactions.

113.    The Northstar Defendants' own filings in this action corroborate this account and establish that in 2018, in connection with their execution of their first Lease Transactions with Amazon, Watson specifically reformed a prior referral agreement with Christian Kirschner to direct payments on the Amazon projects directly to Villanova Trust.  Dkts. 39–40; 99.

114.    Financial records further corroborate that Villanova Trust then funneled the kickbacks to accounts maintained for the benefit of the TM Defendants.

115.    Informant 1 asserted that Defendant Brian Watson was directly involved in the formation of this scheme, including through revisions to Northstar's referral agreement with Villanova Trust and its sole Trustee Christian Kirschner, whom Watson recently described as "one of [his] best friends."  Ex. 1.

116.    Informant 1 provided Amazon with evidence of at least $4.6 million in payments from Northstar to Villanova Trust as of December 14, 2018, and estimated that total payments that would be payable from Northstar to Villanova Trust could amount to $30-40 million through late 2019, and over $50 million over the life of the relevant commercial leases.

117.    The federal forfeiture action the United States filed in this District on June 1 corroborates the subsequent transfer of several million dollars of these funds from Villanova Trust to at least one First Western Trust account held for the benefit of the TM Defendants, which Casey Kirschner then used to fund the personal real estate project at issue in the forfeiture action.

118.    Informant 1 further disclosed that, in addition to Brian Watson, other Northstar personnel may have had knowledge and/or involvement in the kickback scheme.

119.    Informant 1 provided Amazon with several documents, including what appeared to be a partially redacted email string between defendant Watson and other Northstar employees, in which Watson requested a report on the total fees Northstar had paid to Villanova Trust.  Informant

1 also provided what he described as a draft of the referral/kickback agreement between Northstar and Villanova that facilitated Defendants' kickback scheme on the Lease Transactions.

120.    Informant 1 separately provided Amazon with information about fraud and kickbacks on the White Peaks Purchase, including that two former Northstar employees used Defendants White Peaks Capital LLC and NOVA WPC LLC to facilitate that transaction through the same Amazon TMs that facilitated the Lease Transactions. These activities were memorialized in recorded conversations and payment records.

121.    Informant 1's report in December 2019 prompted an immediate and extensive internal investigation that remains ongoing and continues to uncover additional evidence of the RICO enterprise involving Virginia development projects and potentially involving transactions in at least four other states.

**D.    The TM Defendants' Pay-To-Play Scheme Furthered the Unlawful RICO Enterprise**

122.    Since December 2019, Amazon has uncovered significant evidence of the RICO Defendants' pay-to-play scheme and its connection to multiple unlawful enterprise activities involving real estate lease and purchase transactions at Amazon's expense, including the conduct relating to Lease Transactions and Direct Purchases as alleged in Amazon's initial complaint, First Amended Complaint and elaborated herein.

123.    The internal investigation prompted by Confidential Informant 1's December 2019 report encompassed a review of the TM Defendants' company records, including an examination of Casey Kirschner's Amazon laptop.

124.    This examination revealed that Casey Kirschner copied approximately 375 documents onto a USB device the night before he surrendered the laptop for the requested IT scan.

125.     Many of these files referenced confidential Amazon business transactions, including on the Northstar Virginia sites.  MacDonald Decl. ¶¶ 3–4.

126.     The Amazon IT inspection of Casey Kirschner's electronic files identified a remnant file in the Recycle Bin of his laptop, with a partial file name reading "Downloads\Villanova Trust Executed.pdf." A metadata inspection indicated that the file was saved to the laptop Downloads folder on or about May 8, 2019, but was subsequently deleted from the laptop.

127.     Amazon's IT inspection of Casey Kirschner's company files also uncovered a spreadsheet that appeared to be a rough calculation of the fees Casey Kirschner and his co-conspirators expected and agreed to receive on six different build-to-suit deals, including "Shaw Rd.," "Quail Ridge," "Manassas," "Lerner," "Route 50," and "DTC."  *Id.* at ¶¶ 5, 18; Ex. 10.

128.     The referenced fees on these transactions, several of which concern Northstar-affiliated Lease Transaction sites, total  $37.1 million, with the author's total "Share" indicated as $14.5 million.  Ex. 10.  The spreadsheet was recovered from the laptop's Recycle Bin, indicating an attempt to delete the file.  *See* MacDonald Decl. ¶ 18.

129.     Amazon found other suspicious information in Casey Kirschner's files, including an Outlook back-end AppData folder containing a Northstar spreadsheet itemizing purported Northstar costs on the Amazon Manassas Leased Transaction deals.  Ex. 17;  MacDonald Decl. ¶ 6.  On the lower right-hand side of the document, someone had calculated a "Leasing Fee" of $1,656,148, which approximates the $1.6 million Leasing "Commission" that Casey Kirschner had projected for the Manassas transactions.  Ex. 17.  And evidence that the parties have placed in the case record since Amazon filed this suit in April—including Colorado audio recordings of former Northstar principals and sworn witness testimony submitted with the parties' May 14 and

18 PI filings—confirm the TM Defendants' involvement in the RICO Enterprise.  *See* Ex. 8.  This evidence is documented throughout the PI record.  *See* Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99.  And it includes documentation that Defendant Watson reformed a prior agreement with Christian Kirschner to direct Amazon-related payments directly to Villanova Trust, and that the Northstar Defendants considered themselves Amazon's agents when they extracted a multi-million dollar payment on the White Peaks sale, which the TM Defendants sought to include in their pay-to-play scheme and for which they received a seven-figure payment from the White Peaks Defendants.

130.    This and other evidence contradicts Defendant Watson's assertions to the FBI and Amazon business partners in April that the (undisclosed and/or prohibited) "fees" that Northstar paid Villanova Trust on the Virginia real estate transactions were "not sent" to the TM Defendants. It also corroborates that Northstar's engagements were not "competitive," but were instead facilitated by the TM Defendants in violation of Amazon's Code of Conduct, ███████████ ███████████ and CNIAA Agreements governing the TM Defendants' conduct during and after their employment with Amazon.

131.    As relevant here, Amazon's  Code of Conduct requires Amazon personnel to, among other things:  (i) act "lawfully, ethically, and in the best interests of Amazon.com"; and (ii) "avoid" and "promptly notify the Legal Department" of any potential "conflict of interest" such as "when an employee or a family member receives a personal benefit as a result of the employee's position with Amazon.com."  Ex. 18.

132.    Both TM Defendants were aware of the policy and agreed to abide by it.

133.   Defendant Nelson repeatedly certified compliance with Amazon's Code of Conduct during the time he was working on the Amazon transactions at issue in this action and received both online and in-person training related to the Code of Conduct.  Ex. 53.

134.   Defendant Casey Kirschner also certified compliance with Amazon's Code of Conduct during the time the he was working on the Amazon transactions at issue in this action, and received both online and in-person training related to the Code of Conduct as recently as this year.

135.   The Code of Conduct is complemented ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as well as by specific contracts Amazon employees sign, including the CNIAA Agreements that each of the TM Defendants executed as a condition of their employment with the company.



138.   The TM Defendants took advantage of the fact that ▮▮▮▮▮▮▮▮▮

139.   These CNIAA Agreements contain several provisions relevant to this suit, and that the TM Defendants breached as detailed below.

140.   The CNIAA Agreements expressly state that each TM Defendant has read or acknowledged all of the Agreement's terms and enters into them freely.

141.  In particular, Casey Kirschner's 2015 CNIAA Agreement states that he has "carefully read all of th[e] Agreement's terms," that Amazon "has been induced to employ [him] by [his] representation that [he] will abide by and be bound by each of the covenants and restraints in th[e] Agreement," and that he "recognizes that the restrictions in this Section 4 may significantly limit Employee's future flexibility in many ways.  For example, the restriction in Section 4.1 bar Employee, for 18 months after the Separation Date, from accepting certain competitive opportunities."  Ex. 56.

142.  Nelson's 2012 CNIAA Agreement states that he is "entering into this Agreement . . . as a condition of [his] employment" with Amazon, that his employment constitutes "consideration" for the "mutual promises" in the Agreement, and that he "recognizes that the restrictions set forth in Sections 2 and 3 of t[he] Agreement may seriously limit [his] future flexibility in many ways," including by "mak[ing] it impossible for ]him] to seek or accept certain opportunities for a period of 18 months after [his] Termination Date."  Ex. 57.

143.  Both Nelson's and Casey Kirschner's CNIAA Agreements provide that "[a]ny breach of this Agreement may cause" Amazon "irreparable harm for which there is no adequate remedy at law" and that "[a]s a result," Amazon will "be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order, or other equitable relief in favor of itself, without the necessity of posting a bond, restraining [TM Defendant] from committing or continuing to commit any such violation." Ex. 56; Ex. 57.

144.  Both Nelson's and Casey Kirschner's CNIAA Agreements expressly limit each TM Defendant's use and disclosure of a defined universe of "Confidential Information."

145.  Casey Kirschner's 2015 CNIAA Agreement defines Confidential Information to include "proprietary or confidential information of Amazon in whatever form, tangible or

intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets." Ex. 56.

146.    Nelson's 2012 CNIAA Agreement similarly defines Confidential Information to include non-public "valuable proprietary information and knowledge of certain modes of business operation" such as "the identity of the Company's business partners, customers, investors, or joint ventures, vendors or suppliers," "pricing or marketing strategies," "future plans," and "any other information gained in the course of the Employee's employment with the Company that could reasonably be expected to prove deleterious to the Company if disclosed to third parties." Ex. 57. Among other things, Casey Kirschner's 2015 CNIAA Agreement states that he agrees to "hold all Confidential Information in strictest confidence and will not acquire, use, publish, disclose, or communicate any Confidential Information except as required in connection with Employee's work without the prior written approval of an authorized officer of Amazon." Ex. 56 § 3.1 (Casey Kirschner).

147.    Nelson's 2012 CNIAA Agreement similarly states that he "agrees [he] shall not, directly or indirectly, at any time, during the term of [his] employment with the Company or at any time thereafter . . . use or cause to be used any" non-public "Confidential Information" acquired from or during his tenure with the Company "in connection with any activity or business except the business of the Company, and shall not disclose such Confidential Information to any individual, partnership, corporation, or other entity unless such disclosure has been specifically authorized in writing by the Company, or except as may be required by any applicable law." Ex. 57 § 2(b).

148.   Both Agreements also contain robust "non-competition" provisions addressed to each TM Defendant's activities while employed with Amazon, as well as for periods of 12 and 18 months following their termination dates.

149.   These "non-competition" provisions include the following, non-exhaustive restrictions:

| Casey Kirschner Agreement | Carleton Nelson Agreement |
|---|---|
| **18-month Provisions** ||
| "During employment and for 18 months after the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant), engage in or support the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by Amazon (or intended to be sold, offered, or otherwise provided by Amazon in the future) that Employee worked on or supported, or about which Employee obtained or received Confidential Information"; "During employment and for 18 months after the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) accept or solicit business from any Customer of any product or service that Employee worked on or supported, or about which Employee obtained or received Confidential Information; or (b) encourage any Customer or Business Partner to cease doing business with Amazon or to terminate or limit an existing relationship or arrangement with Amazon." Ex. 56 §§ 4.1 - 4.2. | "While employed by the Company and for a period of 18 months after the date the Employee cases to be employed by the Company . . . the Employee will not, directly or indirectly, and whether or not for compensation, either on [his] own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venture, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the Company), knowingly: (i) accept or solicit employment with, or accept or solicit a consulting assignment with, or accept or solicit investment capital, directly or indirectly, from any individual or entity . . . from which the Company has accepted investment capital, or with which, prior to the Termination Date, the Company has held serious discussions regarding the possibility of securing investment capital ("Investors or Prospective Investors"), provided, however, that this Section 3(c)(i) shall not apply to Investors or Prospective Investors that are introduced to the Company through the efforts of the Employee; or . . . (iv) enter into or propose to enter into any business arrangement with any entity with which, prior to the Termination Date, the Company was involved in substantially the same business arrangement, or with which, prior to the Termination Date, the Company |

| CASEY KIRSCHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| | had held discussions regarding the possibility of entering into such an arrangement, if such arrangement would be competitive with or otherwise deleterious to the interests of the Company. Ex. 57 §§ 3(c)(i)-(iv). |
| **12-month Provisions** | |
| "During employment and for 12 months after the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) solicit or otherwise encourage any employee, contractor, or consultant of Amazon ('Amazon Personnel') to terminate any employment or contractual relationship with Amazon; (b) disclose information to any other individual or entity about Amazon Personnel that could be used to solicit or otherwise encourage Amazon Personnel to form new business relationships with that or another individual or entity; or (c) otherwise interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon." Ex. 56 § 4.3. | "While employed by the Company and for a period of twelve (12) months after the date the Employee ceases to be employed by the Company, without regard to when or for what reason if any, such employment shall terminate (the "Termination Date"), the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly employ, or retain as a consultant or contractor, or cause to be so employed or retained, or enter into a business relationship with any person who: (i) is an employee of the Company or has been employed by the Company at any time within the twelve (12) months prior to the date of such act; or (ii) is a consultant, sales agent, contract programmer, or other independent agent retained by the Company; or (iii) has been retained by the Company as a consultant, sales agent, contract programmer, or other independent agent at any time within the twelve (12) months prior to the date of such an act. Ex. 57 §§ 3(b)(i)-(iii). |
| **During Employment** | |
| See above. | In addition to the restrictions above, "[d]uring the period of [his] employment with the Company, the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, |

| CASEY KIRSCHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| | director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly engage in any activity or business which is of the same nature as, or substantially similar to, an activity or business of the Company or an activity or business which the Company is developing and of which the Employee has knowledge. Ex. 57 § 3(a). |

150.    Neither Casey Kirschner's nor Nelson's CNIAA agreement allowed them to engage in the conduct at issue in this suit or to receive kickbacks derived illegally from an abuse of their positions at and the trust previously, and reasonably, placed in them by Amazon.

151.    In any case, and regardless of the contents of the CNIAA Agreements, ███████████ ████████████████████████████████████████████ and the Code of Conduct that the TM Defendants acknowledged at multiple points after they signed the CNIAA expressly prohibit the very conduct in which they nevertheless engaged, *i.e.*, conflicts of interest, bribery, and self-dealing.

152.    Further, Nelson's 2012 CNIAA explicitly prohibits him from using "Confidential Information," which includes "future plans" and "any other information gained in the course of the Employee's employment with the Company that could reasonably be expected to prove deleterious to the Company if disclosed to third parties," "directly or indirectly, at any time, during the term of [his] employment with the Company or at any time thereafter" acquired from or during his tenure with the Company "in connection with any activity or business except the business of the Company, and shall not disclose such Confidential Information to any individual, partnership,

corporation, or other entity unless such disclosure has been specifically authorized in writing by the Company, or except as may be required by any applicable law." Ex. 57 § 2(b).

153. And Casey Kirschner's 2015 CNIAA Agreement prohibits him from using "Confidential Information" in any way without Amazon's "prior written approval." In Casey Kirschner's case, "Confidential Information" is broad and includes "proprietary or confidential information of Amazon in whatever form, tangible or intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets." Ex. 56.

154. Despite this requirement, both Nelson and Casey Kirschner used proprietary and confidential information for their benefit and to Amazon's detriment.

155. Nelson took Confidential Information, including Amazon's future plans for land purchases, as well as information he had learned during his tenure at Amazon, and used it for his own personal gain, including disclosing it to third parties to advance his own interests to the detriment of Amazon, for the purpose of engaging in the enterprise at issue here. *E.g.*, Exs. 58, 59.

156. The TM Defendants violated Amazon's Code of Conduct, the foregoing CNIAA Agreements they signed with the company, and various laws throughout their tenures at Amazon by conspiring to perpetuate such violations after Nelson's termination.

157. These violations involved a host of Amazon business opportunities and transactions, including those involved in the RICO Enterprise at issue in this suit, as well as the use of at least the Cheshire and AllCore LLCs to misuse Amazon information, coopt business opportunities, or otherwise engage in activities that "interfere with the performance by current or former Amazon

Personnel of their obligations or responsibilities to Amazon," Ex. 56 § 4.3 (Kirschner Agreement), or are "competitive with or otherwise deleterious to the interests of the Company." Ex. 57 § 3(c)(iv) (Nelson Agreement), including but not limited to the activities detailed below.

158. As noted, Lease Transaction portion of the RICO Enterprise targeted at least the nine Virginia commercial real property leases that one or both of the TM Defendants steered to the Northstar Defendants between February 27, 2018 and January 13, 2020 (the "Virginia Lease Transactions"). The Direct Purchase portion of the RICO Enterprise in turn encompassed the 2019 White Peaks "flip" transaction in which Amazon bought a Virginia property at approximately $18 million markup from former Northstar employees (the "White Peaks Purchase"), the 2019 purchase of the Blueridge Property which resulted in a $10 million fee paid to Blueridge, as well as the unlawful use of Amazon funds to pursue business opportunities for the TM Defendants, their Wyoming LLCs, and other co-conspirators at Amazon's expense in Virginia and other states. And Amazon's ongoing investigation suggests the likely future scope of these schemes.

159. In all of these transactions, the TM Defendants violated their duties to Amazon and conspired with one another and third parties to misuse company funds, business opportunities, or information to obtain personal benefits or advantages in real estate lease or purchase transactions to the detriment of the company and potentially other market competitors.

160. The scale and complexity of Defendants' enterprise activities underscore the ongoing need for the preliminary injunctive relief the Court awarded on June 5, 2020, particularly given the resources and recent actions of the Defendants in response to this suit, Watson and Northstar's refusal to comply with certain provisions of the preliminary injunction and related discovery ordered by this Court, Dkt. 95, and ongoing internal and criminal investigations.

161.    As detailed in Parts III-V below, the TM Defendants were integral to facilitating at least the ongoing Lease Transaction and Direct Purchase conduct alleged in Amazon's original complaint.  And Amazon's ongoing investigation indicates that the TM Defendants continued their pay-to-play and related enterprise schemes after Defendant Nelson's termination from the company by unlawfully colluding with other named and Doe Defendants to steer Amazon business and competitively sensitive information to their own LLCs and other conspirators.

## III.    THE LEASE TRANSACTION CONDUCT

162.    The Lease Transactions conduct grew in substantial part out of Defendant Northstar's rigged bid for two Virginia development projects the TM Defendants steered to Northstar's CEO Watson at or about the time he executed the 2018 kickback "referral" agreement with TM Defendant Kirschner's brother at Defendant Villanova Trust.

### A.    The TM Defendants Solicit Rigged Northstar Bids for Virginia Leases

163.    Northstar served as a primary developer-landlord for the Virginia Lease Transactions at issue in this suit.  Amazon began its relationship with Northstar in or around September 2017, when Brian Watson, Northstar's CEO, conspired with the TM Defendants to submit a rigged Request for Proposal ("RFP") for certain Virginia real estate development projects. Exs. 19–20, 30.

164.    Defendant Watson's personal relationship with TM Defendant Casey Kirschner began long before Casey Kirschner joined Amazon, and paralleled Watson's longstanding personal relationship with Casey Kirschner's brother Christian Kirschner.  Ex. 21 ("Lorman Decl.") ¶ 7.

165.    Brian Watson also had a personal relationship with Nelson.

166.    On information and belief, Brian Watson and the TM Defendants often communicated with one another through personal emails and chats, including WhatsApp, and during a variety of personal trips and meetings.

167.    These trips included the TM Defendants' participation in a lavish, all-expenses-paid fishing excursion to the Florida Everglades and Casey Kirschner's participation in a luxury hunting trip to New Zealand.

168.    The Kirschner brothers also served as groomsmen at Watson's September 28, 2019 wedding, which TM Defendant Nelson also attended.  *Id.* at ¶ 8.

169.    From February 2018 through January 2020, Amazon executed leases for commercial facilities around Dulles, Virginia with at least four Northstar-affiliated limited liability companies who acted as landlord-developers for the properties:  Dulles NCP LLC; Quail Ridge NCP, LLC; Manassas NCP LLC; and Dulles NCP II LLC.

170.    Northstar's primary equity investor in connection with these Amazon Lease Transactions was IPI NSIPI Data Center Holdings, LLC.

171.    This entity was formed by a partner entity (IPI) that makes real estate investments in technology and connectivity-related real assets.  IPI is not named as a defendant in this action, and is not known or suspected to have endorsed or engaged in any of the conduct at issue in this suit.

172.    As detailed below, Amazon and IPI recently incurred significant costs reforming the leases and related contracts relevant to the sites affected by the RICO Defendants' misconduct and mismanagement, and IPI has since assumed or transferred to other partners all Northstar-related responsibilities on these sites, for which Amazon has approved more than $400 million in Capital Appropriation Requests (*i.e.*, spend requests) since February 2018.  Ex. 22.

173.     The TM Defendants leveraged their personal relationships with Casey Kirschner's brother Christian and his longtime friend, Northstar CEO Brian Watson, to engage the Northstar and Villanova Defendants in the Lease Transaction conduct.  On information and belief, Watson's personal relationship with Casey Kirschner and his brother Christian was Northstar's only preexisting connection to Amazon.

174.     In furtherance of this scheme, the TM Defendants facilitated the award of lease development contracts to Northstar in exchange for Northstar's payment of kickbacks disguised as referral fees to Villanova Trust, whose trustee was Christian Kirschner and which was formed by  Mr. Atherton in 2018 specifically to facilitate the concealed transfer to the TM Defendants of their "referral" payments from Northstar on the Amazon lease projects.  Exs. 6, 25.

175.     The TM Defendants' engagement with Watson and Northstar on the Virginia lease transactions appears to date back to at least mid-2017, when Watson met with Casey Kirschner and Nelson in Seattle.  Ex. 19.

176.     Watson met in Seattle with both individuals on Thursday, August 24, 2017, potentially over dinner.  *Id.*; Ex. 20.

177.     Emails referencing this Seattle meeting indicate that they interacted on a first-name basis, and that Watson referred to Casey Kirschner as "Brother."  Ex. 19.

178.     Email records suggest that at or around the time of the Seattle meeting, Casey Kirschner sent Watson an RFP soliciting terms on which Northstar could partner with Amazon to expand Amazon's build-to-suit facilities in Northern Virginia.  Ex. 5.

179.     On information and belief, the RFP Watson received was simply a pretext the TM Defendants used to justify steering contracts to Northstar on which Northstar would provide kickbacks and other benefits to the TM Defendants.  *See id.*

180.    Northstar had no prior business history with Amazon, and conspired with the TM Defendants to misrepresent its ability to fund and develop the Lease Transaction projects as detailed below.

181.    On or around September 20, 2017, Northstar responded to the RFP.  Ex. 23. Northstar's response contained several representations that induced Amazon to contract with Northstar on the Virginia Lease Transactions at issue here.

182.    *First*, the response assured Amazon of Northstar's "commitment, loyalty, integrity, and honesty" to its business partners, *id.* at 112, and detailed an investment structure accountable to Amazon and investors and insulated from other projects.  Notably, the response stated that each Northstar "investment is orchestrated through a single-purpose limited liability company or fund that Northstar creates and directs," *id.* at 107, and that "Watson[] functions as the managing partner" and shares in the "net profits of [each] investment through designated sharing ratios with the capital partners," *id.* at 109.

183.    *Second*, the Northstar RFP included a proposed lease agreement that contained various representations regarding the disclosure and activities of all "Professional Service Providers."  Ex. 23 at 53.

184.    Like the lease agreements, and the ROFO/ROFR Purchase Agreements Amazon and the Northstar Defendants executed (signed by Watson), the draft agreements Northstar submitted with its RFP response contained a warranty clause stating that the Northstar entities had made no undisclosed brokerage or other fee payments.  *See id.* at 17, 21, 88; Ex. 24 at 7, 207, 209; MacDonald Decl. ¶ 32.

185.     And as detailed in the PI record in this action, the lease agreements at issue in this suit provide that:  "All exhibits and addenda attached hereto are hereby incorporated into this Deed of Lease and made a part hereof."  Ex. 24 at 26; *see generally* Dkts. 41-46, 48, 68-69, 99.

186.     *Third*, the Northstar RFP response proposed the creation of specific Northstar-affiliated entities (the proposed predecessors of Defendant Sterling NCP FF, LLC) that would form a joint venture with IPI to execute Virginia Lease Transactions with Amazon and control the downstream LLCs that would serve as Amazon's landlords for each site.  Ex. 23.

187.     This joint venture (NSIPI Data Center Venture, LLC), a wholly-owned indirect subsidiary of IPI, is the entity that terminated all Northstar-related involvement in the properties on April 2, 2020 based on evidence of the misconduct at issue in this suit.  Ex. 34; Gilpin Decl. ¶ 22–26.

### B.     The TM Defendants Secure Approval of the Rigged Northstar Bids

188.     Acting under Nelson's supervision, TM Defendant Casey Kirschner prepared and presented the internal real estate justifications and recommendations for the Northstar properties within Amazon.

189.     As a result of these efforts, Amazon approved the lease contract awards to the Northstar Defendants.

190.     These approvals were integral to the RICO Enterprise and fraudulently induced by both the TM Defendants, who did not disclose their personal relationships and kickback agreement with Northstar and Villanova Trust, and also by the Northstar Defendants, who deliberately misrepresented and/or concealed from the company their arrangements with the TM Defendants and Villanova.

191.     These arrangements were in place before the Northstar parties signed their first leases with Amazon, as evidenced by the fact that the "Sterling NCP I, LLC" referenced in

Northstar's 2018 kickback ("Independent Contractor") agreement is the same entity referenced in Northstar's September 20, 2017 RFP response to Amazon, *see* Ex. 23, which designated Sterling I NCP, LLC as one of the two Northstar entities—the other being Sterling II NCP, LLC, *id.* at 6—that would execute the two initial Virginia Lease Transactions with Amazon.

192.   These and other misrepresentations and omissions by the Northstar Defendants fraudulently induced Amazon to enter the Lease Transactions, and thus rendered the related contracts with the Northstar Defendants voidable at Amazon's election.

193.   Further, and to the extent these agreements were or are legally enforceable against Amazon, the Northstar Defendants' kickback arrangement with the TM Defendants breached them.

194.   Like the RFP response, the initial Lease agreements between Amazon and the Northstar-affiliated landlord LLCs warranted that:  (i) there "are no management agreements, service, maintenance or *other contracts* . . . relating to the Project . . . other than those" that were "disclosed in writing" to Amazon; (ii) the Northstar parties "dealt with *no brokers, finders or the like* in connection with this transaction,"; and (iii) Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting or professional fees and costs incurred in connection with lease negotiations."  Ex. 24 at 7, 207, 209; MacDonald Decl. ¶ 32.[6]

195.   Further, in signing each Lease, Defendants warranted that "[n]o . . . agreements, oral or written, have been made by Landlord [Defendants] . . . which are not contained in the . . . Lease Documents."  Ex. 24 at ¶ 33.

196.   In the immediately ensuing paragraph, titled "Brokers," Northstar "represent[ed] and warrant[ed] that it has dealt with no broker, agent or other person in connection with this

---

[6] All emphasis herein is supplied unless otherwise noted.

transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth [at the start of the] Lease." *Id.* at ¶ 34.

197.   In all of the Leases at issue in this action, the "Brokers" line on page 1 states "N/A," *id.* at 1, even though the 2018 Villanova Agreement expressly designates as "Brokerage Fees" on the Amazon Virginia Lease Transactions, Ex. 6 at 2, ¶ 2.5, the multi-million dollar kickback payments that Northstar made to Villanova Trust, MacDonald Decl. ¶ 25; Ex. 10.

198.   The executed Lease Agreements' "Broker" provision required that Northstar "represent[] and warrant[] that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth at the beginning of this Deed of Lease, whom Landlord agrees to compensate per separate agreement (a copy of which will be provided by Landlord to Tenant)[.]" Ex. 24 at ¶ 34.

199.   Northstar "set forth" no Brokers at the beginning of the Deed of Lease. Ex. 24.

200.   Instead, the lease states "N/A" next to "Brokers." Ex. 24 at 1. And in any case, the Northstar Defendants never provided Amazon with a copy of a separate agreement.

201.   



Ex. 65, 66.

202

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████

203.  █████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

204.    There are no provisions in either the Lease Agreements or the ███████████
███████████ indicating that it would be permissible for Northstar to have engaged the Villanova Trust as its undisclosed broker.

205.    The Lease Agreements also prohibits corrupt activities, specifically noting "bribes." Ex. 24.

206.    The "Anti-Corruption" provision in the Lease Agreements states: "Landlord acknowledges that Tenant's Code of Business Conducts and Ethics ("the Code") prohibits the paying of bribes to anyone for any reason, whether in dealings with governments or the private sector. Landlord will not violate or knowingly permit anyone to violate the Code's prohibition on bribery or any applicable anti-corruption laws . . . Landlord will maintain true, accurate and complete books and records concerning any payments made to another party by Landlord under

this deed of lease . . . Landlord will provide written notice to Tenant regarding all pertinent facts relating to any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection with activities performed by Landlord pursuant to this Deed of Lease." Ex. 24 at ¶ 40.

207.   Similarly, Exhibit F to the Lease Agreements lists a provision entitled "Code of Conduct," which states "Grantor acknowledges Grantee's Code of Business Conduct and Ethics . . . [that] prohibits the paying of bribes to anyone for any reason," and "Grantor will promptly provide written notice to Grantee regarding all pertinent facts relating to any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection with any activities performed by Grantor pursuant to this agreement . . . Grantee may immediately terminate or suspend performance under this Agreement if Grantor breaches this section." Ex. 24 (¶ 12 of Exhibit F).

208.   The ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

209.   The Northstar Defendants violated this provision of the Lease Agreement by paying kickbacks, which are bribes.

210.   Northstar Defendants further violated this provision by not disclosing their actions to Amazon in writing (or otherwise).

211.   Northstar's representations about undisclosed brokerage or similar arrangements on the Lease Transactions were false when made, because at least a month before the initial lease agreements were signed in February 2018—by Watson, personally--Northstar negotiated and executed the kickback ("Independent Contractor") agreement with Villanova's Trustee for "Business Development" services effective January 8, 2018.  Exs. 6, 25.  Notably, the appendix to this agreement details a compensation schedule including "Development Fees," "MP Profits," "Brokerage Fees," and "Leasing Fees" for "Project Name Sterling NCP I, LLC," Ex. 6, the entity Northstar created to handle the first two Virginia Leased Transactions.

212.   The Independent Contractor agreement itself is signed by Watson, *see id.*, and identifies Villanova Trust, through its Trustee, Christian Kirschner, as the "Contractor" entitled to the payments in the fee schedule, *id.*, which Villanova subsequently funneled to First Western Trust and/or other accounts held for the benefit of the TM Defendants.

213.   On information and belief, Villanova Trust did not perform any legitimate services that would justify its receipt of fees associated with the Lease Transactions.

214.   On information and belief, Mr. Atherton helped the TM Defendants to establish Villanova Trust as a vehicle for them to receive kickback payments from fees Northstar had obtained through its lease transactions with Amazon.

215.   On information and belief, Brian Watson and the TM Defendants all were aware that the purpose of the Villanova Trust was to hide from Amazon the fact that Nelson and Casey Kirschner would each receive a share of the money payable from Amazon to Northstar under the lease transactions and in fact designed this structure to accomplish that aim.

216.   On information and belief, Nelson and Casey Kirschner could and did access a portion of the funds Northstar wired to Villanova Trust, which transfers evaded detection because by means of a sophisticated and interlocking web of interstate bank accounts.

217.   On information and belief, the Villanova Trust could and did wire funds deposited into the Trust to other accounts or trusts that would, in turn, wire the funds to AllCore.

218.   On information and belief, Nelson and Casey Kirschner could and did obtain for their personal use funds wired from these other accounts or trusts to AllCore in the form of sham "loans."

219.   On information and belief, Mr. Atherton structured AllCore as a legitimate business when in reality AllCore was primarily, if not entirely, a mechanism through which the TM Defendants could collect illicit funds without detection.

220.   For the foregoing reasons, and by the foregoing means, the TM Defendants conspired with the Northstar Defendants fraudulently to induce Amazon to do business with the Northstar Defendants on terms that were false, misleading, and violated the RICO Defendants' legal duties to the company.

221.   The Northstar Defendants also engaged in conduct, both independently and in concert with Villanova Trust, that breached the terms of the Lease Transaction contracts that they fraudulently induced, and in April of this year IPI terminated and rescinded those contracts with respect to the Northstar Defendants and reformed them with Amazon.

222. The conduct of the Northstar Defendants and Villanova Trust also aided and abetted the TM Defendants' acts in breach of the TM Defendants' employment agreements and other legal duties to Amazon.

### C. The Northstar and TM Defendants Conspire on Lease Execution

223. To execute the agreed kickback scheme on the rigged Lease Transactions, Northstar had to do more than just form the primary LLCs it used to execute its initial Lease Transactions with Amazon. It had to ensure that those LLCs could purchase and develop the covered real estate sites on the terms specified in the contracts. These obligations posed a significant problem for Northstar, which did not have the capital or capability to fund the acquisition or perform the development work its contracts required.

224. The Northstar Defendants thus conspired with the TM Defendants to obtain an equity partner, lender support, and construction and other development contracts for the Lease Transaction sites on terms that fraudulently concealed the unlawful aspects of their scheme from these partners, and relied on the TM Defendants' positions and authority at Amazon to deflect or otherwise suppress inquiries about fees and contract provisions that the RICO Defendants' site partners questioned or identified as suspicious.

225. IPI is the entity Northstar approached, and ultimately secured, as an equity partner to supply capital necessary to purchase and develop the Amazon lease sites. IPI has experience entering into joint ventures (JVs) with other firms in order to combine resources on development projects, and often serves as a capital provider as part of its role in JVs and partners with firms that serve primarily as developers for real estate developments. Gilpin Decl. ¶ 3.

226. IPI was introduced to Brian Watson and Northstar in January of 2018 by third-party brokers who were helping Watson source capital for a real estate development where Amazon was to be the sole tenant ("Shaw Road"). Together, IPI and Northstar formed the joint venture known

as NSIPI Data Center Venture, LLC, that partnered with Northstar on the Amazon Lease Transactions.

227.    An IPI affiliate, IPI NSIPI Data Center Holdings, LLC ("IPI NSIPI"), is the sole owner of NSIPI Data Center Venture, LLC, which is now the sole owner of the four downstream LLCs—Dulles NCP, LLC, Quail Ridge NCP, LLC, Dulles NCP II, LLC, and Manassas NCP, LLC (the "Project Entities")—that hold the nine executed leases with Amazon for the shell facilities developed and located on the Virginia real property sites involved in the Lease Transactions (the "Projects").  Gilpin Decl. ¶¶ 3–4.

228.     Watson and Northstar initially reached out to IPI because Northstar did not have the capital to purchase and develop the properties covered by their unjustly-obtained contracts.

229.    Thus, Watson and Northstar leveraged their relationships with the TM Defendants to solicit funding and joint venture support from IPI. Ex. 32 [Gilpin Decl. ¶ 3].

230.    Northstar Commercial Partners Management, LLC and its affiliates, at the direction of Brian Watson, was originally the developer, property manager, and asset manager for IPI and Amazon on each of the four Projects above.  Gilpin Decl. ¶ 4.  Watson created Defendant Sterling NCP FF, LLC to be a minority equity investor in the Quail Ridge NCP, LLC and Dulles NCP, LLC Project Entities.  *Id.*  And he created Defendant Manassas NCP FF, LLC to be a minority investor in the Manassas NCP, LLC Project Entity.

231.    Collectively, Defendants Sterling NCP FF, LLC and Manassas NCP FF, LLC owned approximately 8.4% of the equity interest in all four of the Projects (via an interest in NSIPI Data Center Venture, LLC) until April 2, 2020, when IPI terminated them from the lease contracts and associated Projects based on the misconduct at issue in this suit.  *Id.*

232.    Once formed, the joint venture between IPI and the Northstar Defendants created the four downstream LLCs—Dulles NCP LLC[7]; Quail Ridge NP, LLC[8]; Manassas NCP LLC[9]; and Dulles NCP II, LLC[10]—that Northstar/Sterling managed as the landlords for the leased sites. Watson separately created and controlled (through two intermediary LLCs) a separate entity—Defendant NSIPI Administrative Manager, LLC—to handle this management role.  The following chart depicts the relationships that the Northstar Defendants had with the IPI joint venture and various LLC landlord-developers involved in the Lease Transactions prior to Northstar's termination on April 2 of the this year:

---

[7] On or around January 17, 2018, Northstar and IPI, through NSIPI Data Center Venture, LLC, formed Dulles NCP, LLC in Delaware for the purpose of executing lease agreements with Amazon for the first two Virginia sites at issue here.  Ex. 26.  On or around February 27, 2018, Amazon executed the two lease agreements for these sites with Dulles NCP LLC.

[8] On or around April 6, 2018, Amazon executed lease agreements for four additional commercial sites with Quail Ridge NCP, LLC.  Ex. 22.  Public records indicate that Quail Ridge NCP, LLC was incorporated on January 17, 2018.  Ex. 27 (https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx).

[9] On or around November 1, 2018, Amazon executed lease agreements for two further sites with Manassas NCP, LLC.  Ex. 22.  Public records indicate that Manassas NCP LLC was incorporated on May 16, 2018.  Ex. 28 (https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx).

[10]    On or about January 13, 2020, Amazon executed a further lease agreement for another commercial site with Dulles NCP II.  Ex. 22.  Public records indicate that Dulles NCP II, LLC was incorporated on June 6, 2018.  Ex. 29.



233.    The Deeds of Lease were signed by Brian Watson, who was identified as the "Manager" or "President," on behalf of the landlord entities.

234.    As part of the Lease Transaction conduct, the Northstar Defendants utilized the foregoing network of LLCs to induce and execute the nine Lease Transactions with Amazon since 2018:

| Lease # | Landlord Entity | Date Executed |
|---------|-----------------|---------------|
| 1 | Dulles NCP LLC | February 27, 2018 |
| 2 | Dulles NCP LLC | February 27, 2018 |
| 3 | Quail Ridge NCP, LLC | April 6, 2018 |
| 4 | Quail Ridge NCP, LLC | April 6, 2018 |
| 5 | Quail Ridge NCP, LLC | April 6, 2018 |
| 6 | Quail Ridge NCP, LLC | April 6, 2018 |
| 7 | Manassas NCP LLC | November 1, 2018 |
| 8 | Manassas NCP LLC | November 1, 2018 |
| 9 | Dulles NCP II | January 13, 2020 |

235.    All but one of these Lease Transactions were recommended by the TM Defendants in furtherance of the RICO Enterprise (Lease 9 was recommended by Casey Kirschner because Nelson was terminated in June 2019).

236.    The Northstar Defendants were central to the creation, management, and control of the landlord entities. Watson signed the Deeds of Lease as well as the ROFO/ROFR Agreement on behalf of the landlord entities and was identified as the "Manager." Ex. 24 at ¶ 34. The signed ROFO/ROFR agreement also identifies Watson by name as a Key Individual: "As used herein, the term 'Seller's actual knowledge,' and like phrases, means to the actual direct present knowledge of Seller's Manager and Brian Watson (collectively, the 'Key Individuals')."

237.    As detailed below, all of the transactions were tainted by kickbacks reflected in at least nine lease-related payments from Northstar to "Villanova Trust" from March 7, 2018 to August 7, 2019. Exs. 7, 11, 14, 30–31.

238.    Specifically, Northstar (through its alter ego WDC Holdings) made payments of at least $5.11 million between March 2018 and August 2019 to Villanova Trust referencing at least four of the landlord LLCs Northstar created to manage nine separate Amazon Lease Transactions: Sterling (Leases #1, 2), Quail Ridge (Leases #3, 4, 5, 6), Dulles (Lease #9), and Manassas (Leases #7, 8).

239.    Notably, "Amazon would not, under any circumstances, have approved the real estate transactions it entered into with Northstar organized by the TM Defendants had Amazon been aware of the undisclosed conflicts of interest and 'referral' agreement arrangement between Northstar and Christian Kirschner/Villanova Trust described in detail" in Amazon's complaint. Dkt. 59 at ¶ 20.

### D.    2020 Corroboration of the RICO Enterprise from Northstar COO Timothy Lorman and IPI Vice President Luke Gilpin

240.    In January 2020, Timothy Lorman,[11] who served as Northstar's COO until April of this year, approached Luke Gilpin, the Vice President of IPI Partners in Chicago, and disclosed information and documents substantially corroborating the facts supplied by Informant 1.  *See generally* Gilpin Decl. ¶¶ 2, 10–21.

241.    Mr. Lorman is a long-time reserve Sheriff's Deputy for the Douglas County Sheriff's Office in Douglas County, Colorado.  Lorman Decl. ¶ 4.

242.    Mr. Lorman was the Chief Operating Officer of Northstar from March 25, 2019 to April 7, 2020.  *Id.* at ¶ 2.

---

[11]    Mr. Lorman is the individual referenced as Informant 2 in the original complaint and other documents filed in this matter.

243.     Mr. Lorman personally knows and has interacted with Mr. Gilpin on numerous occasions in Mr. Gilpin's official capacity as Vice President of IPI.  Gilpin Decl. ¶ 10.  Mr. Gilpin first met Mr. Lorman in October 2019, and finds him "competent and trustworthy."  *Id.*

244.     On January 24, 2020, Mr. Lorman told Mr. Gilpin that he wanted to travel from Denver, Colorado to speak with Mr. Gilpin in Chicago, where Mr. Gilpin works for IPI.  Gilpin Decl. at ¶¶ 2, 11.  Mr. Lorman told Mr. Gilpin that the conversation should take place in person. *Id.* at ¶ 11.

245.     Mr. Lorman and Mr. Gilpin met in Chicago on January 28, 2020.  During the meeting, Mr. Lorman asked Mr. Gilpin if he knew of a "special agreement" between Casey Kirschner and Brian Watson.  Gilpin Decl. at ¶ 12.  Mr. Lorman told Mr. Gilpin that he suspected that Brian Watson, former Northstar employees Kyle Ramstetter and Will Camenson, Casey Kirschner, and Casey's brother Christian Kirschner had engaged in misconduct that "violated Northstar's agreements with IPI."  *Id.*  Mr. Lorman also suspected that these individuals could have "violated the leases the entities signed with Amazon, and might have violated the law."  *Id.*

246.     During the January 28, 2020 meeting, Mr. Lorman shared with Mr. Gilpin multiple documents evidencing the RICO Defendants' misconduct at Amazon's expense.  Notably, Mr. Lorman shared an executed version of the Villanova referral/kickback agreement that Brian Watson signed on behalf of Northstar on January 8, 2018.  Gilpin Decl. ¶ 13; Ex. 6.  Mr. Gilpin reviewed the documents and informed IPI's outside counsel of the meeting with Mr. Lorman. Gilpin Decl. at ¶ 14.  IPI then informed Amazon of the meeting.  *Id.*

247.     On or around February 14, 2020, Mr. Lorman provided Mr. Gilpin with at least four documents via Dropbox that further evidenced misconduct by the RICO Defendants at Amazon's expense.  *See* Gilpin Decl. ¶ 15.

248. The first document is a copy of the executed version of the Northstar-Villanova kickback agreement that Lorman shared at the Chicago meeting with Mr. Gilpin.  Gilpin Decl. ¶ 15; Ex. 6.

249. The second and third documents are wire receipts (dated June 7, 2019, and August 7, 2019) evidencing payments from Northstar-affiliated entities to Villanova Trust in connection with certain Virginia Leases at issue in this action.  Gilpin Decl. ¶ 15; Exs. 30, 14.

250. Each wire receipt lists the "Originator Name" as "W D C HOLDINGS LLC" (aka Northstar), the "Beneficiary Bank" as "First Tennessee Bank," and the "Beneficiary" as "Villanova Trust" at "16 Compton Trace Nashville, TN."  *See* Exs. 14, 30.

251. The June 7 wire for $150,000 references "Dulles Final Leasing Payment."  *See* Ex. 30.

252. And the August 7 wire for $321,028.44 references "Manassas Leasing Fee."  *See* Ex. 14.

253. The fourth document that Mr. Lorman provided to Mr. Gilpin is a spreadsheet with a column titled "Referal [sic] - Villanova Owed" with four separate entries totaling $1,497,614.50. Gilpin Decl. ¶ 15; Ex. 7.

254. The first entry lists $250,000 owed for a "Leasing Fee" associated with the "Dulles" "Project."  *Id.*

255. The second entry lists $225,642.60 owed for a "Development Fee (20%)" also associated with the "Dulles" "Project."  *Id.*

256. The third entry reflects $760,210.50 owed for a "Leasing Fee (25%)" associated with the "Quail" "Project."  Ex. 7.

257.    And the fourth entry reflects $211,761.40 for a "Development Fee (20%)" also associated with the "Quail" "Project."  *Id.*

258.    On February 16, 2020, Mr. Lorman provided Mr. Gilpin with additional evidence of the RICO Defendants' misconduct concerning Amazon properties in this District.  This evidence consisted of audio recordings that Defendant Brian Watson directed Mr. Lorman to record of discussions between Watson and former Northstar employees (and White Peaks principals) Kyle Ramstetter and Will Camenson on or about September 27, 2019.   Gilpin Decl. ¶ 16; Ex. 9; Lorman Decl. ¶¶ 9–11.

259.    In these recordings, Watson demands that these individuals pay Northstar millions of dollars in proceeds the White Peaks Defendants realized on their $116 million "flip" sale of a Virginia property to Amazon in July 2019.

260.    Mr. Lorman and Mr. Gilpin had further conversations this spring concerning Mr. Lorman's "ongoing suspicions regarding potential misconduct by Brian Watson and Northstar relevant to [IPI and Northstar's] business relationship and work for Amazon in Virginia."  Gilpin Decl. ¶ 18.  Notably, Mr. Lorman and Mr. Gilpin discussed "on multiple occasions" Mr. Gilpin's discovery that Kyle Ramstetter "had signed" while at Northstar and "without authorization, multiple contracts and change orders related to the [Amazon] Projects [in Northern Virginia]."  *Id.* at ¶ 19.  Mr. Gilpin stated that this unauthorized conduct put the (Northstar-managed) landlords to whom Amazon rendered payments "in default under their respective credit agreements."  *Id.*

261.    Mr. Lorman also reported that "multiple Northstar employees were involved in matters relating to Brian Watson's personal finances," and that Watson had "received into a personal bank account a deposit of approximately $5 million" that Mr. Lorman understood to comprise "part of a settlement" between Watson, Kyle Ramstetter, and Will Camenson on the

White Peaks transaction proceeds that Watson demanded Ramstetter and Camenson pay Northstar in September 2019.  Gilpin Decl. ¶ 21.

262.    After Mr. Gilpin received the information and corroborating documents and files from Mr. Lorman in February 2020, *see infra* ¶¶ 97–102, he promptly shared them with IPI's outside counsel, who in turn shared them with Amazon.  *See* Gilpin Decl. ¶ 17; Dkt. 44 ¶ 12.  IPI also shared "numerous examples" of Northstar's and Brian Watson's failures to "appropriately manage and comply with" requirements found in contracts governing the affected Virginia real property sites that Amazon would not have executed but for the RICO Defendants' and their co-conspirators unlawful conduct, as well as Brian Watson's failures to "appropriately manage and comply with project requirements."  Gilpin Decl. ¶ 6.

263.    For example, in April 2018 Northstar told IPI that Amazon had instructed Northstar "to include certain fees in the [Northern Virginia] Projects" that "were excessive."  Gilpin Decl. ¶ 5.

264.    But Northstar represented to IPI "that an Amazon employee had nonetheless instructed Northstar to include them"—a representation on which IPI reasonably relied based in part on the Northstar Defendants' relationship with the TM Defendants.  *Id.*

265.    On information and belief, Casey Kirschner requested that Northstar add and/or increase fees to the budgets for the Lease Transactions to increase the amount of fees that he would receive through the Villanova Trust, which thereby increased the cost of the transaction to Amazon.

266.    For example, the first Virginia Lease Transaction contained a leasing fee of 0.5%, which was equivalent to an anticipated $300,000 for that transaction.  The next Northstar budget, however, increased that fee to 2%, which was equivalent to an anticipated $1,013,614 for that transaction.

267.     Amazon also learned of numerous instances in which Northstar failed to "appropriately manage and comply with project requirements,"  Gilpin Decl. ¶ 6, including the delivery of draw packages, operating reports, budgets, compliance packages, and operating expense details.  Gilpin Decl. ¶ 7.  These failures resulted in:

   i.     "Five credit agreement defaults or draw stops" that resulted in the halt of necessary property development funding from relevant lenders;

   ii.    Late payments (in some cases by months) to multiple vendors;

   iii.   Multiple breakdowns in financial reporting to Amazon; and

   iv.    Unauthorized execution of construction contracts and change orders totaling more than $50 million.

*Id.* ¶ 7.

268.     All of these failures caused damage to Plaintiffs in amounts to be determined in the course of these and related legal proceedings.

269.     As a result of this and other mismanagement by Northstar, the Shaw Road and Manassas projects were not scheduled to be completed on time and exceeded their budgets.  *Id.* ¶ 8.

270.     These and additional actions taken by the RICO Defendants resulted in both actual and anticipated harm to Amazon, including but not limited to the payment by Amazon of rent inflated by kickback fees; the establishment of lease agreements that contemplate rent amounts inflated by kickback fees; and adverse impact to Amazon's relationships with its business partners, including IPI, banks, and investors.  And to the extent that IPI or others absorbed these costs, they are additional victims of the RICO Enterprise.  Amazon has thus suffered irreparable harm to its goodwill and business relations due to the RICO Defendants' misconduct.

271.     These acts and other contract breaches, along with the underlying fraud and other unlawful acts that precipitated them, damaged Amazon, IPI, and their business partners, and

compelled the Northstar Defendants' for-cause termination from involvement with the Lease Transaction Projects and contracts on April 2, 2020. *Id.* ¶ 22–25.

### E. Northstar's April 2, 2020 Termination from the Lease Transactions

272. The foregoing and other evidence of the RICO Enterprise as it relates to Lease Transactions established that Northstar's continued involvement with the nine Virginia lease sites detailed above presented an imminent risk to the integrity and goodwill of Amazon's business relationships, as well as an opportunity for the RICO Defendants and those acting in concert with them to spoliate evidence and convert assets central to ongoing legal investigations. Accordingly, Amazon and IPI devoted significant resources to transitioning and ultimately removing Defendants Watson, Northstar, Sterling, Manassas, and Administrative Manager from their roles in the Virginia Lease Transaction sites this spring. *See generally* Gilpin Decl. ¶ 22–26; Ex. 34.

273. On February 19, 2020, Amazon and IPI agreed to reform the leases and management contracts at the Northstar-affiliated Virginia Lease Transaction sites to facilitate this transaction and the Northstar Defendants' termination. IPI relied on its ability to exercise its "majority interest" authority over the joint venture that controls the Landlord LLCs for the relevant properties ("Dulles NCP, LLC, Quail Ridge NCP, LLC, Dulles NCP II, LLC and Manassas NCP, LLC") to remove the Watson/Northstar-affiliated Sterling entities from both the joint venture and their involvement with the Landlord LLCs and the properties.

274. As part of this reformation, Amazon and IPI agreed it was critical to avoid any interruption in the development or construction of the unfinished Northstar-affiliated Virginia Lease Transaction sites and the operation of all Northstar-affiliated Virginia Lease Transaction sites. It was also understood that any delays or interruptions would cause Amazon substantial damage.

275.    These understandings are reflected in the 2020 Lease Continuity Agreement between Amazon and IPI, which contains a clause guaranteeing completion of the Virginia Lease Transaction sites and Amazon's right to "uninterrupted quiet enjoyment."  To accomplish these objectives, the Agreement contemplates "removal steps" under which IPI would "(i) terminate or cause to be terminated all agreements" that each Landlord and Administrative Manager had with the Northstar Defendants to ensure that the Northstar Defendants were removed or rescinded from all agreements with Amazon and IPI on the Lease Transaction Projects; (ii) cause another entity "to assume responsibility for completing the construction of the Unfinished [Northstar-affiliated Virginia property sites]"; and "(iii) terminate, or otherwise remove Administrative Manager from, any other [relevant] agreement."

276.    In early April 2020, IPI executed its obligations under the Lease Continuity Agreement with Amazon by, among other things, terminating the Watson/Northstar-affiliated rights and interests in the Lease Transaction sites, transitioning vendor obligations, and demanding the Northstar Defendants' return of books, records, and business information central to the integrity of Plaintiffs' legal and business interests.  Ex. 34; Gilpin Decl. ¶¶ 22–26.

277.    Specifically, on April 2, 2020, IPI sent a formal Termination Letter to Northstar and Watson notifying them of the Cause Event for their termination and IPI's Election of Remedies as controlling stakeholder in the joint venture parent of the four landlord-developer entities for the relevant Virginia lease sites.  This letter effected the immediate removal of Watson and several Northstar affiliates (NSIPI Administrative Manager, LLC, Sterling NCP FF, LLC, and Manassas NCP FF, LLC) from the joint venture and associated landlord-developer companies.  Ex. 35.

278.    IPI coupled its April 2, 2020 Termination Letter to Defendants Watson and Northstar with required notices to other affiliates and partners.  Ex. 34.

279.     The Termination Letters removed Northstar-related persons and entities from the NSIPI Virginia development joint venture and its affiliated landlord LLCs.

280.     All of these termination actions were necessary to protect Amazon goodwill and business relationships at the relevant properties, and to mitigate site development costs and other damages that Amazon and/or its partners suffered as a result of the fraud and other unlawful conduct by the Lease Transaction Defendants.  This conduct caused costs on Amazon projects to exceed budgets, caused budgeted costs to be diverted to kickbacks and other unauthorized and unlawful payments, and fraudulently induced and caused Amazon to engage in business with partners that did not deliver the value they represented and contracted to provide, and whose work for the company Amazon would not have approved but for the RICO Defendants' unlawful acts.

**F.     June 2020 Federal Forfeiture Action and May 2020 Forfeiture Notices**

281.     The full scope of the fraud, kickback, and other unlawful activities encompassed by the Lease Transaction conduct is not yet known.  But recent proceedings in this action, as well as a parallel forfeiture action the United States filed in June and related seizures in public notices, directly connect it to the TM Defendants.

282.     The United States filed a forfeiture action in this District indicating that, from August 2018 to August 2019, "the Villanova Trust wired approximately $3,375,625 to a bank account maintained for the benefit of" the TM Defendants.  Ex. 12 at ¶ 10. The forfeiture complaint, which was filed against property owned by TM Defendant Casey Kirschner, further states that Casey Kirschner "has admitted accepting funds from [Northstar] associated with [his] job with [Amazon]," that Northstar "paid the kickbacks to the Villanova Trust associated with the [Amazon] development deals in Northern Virginia," ¶ 13, and that the TM Defendants also "received or benefitted from approximately $5,818,955 from other developers in 2019 for [Amazon] projects in Northern Virginia." *Id.*  ¶ 14.

283.     The government's account of the Northstar kickbacks on the Amazon Lease Transactions at issue in this suit accords with evidence Amazon has obtained in its ongoing internal investigation of the RICO Defendants' unlawful enterprise conduct.

284.     Specifically, on information and belief, the "First Western Trust Bank account ending 3698 maintained for" Nelson and Casey Kirschner that received "$9,194,580.50 in fraud proceeds" (Ex. 12) reflects at least in part wire payments from Villanova Trust to another trust or account (¶¶5–15).  Further, the "seven transfers totaling $6,244,442.19 [that] were made between First Western Trust Bank account ending 3698 and First Western Trust Bank account ending 0525" (Ex. 12) reflect, on information and belief, at least in part wire payments from a separate trust or account (¶16) to AllCore.

285.     On or about December 14, 2018, Brian Watson asked a Northstar subordinate to send him "the template referral agreement" and itemized referral fees for Northstar's "top 10 referral partners," including Villanova Trust.  Ex. 36.

286.     The Northstar employee informed Watson that "V illanova [sic] Trust" had received "$50,000."  *Id.*

287.     Watson then requested "the total amount of fees we have paid to Villanova, or ALL fees . . . . Leasing, sales, development, etc."  *Id.*

288.     The Northstar employee responded that Northstar had paid $4,641,955.40 to Villanova.  *Id.*

289.     On information and belief, funds received by Villanova were subsequently passed through to AllCore for the personal benefit of the TM Defendants.

290.     Whether other entities or individuals covered by Northstar's "template referral agreement" or "top ten referral partners' had a role in the Lease Transaction portion of the RICO

or other unlawful scheme is not clear.  But records obtained from Northstar's former COO Mr. Lorman indicate that at a minimum, the Lease Transaction conduct involving the RICO Defendants continued beyond the December 2018 date on which Northstar records show $4.6 million in payments to Villanova Trust.  In 2019, Northstar sent at least two wires to Villanova Trust with "transaction memo" references to two separate Northstar landlord LLCs (Dulles and Manassas) connected to the Lease Transaction conduct:

| DATE | AMOUNT | TRANSACTION MEMO |
|---|---|---|
| June 7, 2019 | $150,000.00 | Dulles Final Leasing Payment |
| August 7, 2019 | $321,028.44 | Manassas Leasing Fee |

291.    Further, financial statements obtained since Amazon initiated this suit indicate that the Northstar Defendants had received at least $10,026,899 in acquisition, leasing, development, and asset management fees on just the Dulles and Quail Ridge lease projects as of late 2018, and had wired at least $5,112,983.84 to Defendant Villanova Trust pursuant to its 2018 Referral Agreement with Northstar on the Amazon Lease Transactions.  Ex. 11, Dkt. 57 ¶ 4.

292.    As evidenced by public forfeiture notices, the United States has also seized various bank accounts owned by the TM Defendants and Defendant Cheshire Ventures, including a U.S. Bank account co-owned by Casey Kirschner and 10 bank accounts owned or co-owned by Nelson. *See* Ex. 60 [forfeiture notices].

## IV.    THE DIRECT PURCHASE CONDUCT

293.    The Direct Purchase portion of the RICO Enterprise was a parallel and significant complement to the Lease Transaction portion of the RICO Enterprise facilitated by the TM Defendants' broader pay-to-play scheme for Amazon contracts and business opportunities.  The Direct Purchase conduct included at least the 2019 White Peaks land sale to Amazon alleged in Amazon's initial complaint and elaborated below and a separate land acquisition in Northern

Virginia at the end of 2019 that, on information and belief, netted the TM Defendants $2.5 million each, as well as other efforts by the TM Defendants and their co-conspirators to use Amazon funds, contracts, or information to profit from commercial real estate sales in Virginia and potentially other states where the RICO Defendants had knowledge of Amazon efforts to explore or execute real estate transactions. These states included Ohio, South Carolina and Tennessee.

### A. The White Peaks Transaction

294. In the summer of 2019, two of Northstar then-employees (Kyle Ramstetter and Will Camenson) used Defendants White Peaks Capital LLC and NOVA WPC LLC to facilitate Amazon's acquisition of land in Chantilly, Virginia for a new Amazon development. *See* Ex. 37. At the time of the transaction, these two Northstar employees styled themselves as, respectively, as "Managing Director" of both LLCs, and as "Manager" of White Peaks Capital.

295. The TM Defendants played an essential role in the White Peaks Transaction, worked with the White Peaks Defendants to ensure its success, and did so to obtain kickbacks from the White Peaks Defendants—actions that both TM Defendants knew to be fraudulent and in violation of their obligations under Amazon's Code of Conduct.

296. On or about July 30, 2019, defendant NOVA WPC LLC purchased the White Peaks property from 41992 John Mosby Highway LLC, a Virginia limited liability company, for $98.67 million.

297. 41992 John Mosby Highway LLC had purchased the White Peaks property for $20 million just 13 months earlier. Exs. 47–48, 38.

298. That same day (July 30, 2019), NOVA WPC LLC sold the White Peaks property to Plaintiff Amazon Data Services for $116.4 million. Exs. 37–39. Press coverage of the sale highlighted Defendant NOVA WPC LLC's same-day profit of nearly $18 million. Ex. 38.

299.     It is undisputed that the nearly $18 million in proceeds the White Peaks Defendants realized on the sale were funded directly by Amazon's purchase of the property.

300.     On information and belief, the TM Defendants exerted pressure against the White Peaks Defendants to obtain a share of the approximately $18 million profit obtained by the White Peaks Defendants through the sale of the property to Amazon.

301.     On information and belief, the White Peaks Defendants yielded to this pressure and agreed to wire monies to one or both of the TM Defendants.  On information and belief, the TM Defendants arranged for a Virginia civil engineering consultant, Johnny Lim, and his company, E2M Properties LLC, to facilitate the transfer of the seven-figure kickback they demanded from on the White Peaks transaction.

302.     On information and belief, TM Defendant Casey Kirschner utilized at least some portion of the funds to finance the property named in the government's pending civil forfeiture action in this District.  Ex. 12.

303.     The White Peaks Defendants also disbursed $5 million of the proceeds from the 2019 property sale to Defendants Brian Watson and/or Northstar.

304.     On September 27, 2019, approximately six weeks after the Washington Business Journal reported on the transaction, Brian Watson confronted the White Peaks principals and then-Northstar employees Kyle Ramstetter and Will Camenson about the land sale.  Ex. 9.

305.     Watson accused Ramstetter of engaging in a side deal with Northstar's "largest client" (Amazon), and characterized Ramstetter's conduct of the transaction as "federal FBI-type stuff."  *Id*.

306.     Watson never raised these concerns with Amazon, and instead pressed Ramstetter to "pay us [Northstar] the money [$17.73 million] immediately" because "[a]nything that comes from [Amazon deals] should be Northstar." *Id.* at 5.

307.     Ramstetter replied that he was "[p]otentially" willing to pay Northstar the money, but suggested he and Watson discuss the matter with their mutual Amazon contact—TM Defendant Casey Kirschner—"over a drink." *Id.* at 6.  Ramstetter then alluded to misconduct on other Amazon-related transactions, stating that "what we did for Amazon—that's FBI . . . . You have two corporate real estate people for the largest tenant in the world that you can trace the money, it will get out of hand" because there is evidence showing that "we all know what we did." *Id.* at 8.  He then reiterated that he, Watson, and TM Defendant Casey Kirschner should try to "work something out" before someone "say[s] something to the wrong person and it gets out, [and] the whole Amazon thing shut[s] down." *Id.*

308.     During a separate conversation Watson secretly recorded and placed in the record in this case on May 14, 2020, former Northstar employee and White Peaks principal Will Camenson stated that Northstar was left out of the deal because of Watson's "actions and [Watson's] treatment of Kyle [Ramstetter] and his contract." Ex. 9 at 19.

309.     Following these conversations, Northstar did *not* immediately "fire[]" the two employees involved in the White Peaks transaction, as Watson asserted in April 2020 and in this litigation.  Exs. 1, 4.  Rather, these individuals separated from Northstar only after ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████  MacDonald Decl. ¶ 8; *id.* Ex. 61; Lorman Decl. ¶ 13.

311.     Watson and Northstar accepted the $5 million payment for the White Peaks transaction instead of notifying Amazon of the inflated price of the property or of the fraud and kickback scheme engaged in by their employees.

312.     On the following Monday, September 30, 2019, Watson continued to discuss the White Peaks Purchase with Northstar's former COO Timothy Lorman.  To "demonstrate to [Mr. Lorman] that his relationship with Casey Kirschner was still strong despite the fallout from the NOVA WPC Transaction, Brian Watson called Casey Kirschner and put the call on speakerphone," without telling Casey Kirschner that Mr. Lorman was in the room.  Lorman Decl. ¶ 12.  After discussing the White Peaks Purchase, Casey Kirschner "commented that he had never liked Kyle Ramstetter, and that Kyle Ramstetter had 'been involved in this for two weeks and he figured out what you and I were doing,' or words to similar effect."  *Id*.

313.     The foregoing evidence, which is elaborated in the PI record, alone indicates that, at the time Defendant Watson demanded and accepted $5 million in proceeds from the White Peaks transaction on the premise that the money was payable to Northstar as Amazon's agent, Defendant Watson knew or should have known that the land sale was tainted by payments or other benefits to TM Defendant Casey Kirschner that violated Amazon policies and Northstar's obligations as Amazon's purported agent.  *See* Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99.

**B.     Other Land Acquisitions in Northern Virginia**

314.     On information and belief, the TM Defendants facilitated other purchase transactions in Northern Virginia for their own personal benefit.

315.   In late 2019, Amazon purchased 100 acres in Northern Virginia (the "Blueridge Property") for $83 million (the "Blueridge Transaction").

316.   On information and belief, Nelson used proprietary information he had obtained while working at Amazon to arrange the involvement in the transaction of an intermediary, the "Blueridge Group," in order to benefit himself, Cheshire Ventures, and Casey Kirschner.

317.   The Blueridge Group purchased the land from the seller for approximately $73 million in or around May 2019.

318.   Although Defendant Nelson's with Amazon had been terminated in June 2019, Nelson was copied on an email chain dated between August 20 and September 20, 2019—months after he was terminated from Amazon—regarding the purchase of this property by Blueridge.  Exs. 58, 59.

319.   In    that    email    chain,    Nelson's    email    address    is    listed    as "Cheshireventures@outlook.com."

320.   Thus, Nelson knowingly engaged in this transaction in violation of his CNIAA agreement with Amazon.

321.   In or around November 2019, and due to the machinations of TM Defendant Casey Kirschner, a $10 million assignment fee was added to the contemplated transaction by which Amazon would acquire the Blueridge Property.

322.   On or around December 23, 2019, Amazon was assigned the purchase agreement and acquired the property for $83 million.

323.   The $83 million purchase price included a $10 million assignment fee payable to Blueridge Group, LLC.

324.    On information and belief, Blueridge Group was brought into the transaction by the TM Defendants to serve as a conduit for a $10 million kickback.

325.    On information and belief, Blueridge Group provided no services and made no improvements to the Blueridge Property between the time it signed the purchase agreement and the time it assigned it to Amazon, netting $10 million in profit.

326.    On information and belief, after the transaction closed, Blueridge Group funneled half of the assignment fee—or $5 million—back to the TM Defendants, who split it evenly, netting approximately $2.5 million profit each from the Blueridge Transaction.

## V.    THE RICO DEFENDANTS' ONGOING MISCONDUCT, DAMAGE, AND THREATS OF IRREPARABLE HARM

327.    The RICO Defendants' enterprise is ongoing, has damaged Amazon, IPI, and their business partners, and poses an imminent threat of irreparable harm to time-sensitive development projects at the affected sites and to associated Amazon business relationships and goodwill.

### A.    The Northstar Defendants

328.    Hours after the FBI raided his home on April 2, 2020, Brian Watson sent a lengthy and wide-ranging email to a broad range of personal and business contacts including Casey Kirschner and other RICO Defendants who perpetrated the fraud against Amazon.  Ex. 1.  In that email, Watson alerted the group to the FBI's questions and documents (including and particularly the grand jury's interest in Villanova Trust), cast blame on various former Northstar personnel, referenced discussions with his legal counsel, and identified Northstar assets and payments that could be affected by the fraud and misappropriation allegations against him.  The email also made factual statements about Defendants' RICO Enterprise activities that conflict with internal evidence including computer files, bank records, and voice recordings that Watson himself made.

329.    Notably, Watson's April email stated that Northstar's "$4,000 per month" agreement with Villanova Trust was executed with one of Watson's "best friends," for "research" and "introduc[tions]" to companies "who may have commercial real estate needs."  *Id.*  It further stated that although Villanova's Trustee, Christian Kirschner, "introduced" Northstar to his brother at Amazon, Northstar won a "competitive" bid for the Amazon Virginia projects.  Watson then stated that Northstar "paid [Villanova] a share of fees that were generated from [Northstar's] work with Amazon," but declared that "[t]he funds we sent were never sent to Casey Kirschner or Carl Nelson," the former Amazon TMs who oversaw the deals.  Watson's April 2 email also referenced recent statements he made to "investors" that Amazon was "so pleased" with Northstar's work that Amazon "referred to [Northstar] as their best developer in the country."

330.    The conflict between the investigation record and Watson's statements confirms the RICO Defendants' misconduct and the ongoing and imminent threat they pose to Amazon and public interests in this and related legal proceedings.

331.    As a threshold matter, the email statements Watson made on the evening of April 2 (and earlier that week to investors) about Amazon's view of Northstar's work flatly contradicts the record and termination notice for "fraud and willful misconduct" IPI issued to Northstar that same day.

332.    As detailed above and in the PI record in this action, recently uncovered voice recordings, computer files, and financial records indicate that the Northstar Defendants fraudulently induced and/or breached actionable representations and covenants in their 2017 RFP and ensuing contracts that Watson executed on their behalf with Amazon and its partners on the Virginia Lease Transaction sites.

333.     And the case record further demonstrates the knowing or recklessly false nature of the Northstar Defendants' account of the Lease Transaction portion of the RICO Enterprise. *See* Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99.

334.     These statements this spring, which on information and belief were designed to signal accomplices to obstruct discovery of the RICO Defendants' ongoing unlawful activities, were followed by a host of other developments, including the resignation of much of Northstar's management team, that led to entry of the Temporary Restraining Order on April 28, 2020 (Dkt. 16) and the Preliminary Injunction on June 5, 2020 (Dkt. 57). *See generally* Exs. 14, 30, 40–42; MacDonald Decl. ¶¶ 18, 22, 38, 48–50.

335.     The Northstar Defendants have since defied both the TRO and PI, as well as the Court's discovery order regarding their compliance with the same, and dissipated assets.

336.     Defendants Watson and Northstar admit that on June 19, 2020, they closed— without any notice to Plaintiffs or this Court—the $1.85 million sale of a luxury Denver condominium that Defendant Northstar owned and Defendant Watson personally used. Dkt. 68 at 16; Dkt. 82 at 8.

337.     Defendants Watson and Northstar admitted that they netted nearly $700,000 from the sale of this condo. Dkt. 82-3 at 1 (listing net value of condo as of May 31, 2020 of $688,108 based on appraisal of $1.85 million—the same amount for which the condominium was sold less than three weeks later).

339.     And as recently as July 2020, Northstar and Watson demanded $11 million in unjustified payments on their terminated lease contracts for the nine Virginia properties Amazon

has the right to lease from IPI, as well as threatened to place liens on those properties in violation of Virginia law and this Court's PI. Dkt. 57.

340.    As of the date of the filing of this Complaint, Defendants Watson and Northstar remain in violation of the preliminary injunction and have not put up for escrow or bond even one penny of their claimed $61 million in personal "net worth." Dkt. 82-3 at 1. Further, they have yet to explain in any way what has happened to the proceeds from the sale of the condominium ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

**B.     The TM Defendants and Defendants AllCore Development LLC, Cheshire Ventures LLC, and Finbrit Holdings LLC**

341.    Amazon's investigation of the TM Defendants is ongoing, but continues to reveal significant evidence of their involvement in the unlawful pay-to-play scheme and related RICO Enterprise at issue in this suit. The first direct evidence of their involvement in these unlawful activities appeared in the information and documents Amazon received from Confidential Informant 1 in December 2019. And the company's ensuing investigation has continued to reveal corroborating evidence of the TM Defendants' extensive misconduct.

342.    As noted, this evidence is particularly significant to the extent it connects the TM Defendants to the Lease Transaction portion of the Enterprise in which Casey Kirschner's brother served as a conduit for kickback payments to benefit the TM Defendants, who Defendant Watson conspicuously declared on April 2 did not receive any of the "funds" Northstar "sent" to Villanova on the Virginia Lease Transactions. Ex. 1. Amazon's retrieval of files from TM Defendant Casey Kirschner's laptop, the recorded conversations Watson placed into the docket in this case in May 2020, and financial records tracing Villanova funds to First Western Trust and/or other accounts held for the benefit of the TM Defendants all evidence the TM Defendants' involvement in the

RICO Enterprise, as well as the knowing or reckless falsity of Watson's April 2020 statements to the contrary.

343.    The TM Defendants continued their pay-to-play scheme, the RICO Enterprise, and other unlawful conduct at Amazon's expense after they were terminated from the company.  The TM Defendants created one or more of the AllCore, Finbrit and Cheshire LLCs while they were at Amazon, and, on information and belief, supported these LLCs with proceeds from their unlawful conduct and continue to use them to obtain information and business opportunities at Amazon's expense.

344.    Although the only individual listed as a contact for these LLCs in public registration documents is their organizer, Mr. Atherton, email correspondence on Amazon systems shows the TM Defendants interacting for or with these entities during and after their time at Amazon.

345.    For example, on March 10, 2020, TM Defendant Nelson—who was terminated from Amazon in June 2019—sent Knoxville real estate site proposals stamped with an AllCore logo to an Amazon broker using a Cheshire Ventures email address and signature block:

Carleton Nelson
Principal | Development Consulting
Cell: (612) 991 -7114

 

Exs. 43–44.

346.    Similarly, on January 16, 2020, TM Defendant Casey Kirschner received a proposal for a Fairfax, Virginia real estate site from a Cheshire Ventures email handle that Kirschner forwarded internally for consideration within Amazon.  Ex. 49.

347.    All of the acts alleged herein violate the law and Amazon policies, as well as breach multiple provisions of the CNIAA Agreements each TM Defendant signed with the company as a condition of their employment.

348.    Those agreements expressly state that "any breach" may cause Amazon "irreparable harm for which there is no adequate remedy at law," and that the TM Defendants have already agreed that Amazon will "be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order, or other equitable relief in favor of itself, without the necessity of posting a bond, restraining [the TM Defendants] from committing or continuing to commit any such violation."  Ex. 56 § 7.4 (Casey Kirschner CNIAA); Ex. 57 § 6 (Nelson CNIAA).

### C.    Villanova Trust

349.    Villanova Trust's central and recently publicized role in the RICO Enterprise as it relates to Lease Transactions underscores the risk that the RICO Defendants or those acting in concert with them will spoliate or convert evidence or assets related to the Trust's role in the RICO enterprise.

350.    Following the PI hearing in this action against Defendant Villanova Trust, Christian Kirschner's counsel advised Amazon that Christian Kirschner, Villanova's founder and sole trustee, "is cooperating with the government in its ongoing investigation into the events referenced in [Amazon's] complaint," that "Villanova Trust is not in possession of any Amazon confidential or non-public proprietary information," and that "Villanova Trust has no monetary assets in its possession or control."  Ex. 45.

351.    Based on these representations, Amazon has not included Villanova Trust in its recent actions to enforce the PI, but reserves the right to do so in the event evidence of non-compliance emerges.

### D.    The White Peaks Defendants

352.    The White Peaks Defendants' role in the Direct Purchase Transactions, as well as their principals' involvement in the Lease Transactions while employed with Northstar, underscores the risk that these RICO Defendants or those acting in concert with them will spoliate or convert evidence or assets related to the White Peaks Defendants' role in the enterprise misconduct at issue in this suit.

353.    Following the PI hearing in this action in May 2020, counsel for the White Peaks principals advised Amazon that:

    a.    "Kyle Ramstetter (controlling manager of White Peaks Capital and NOVA WPC LLC) is cooperating with the government in its ongoing investigation of the events referenced in your complaint";

    b.    "Regarding the non-monetary aspects of the TRO," the White Peaks Defendants "are not in possession of any Amazon confidential or non-public proprietary information. White Peaks and NOVA (and their principals) understand their obligations under paragraphs 6-8 of the TRO and will comply with these provisions";

    c.    "With respect to the monetary conditions of the TRO, as previously referenced, Mr. Ramstetter is cooperating with the government in its criminal investigation. As part of this cooperation, all proceeds from [] what [Amazon refers] to as the 'Direct Purchase Enterprise' that were within the custody and control of White Peaks LLC and NOVA WPC LLC have been forfeited to the federal government. Mr. Ramstetter voluntarily relinquished these funds and waived his right to assert any defense to forfeiture proceedings. At present, no monetary assets remain in the possession or control of White Peaks LLC or NOVA WPC LLC"; and

    d.    "Moreover, as you already know from Mr. Watson's 'Last Words' email sent on April 2, 2020 (referenced in Exhibit 34 to your Complaint and TRO request), a portion of the proceeds from the White Peaks transaction was paid to an entity under Mr. Watson's control."

Ex. 8.

354.     Based on these representations, Amazon has not included the White Peaks Defendants in its recent actions to enforce the PI, but reserves the right to do so in the event evidence of non-compliance emerges.

* * * * *

355.     The foregoing factual allegations alone establish that the RICO Defendants' extensive and unlawful enterprise activities have already resulted in direct, proximate, and foreseeable injuries to Amazon's business and property, including by inflating the prices that Amazon paid and depriving Amazon of the benefits of business decisions free from illegal outside pressure and control of the disposition of its assets and risk of loss.  By reason of their misconduct, the RICO Defendants have successfully extracted from Amazon millions of dollars in kickback and other payments, the full extent of which is not yet known.  Beyond these illegal payments, the RICO Defendants' misconduct has caused site disruptions and development delays that have caused Amazon and its partners to incur damages in the form of fees, costs, and reputational harm.

356.     Without the Court's intervention, Amazon will continue to suffer significant harm at the hands of the RICO Defendants and their co-conspirators.

357.     Based on the foregoing allegations, Plaintiffs hereby plead the following causes of action and requests for relief.

### COUNT I
### RICO Enterprise
### In Violation of RICO 18 U.S.C. § 1962(a), (b), (c), (d)

358.     Plaintiffs incorporate all preceding paragraphs by reference.

359.     This count is against all Defendants (RICO Defendants).

360.     Each RICO Defendant is a "person" as required by 18 U.S.C. § 1961(3).

361.     The RICO Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  Each RICO Defendant participated in the operation or management of the RICO Enterprise, which includes but is not limited to the Lease Transaction conduct and Direct Purchase conduct alleged herein.

362.     At all relevant times, the RICO Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

363.     The RICO Enterprise is an "enterprise" as defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting from the acquisitions, investments, and business activities of at least Amazon and its business partners and investors through perpetration of kickbacks and other unlawful acts by and through which the RICO Defendants fraudulently induced Amazon and its affiliates to send business and payments to or through RICO Enterprise members and their accomplices to obtain and distribute illicit gains from the RICO Enterprise, including from the Lease Transactions and Direct Purchases alleged herein.

364.     The RICO Defendants organized their operation into a cohesive group with specific and assigned responsibilities to further the enterprise.  Over the course of the scheme, the RICO Defendants have adapted the structure of their scheme to changing circumstances—recruiting and attempting to recruit new members, creating new legal entities through which to funnel their illicit proceeds, and preparing to expand and perpetuate their fraudulent scheme.

365.     Amazon and its affiliates reasonably relied on the RICO Defendants' representations and assurances that they were conducting business ethically, legally, and according to the applicable provisions laid out in various agreements and relationships between and among Amazon and the RICO Defendants.  This reliance resulted and proximately caused harm to Amazon by, among other things, causing Amazon and its affiliates to enter into agreements they

would not have otherwise entered, to pay more than they would have otherwise paid, and to lose the honest services of its own employees.

366. The RICO Defendants acted with the intention of securing and sharing between themselves the proceeds of transactions that, absent the combination and illicit payments, would not have taken place or would not have resulted in the prices that were approved or received. The agreement between the RICO Defendants resulted in higher purchase, lease, property management, and other costs to Amazon than otherwise would have occurred. As a direct and proximate result of the RICO Defendants' conduct, Amazon and its affiliates suffered economic and reputational harm.

367. The RICO Defendants participated in the RICO Enterprise with the purpose of extracting payments and terms from Amazon and its affiliates that the RICO Enterprise Defendants would not have been able to obtain absent their undisclosed and illegal relationships between and among the RICO Defendants. The RICO Defendants colluded to obtain and direct kickbacks and other illegal benefits to the TM Defendants in exchange for the TM Defendants' fraudulent and otherwise unlawful and inequitable acts causing Amazon and its affiliates to approve contracts, payments, and other benefits to the RICO Defendants.

368. After the RICO Defendants secured commitments and/or approvals from Amazon and its affiliates for real estate transactions worth hundreds of millions of dollars, the RICO Defendants illegally funneled a portion of the proceeds to the TM Defendants and their accomplices, including family members. This kickback scheme allowed the RICO Defendants to secure business and increased the costs and other terms that Amazon and its affiliates agreed to and approved for at least 11 commercial real estate projects in Northern Virginia.

369.    The pattern of racketeering has been continuous.  The Supreme Court has recognized "continuity" is "both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989).  The predicate acts in the RICO Enterprise stretched over a substantial period of time, with the scheme beginning in or before September 2017 with the fixing of the RFP process on the Lease Transactions and continuing through August 2019 with the various wire payments made as kickbacks for the lease agreements as well as transaction fraud and kickbacks on the Direct Purchases.  The RICO Enterprise expanded over time to encompass new transactions, and was intended to and did present a significant risk of being repeated and expanded to new real estate transactions in Virginia and other markets.

370.    Had Amazon and its affiliates not discovered the actions of the RICO Defendants, the RICO Enterprise would have continued and expanded undetected into new transactions and markets.  The RICO Defendants worked to set up and expand the infrastructure and patterns that allowed them to execute and repeat their behavior.  The development of the RICO Enterprise, and the very nature of it, projects into the future with a threat of repetition due to the constant presentation of new real estate opportunities and contracts.  The relationships among the RICO Defendants—including their practices of social interactions—and the way they set up the scheme to function under the cover of their regular courses of business, further establish the common purpose, longevity, and continuing harm of the RICO Enterprise to Amazon, its affiliates and partners, and other victims.  The RICO Defendants agreed to and did conduct and participate in the conduct of the RICO Enterprise through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding or otherwise harming the Amazon Plaintiffs and their affiliates.

As relevant here, "racketeering activity" is defined in 18 U.S.C. § 1961(1) to include, among other crimes, violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1957 (transacting in criminally-derived property), 18 U.S.C. § 1952 (violations of the Travel Act).

### Pattern of Racketeering Activity
### Multiple Instances of Wire Fraud in Violation of 18 U.S.C. § 1343

371.    The RICO Defendants conducted and participated, directly or indirectly, in the conduct, management, or operation of the RICO Enterprise's affairs through repeated acts of racketeering activity amounting to a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).

372.    Pursuant to and in furtherance of their unlawful scheme, the RICO  Defendants committed, or agreed to facilitate, multiple related acts of wire fraud in violation of 18 U.S.C. § 1343.  Under 18 U.S.C. § 1343, anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" is prohibited from making use of the "wire[s]" "for the purpose of executing such scheme or artifice."

373.    "For purposes of this chapter, the term 'scheme or artifice to defraud' includes[, but is not limited to,] a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

374.    Pursuant to and in furtherance of their unlawful scheme, the RICO Defendants committed multiple related acts of wire fraud as described in 18 U.S.C. § 1343 by "devis[ing] [a] scheme or artifice to defraud," and by "obtaining money [and] property. . . by means of false or fraudulent pretenses, representations, or promises" and by transmitting or causing "to be

transmitted by means of wire" "writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

375.    These acts of wire fraud included at least nine wire payments between March 2018 and August 2019 that constituted kickback payments made pursuant to the referral/kickback agreement that Northstar, by and through its CEO and *alter ego* defendant Brian Watson, signed with Villanova Trust involving the Virginia Lease Transactions.   These payments and related activities constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).   The RICO Defendants' acts of wire fraud also included several bank wire payments among the RICO Defendants to secure the sale and settlement of Amazon's direct purchase of the Blueridge Property and also the White Peaks commercial real estate parcel in 2019.  For example, the RICO Defendants directed the "Exchange Escrow Funds" to "be disbursed directly to Realty Exchange Corporation *by wire for placement in the qualified exchange escrow account*." Ex. 46. The RICO Defendants also wired the funds through First VA Community Bank, 11325 Random Hills Rd., Fairfax, VA 22030, to a beneficiary address at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155. *Id.* The RICO Defendants also directed or caused the payment of approximately $5 million in proceedings from the White Peaks transaction to a personal bank account registered to RICO Defendant Brian Watson in or around the fall of 2019.

376.    On information and belief, the RICO Defendants and their agents have also transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and sounds that furthered their fraudulent enterprise. These communications included emails, chats, and other communications between and among the RICO Defendants concerning their scheme; the transmission of Amazon's confidential business information using personal email addresses; communications by the TM Defendants, Brian

Watson, and his agents to co-conspirators and others misrepresenting the nature of the RICO Enterprise, misleading federal agents, and alerting his co-conspirators to the FBI's investigation; and communications by Northstar, Brian Watson, and his agents to IPI and others designed to interfere with Amazon's use and enjoyment of several Virginia lease sites.

377.    In all instances, the RICO Defendants acted with knowledge and fraudulent intent to cause Amazon to make payments that would benefit the RICO Defendants and their co-conspirators.

378.    In committing these acts, the RICO Defendants committed wire fraud in violation of 18 U.S.C. § 1343, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).

**Pattern of Racketeering Activity**
**Honest Services Fraud in Violation of 18 U.S.C. § 1346**

379.    Pursuant to and in furtherance of their unlawful scheme, the RICO Defendants committed, or agreed to facilitate, multiple related acts of honest services fraud as described in 18 U.S.C. § 1346.

380.    18 U.S.C. § 1346 provides that the term "scheme or artifice to defraud" in the wire fraud statute, *id.* at § 1343, "includes a scheme or artifice to deprive another of the intangible right of honest services."

381.    The honest services fraud statute "criminalizes . . . schemes to defraud that involve bribes or kickbacks."  *Black v. United States*, 561 U.S. 465, 471 (2010) (citing *Skilling v. United States*, 561 U.S. 358, 408 (2010)).

382.    The RICO Enterprise described herein is a fraudulent kickback scheme under 18 U.S.C. § 1346.  Critically, the RICO Defendants used the Villanova Trust and other entities to funnel kickbacks to the TM Defendants on Lease Transactions and Direct Purchases.  This kickback scheme was central to the RICO Defendants' broader unlawful enterprise, which was

designed and executed through multiple unlawful acts with the common purpose of causing Amazon and its affiliates and partners to approve or provide payments, contracts, or other benefits to the RICO Defendants that caused Amazon and its partners direct and proximate harm.

383.    The RICO Enterprise is reflected in at least nine lease-related payments from Northstar to "Villanova Trust" from March 7, 2018 to August 7, 2019, Exs. 3, 7, 11, 14, 31, and also in kickback and other illicit payments on the Direct Purchases.

384.    In furtherance of the RICO Enterprise, the RICO Defendants made material false statements and omissions, including but not limited to falsely warranting that the Northstar parties "dealt with *no brokers, agent or other person* in connection with" the covered transaction, Ex. 24, in connection with real estate transactions worth hundreds of millions of dollars.   The RICO Defendants also made knowingly false and material representations about the price, terms, comparables, and availability of Virginia real estate parcels as detailed above.

385.    In furtherance of the RICO Enterprise, TM Defendant Casey Kirschner made material false statements or omissions, including but not limited to the failure to disclose his personal interest in the transactions he promoted with other RICO Defendants.

386.    In furtherance of this fraudulent kickback scheme, Defendant Carleton Nelson made material false statements or omissions, including but not limited to the failure to disclose his personal interest in the transactions he promoted with other RICO Defendants.

387.    The RICO Defendants also owed fiduciary duties to Amazon, either through their employment relationship or occupation of other positions of trust, which they violated by depriving Amazon of its intangible right to their honest services.

388.    Absent the kickback payments and related deception and unlawful conduct by the RICO Defendants, Amazon would not have entered into any of the Lease Transactions or Direct Purchases on the terms infected by the RICO Defendants' unlawful acts.

389.    In all instances, the RICO Defendants acted with knowledge and fraudulent intent.

390.    In all instances, the RICO Defendants knew, or reasonably should have known, that the RICO Enterprise would directly and proximately harm Amazon and its affiliates and partners.

391.    In committing these acts, the RICO Defendants committed, or agreed to facilitate, honest services fraud in violation of 18 U.S.C. § 1346, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).

### Pattern of Racketeering Activity
### Money Laundering in Violation of 18 U.S.C. § 1956

392.    Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the federal money laundering statute, 18 U.S.C. § 1956.

393.    Under 18 U.S.C. § 1956(a)(1)(A)–(B), a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" is prohibited from conducting a "financial transaction" that involves that property "with the intent to promote the carrying on of specific unlawful activity" or "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

394.    A "financial transaction" is broadly defined in 18 U.S.C. § 1956(c)(3)–(4) to include transactions that affect interstate or foreign commerce, such as "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition," or various transactions affecting interstate or foreign commerce through a financial institution, including "a deposit, withdrawal, transfer

between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument."

395.    The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)," of the RICO statute.

396.    The RICO Defendants repeatedly engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) by engaging in transactions using bank accounts at financial institutions to further their racketeering activities.

397.    First, they regularly transacted business among themselves and others affiliated with the RICO Enterprise using the various LLCs and trusts.  For example, Informant 1 provided Amazon with apparent evidence of at least $4.6 million in wired kickback payments from Northstar to Villanova Trust as of December 14, 2018.  Former Northstar COO Timothy Lorman then corroborated these payments and discovered two additional wire receipts (dated June 7, 2019 and August 7, 2019) documenting kickback payments from WDC Holdings (Northstar) to Villanova Trust in furtherance of the RICO Enterprise.  These wire transfers occurred across state lines, as Northstar is located in Colorado and Villanova Trust and its accounts are located in Tennessee.  Moreover, the RICO Defendants knew that the funds being transferred were derived from the unlawful activities of their RICO Enterprise and associated unlawful acts, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein.  As such, the RICO Defendants violated 18 U.S.C. § 1956 every time they transacted using funds illicitly derived from the Lease Transactions and every time payments were made to Villanova Trust.

398.    The RICO Defendants also engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) by engaging in transactions using bank accounts to further their racketeering

activities on the Direct Purchases. Specifically, on the White Peaks transaction the RICO Defendants directed the "Exchange Escrow Funds" to "be disbursed directly to Realty Exchange Corporation by wire for placement in the qualified exchange escrow account." Ex. 46. The RICO Defendants also wired the funds through First VA Community Bank, 11325 Random Hills Rd., Fairfax, VA 22030, to a beneficiary address at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155. *Id.* The RICO Defendants subsequently directed or caused to be paid a portion of the funds they received from Amazon for the White Peaks sale to at least one account held for the benefit of the TM Defendants. TM Defendant Casey Kirschner used at least a portion of these funds for personal gain, including to finance the real property and improvements known as 35 Queensland Lane North in in Plymouth, Minnesota at issue in the federal civil forfeiture action the United States filed in rem against that property and improvements in this Court on June 1, 2020. Ex. 12.

399.     The RICO Defendants also directed or caused the payment of approximately $5 million in proceeds from the White Peaks Purchase to a personal bank account registered to RICO Defendant Brian Watson in or around the fall of 2019. The RICO Defendants knew that the funds being moved to these accounts were derived from the unlawful activities of their enterprise, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein. As such, the RICO Defendants violated 18 U.S.C. § 1956.

400.     In addition, in violation of 18 U.S.C. § 1956(a) the RICO Defendants attempted to hide the origins and paths of the proceeds of their Lease Transactions, Direct Purchases, and related unlawful activities by passing funds derived from such activities through various LLCs and trusts, including Villanova Trust, an entity created by Christian Kirschner, the brother of TM Defendant Casey Kirschner, who had legal, fiduciary, and ethical duties to Amazon.

**Pattern of Racketeering Activity: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity in Violation of 18 U.S.C. § 1957**

401.    Under 18 U.S.C. § 1961(1), violations of 18 U.S.C. § 1957 constitute a predicate act of racketeering activity.

402.    One who "knowingly engages . . . in a monetary transaction in criminally derived property" violates 18 U.S.C. § 1957 if that property is "of a value greater than $10,000 [and] derived from specified unlawful activity."

403.    The statute defines "criminally derived property" as property that constitutes "proceeds obtained from a criminal offense," *id.* at § 1957(f)(2); it further defines "specified unlawful activity" as the same unlawful activity defined in 18 U.S.C. § 1956, including acts constituting racketeering activity under 18 U.S.C. § 1961(1), *id.* at § 1957(f)(3).

404.    The money that the RICO Defendants derived through the kickback scheme and fraudulent dealings were taken at the expense, and to the detriment of, Amazon and its affiliates.

405.    Relatedly, through the RICO Enterprise and related unlawful activities, the RICO Defendants committed numerous criminal offenses constituting racketeering activity as detailed herein (including wire fraud), which also constitute "specified unlawful activity" under 18 U.S.C. § 1957(f)(3).  Through this conduct, the RICO Defendants derived proceeds that unjustly enriched themselves and also directly and proximately harmed Amazon and its affiliates and partners.

406.    As the perpetrators and beneficiaries of the "specified unlawful activity" from which the funds were derived, the RICO Defendants knew the money and other benefits they obtained from the RICO Enterprise were the product of such activity.

407.    By depositing these funds in at least one bank account held by an interstate financial institution, the RICO Defendants engaged in monetary transactions as defined by 18 U.S.C. § 1957(f)(1).  When the RICO Defendants engaged in any subsequent withdrawal, transfer, or

exchange of these funds, they engaged in further monetary transactions as defined by 18 U.S.C. §
1957(1).

408.    As detailed above, Informant 1 provided Amazon with apparent evidence of at least
$4.6 million in payments from Northstar to Villanova Trust as of December 14, 2018. And Mr.
Lorman discovered two wires, one for $150,000 and another for $321,028.44, both far in excess
of the $10,000 threshold required for liability under 18 U.S.C. § 1957. On numerous occasions,
the RICO Defendants withdrew or transferred portions of these proceeds in excess of $10,000.

409.    In addition, the RICO Defendants directed or caused the payment of over $6 million
in proceeds from the White Peaks sale to bank accounts held for the benefit of the TM Defendants
and Brian Watson in or around the period from July to September 2019. The RICO Defendants
also directed or caused the payment of $10 million in illicit profits on the Blueridge Property to be
paid or funneled to the TM Defendants. The funds were fruit of the RICO Defendants' unlawful
activities related to their RICO Enterprise.

410.    For the foregoing reasons, the RICO Defendants repeatedly violated 18 U.S.C. §
1957, engaging in further racketeering activity under 18 U.S.C. § 1961(1).

### Pattern of Racketeering Activity:
### Violation of the Travel Act, 18 U.S.C. § 1952

411.    Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations
of the "Travel Act," 18 U.S.C. § 1952, which criminalizes the use of interstate facilities to "(1)
distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish,
carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful
activity."

412.   The Travel Act defines "unlawful activity" to include "extortion, bribery, or arson in violation of laws of the State in which committed or of the United States" as well as acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

413.   For purposes of 18 U.S.C. § 1952, "interstate facilities" are defined to include email, mail, telephone calls, text messages, and wire transfers.   The RICO Defendants made use of interstate facilities in furtherance of their crimes of money laundering.

414.   The RICO Defendants used wire transfers to make payments and communicated to each other via phone, e-mail, and/or other electronic means in order to further their money laundering activities.   The RICO Defendants reside in various states and used interstate facilities in furtherance of their crimes of money laundering.   For example, multiple wire transfers from Northstar in Colorado went to Villanova Trust in Tennessee.   Northstar and other Defendants domiciled in Colorado, Tennessee, and Nevada conducted business with Amazon, which has headquarters and/or principal places of business in Washington State and Virginia.   And the RICO Defendants, including the TM Defendants, personally engaged in interstate travel to participate in meetings or other activities in furtherance of the RICO Enterprise.   Any transactions that the RICO Defendants made with vendors or other business partners located in Virginia were also interstate activities that furthered their bribery (kickback) and money laundering activities with respect to the Lease Transactions and Direct Purchases.

415.   Both to commit acts of bribery of others (to ensure their silence) and money laundering and to facilitate these acts, the RICO Defendants made use of "interstate facilities" to "distribute the proceeds of any unlawful activity; or . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of [their] unlawful activity."   Among other things, they intentionally engaged in acts of bribery of others

Case 1:20-cv-00484-RDA-TCB  Document 130-4  Filed 09/28/21  Page 92 of 131 PageID# 4585

(kickbacks to secure improper and unjust benefits and to secure concealment of the RICO Enterprise) and money laundering through interstate channels, in violation of 18 U.S.C. §§ 1952 and 1956. Their conduct thus constitutes racketeering activity in multiple forms according to 18 U.S.C. § 1961(1).

**Predicate Acts of Racketeering Activity Amount to a Pattern of Racketeering Activity under 18 U.S.C. § 1961(5)**

416.    The RICO Defendants committed and/or aided and abetted the commission of at least two or more of the foregoing acts of racketeering. The acts alleged were related to each other by virtue of common participants (the RICO Defendants), common victims (Amazon, IPI, and their affiliates, partners and investors), a common method of commission (perpetration of a kickback and money laundering scheme that fraudulently induced business and contracting decisions to the benefit of the RICO Defendants), and a common purpose (defrauding and otherwise extracting money and property from Amazon and its affiliates and partners for the personal financial gain of the RICO Defendants while concealing their unlawful conduct). The RICO Defendants' conduct thus constitutes a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5).

417.    The RICO Defendants violated 18 U.S.C. § 1962(a).

418.    As a direct and proximate result of the RICO Enterprise and the RICO Defendants' racketeering and other activities, Plaintiffs have been injured in their business and property in violation of 18 U.S.C. § 1962(a), which prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principle  . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

PLAINTIFFS' CORRECTED VERIFIED FIRST AMENDED COMPLAINT 88

419.     The RICO Defendants violated 18 U.S.C. § 1962(b).

420.     As a direct and proximate result of the RICO Defendants' racketeering activities, the Amazon Plaintiffs and their affiliates, partners, and investors, have been injured in their business and property in violation of 18 U.S.C. § 1962(b), which prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

421.     The RICO Defendants derived, both directly and indirectly, financial and other benefits as a result of their unlawful RICO Enterprise, including but not limited to the kickbacks and other payments they received as a result of their fraud and other enterprise conduct.

422.     The unlawful proceeds from the RICO Enterprise were used in part to operate defendant Northstar, which defendant Brian Watson converted as a vehicle and *alter ego* for the unlawful activities of the RICO Defendants' racketeering activities.

423.     On information and belief, Watson commingled his personal finances with Northstar funds and assets.

424.     Moreover, Watson is listed as the owner of the various Northstar-associated entities—notably Defendants Sterling NCP FF LLC, Manassas NCP FF LLC, and NSIPI Administrative Manager, LLC—that until April 2, 2020, had ownership interests and/or management responsibilities for Lease Transaction properties through NSIPI Data Center Venture, LLC, the joint venture that (through IPI) recently terminated all Northstar-related interests in the venture.

425. The RICO Defendants maintain control of the RICO Enterprise, including through the activities of the RICO Defendants and trusts, LLCs, and other channels engaged in interstate commerce and whose activities affect interstate commerce.

426. The RICO Defendants violated 18 U.S.C. § 1962(c) by "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

427. The RICO Defendants also violated 18 U.S.C. § 1962(d), which prohibits "any person to conspire to violate any of the provisions of" 18 U.S.C. §§ 1962(a)-(c). The RICO Defendants knowingly agreed to commit, and subsequently engaged in, a pattern of racketeering activity, and further knew that the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. Each of the RICO Defendants knew about and agreed to facilitate the RICO Enterprise's unlawful scheme to obtain property and other illicit benefits from Amazon and its affiliates and partners. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the RICO Enterprise, including the acts of racketeering set forth above.

428. Amazon was injured in its business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(a), (b), (c), and (d).

429. The RICO Enterprise directly and proximately caused injuries to Amazon and its affiliates and partners include, but are not limited to: the purchase of real property in Virginia unlawfully inflated above its fair market value by millions of dollars; millions of dollars in kickback payments that resulted in Amazon and its affiliates paying artificially inflated prices for at least the 11 real estate transactions alleged herein; the fees and costs Amazon and its partners incurred by working to remove the RICO Defendants, their agents, and those acting in concert

with them from their roles on the affected Lease Transaction sites, including attorneys' fees and costs associated with preparing, executing, and enforcing the February 19, 2020 Lease Continuity Agreement; the fees, costs, and reputational damage Amazon and its affiliates incurred due to Lease Transaction site disruption and development delays; the fees and costs associated with investigating, exposing, and defending against the RICO Defendants' pervasive fraud and other misconduct; the fees and costs associated with complying with federal law enforcement agencies' investigations of the RICO Defendants' misconduct; damage to Amazon's business reputation and goodwill, including damage to Amazon's business relationships with entities and individuals associated with the affected Virginia real property sites; the impairment of Amazon's legal entitlement to business relationships and to make business decisions free from outside pressure wrongfully imposed; and the denial of Amazon's right to control both the disposition of its assets and its risk of loss.

430.    These injuries to Amazon were a direct, proximate, and reasonably foreseeable result of the RICO Defendants' violations of 18 U.S.C. § 1962(a), (b), (c), and (d).  Amazon has been and will continue to be injured in its business and property in an amount to be determined at trial.

431.    Pursuant to RICO, 18 U.S.C. § 1964(c), Amazon is entitled to recover treble damages, plus costs and attorneys' fees, from the RICO Defendants.

432.    Pursuant to the RICO statute, 18 U.S.C. § 1964(a), Amazon is entitled to injunctive and other equitable relief, including an order requiring the RICO Defendants to disgorge the full measure of their unjust gains from the Lease Transactions.

433.    Amazon is further entitled to, and should be awarded, a permanent injunction that enjoins the RICO Defendants, their assignees, and anyone else acting in concert with them from

profiting from or otherwise monetizing their relationship with Amazon, Amazon confidential information, or any of the projects or properties described herein, including by marketing or otherwise leveraging the existence of a relationship with Amazon and/or knowledge of Amazon business practices to promote future business activities.

## COUNT II
## Detinue Pursuant to Va. Code § 8.01-114

434.    Plaintiffs incorporate all preceding paragraphs by reference.

435.    This count is against the RICO Defendants.

436.    "An action for detinue lies when a party unlawfully withholds the personal property of another." *Secureinfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 620 (E.D. Va. 2005) (citing Va. Code § 8.01-114).  In a detinue action, "[t]he plaintiff must merely allege that it owns the chattel and that the defendant unlawfully withholds it." *Id.*

437.    Further, under Virginia law, "[i]t shall be sufficient ground for an action for pretrial levy or seizure of an attachment if the specific personal property sought to be levied or seized [w]ill be sold, removed, secreted or otherwise disposed of by the defendant, in violation of an obligation to the plaintiff, so as not to be forthcoming to answer the final judgment of the court respecting the same."  Va. Code § 8.01-534(B)(1).  "[A]n attachment in equity under Virginia Code 8.01-534" is satisfied if the district court makes factual findings supporting, among other things, "any incident of self-dealing" or "any incident of secret manipulation of a financial transaction for an unlawful purpose." *United States v. Cohen*, 152 F.3d 321, 326 (4th Cir. 1998).

438.    The RICO Defendants fraudulently induced the Plaintiffs to sign multiple lease agreements.

439.    Each Lease warranted that "[n]o . . . agreements, oral or written, have been made by Landlord [Defendants] . . . which are not contained in the . . . Lease Documents." Ex. 24 ¶ 33.

440.     And in the immediately ensuing paragraph, titled "Brokers," Northstar "represent[ed] and warrant[ed] that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth [at the start of the] Lease." *Id.* at ¶ 34.

441.     In all of the Leases, the "Brokers" line on page 1 states "N/A," *id.* at 1, and each Lease represented that there were "no management agreements, services, maintenance, or other contracts . . . relating to the Project . . . other than those" that had been "disclosed in writing" to Amazon, *id.* at 207.  The Leases also state that the Northstar parties "dealt with no brokers, finders or the like in connection with th[e] transaction," and that Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting or professional fees and costs incurred in connection with lease negotiations."  *Id.* at 6, 209.

442.     In a scheme orchestrated by Defendant Watson and facilitated at his direction through Defendant WDC Holdings, the RICO Defendants charged Amazon fees and costs that were outside the permitted scope of the Lease Agreements and which resulted in inflated pricing.

443.     Watson and WDC Holdings then transferred those fees and costs to Defendant Villanova Trust, which thereafter disbursed those funds to former Amazon employees Casey Kirschner and Carlton Nelson, and Villanova Trust Trustee Christian Kirschner.

444.     The so-called management services, broker and finder fees, and other "professional fees and costs incurred in connection with lease negotiations" were never disclosed to Plaintiffs. *Id.*

445.     These "incident[s] of self-dealing" and "secret manipulation[s] of . . . financial transaction[s] for an unlawful purpose" "are shown in the multitude of exhibits and affidavits" that

the Plaintiffs have submitted to the Court, and satisfy the issuance of a prejudgment attachment under Virginia law. *Cohen*, 152 F.3d at 326.

446.    Through the Lease Transaction portion of the RICO Enterprise, the RICO Defendants obtained "specific personal property" that the Plaintiffs now seek "to be levied or seized" given the risk that they will be "disposed of by the [Count I Defendants]." *See* Va. Code § 8.01-534(B)(1).

447.    The specific personal property totals at least $16,250,00.00.

448.    And the remainder represents the sum of specific amounts that Defendant Casey Kirschner expressly designated as kickbacks from the Northstar Lease Transaction fees in a file recovered from his company laptop: $4,150,000 (Shaw Rd.), $8,500,000 (Quail Ridge), $3,600,000 (Manassas Lease Transactions). Ex. 10; Dkt. 57 ¶ 2.

449.    By including in the Lease Transactions at least an additional $16,250,000 in kickback fees, the RICO Defendants inflated the transaction price by at least $16,250,000.

450.    Accordingly, Amazon committed to overpaying at least $16,250,000 for the contracts at issue, to its detriment.

451.    For this reason alone, the corpus of funds the PI designates for judgment security represents only a highly conservative and clearly documented portion of the Amazon property the Northstar Defendants and their co-conspirators unlawfully procured from the company, which included more than just the kickback "shares" specifically designated to flow to Casey Kirschner.

452.    Although the Northstar Defendants dispute that they actually received all of these funds, they do not deny making nine wire payments totaling $5,112,983.84 to Villanova Trust pursuant to their 2018 Referral Agreement on the Amazon Lease Transactions. Ex 11, Dkt. 57 ¶ 4.

453.    These payments relate direct to real estate transactions that occurred in Virginia, and are therefore subject to a claim for detinue under Virginia law.

454.    The $17,730,000 that Plaintiffs overpaid White Peaks Capital and NOVA PWC LLC, the $5,000,000 from that corpus these two defendants wired to Watson and WDC Holdings after an October 2019 "settlement," and, on information and belief, the approximately $1,000,000 from that corpus one or both of these defendants wired to an account associated with Johnny Lim and/or E2M Properties, LLC for Casey Kirschner's benefit, also qualify for pretrial attachment under Virginia law.

455.    White Peaks Capital and NOVA PWC LLC inflated the price of the transaction— unknowingly to Plaintiffs, who believed that they were paying a price that was negotiated in the absence of fraud or self-dealing.

456.    The White Peaks transaction concerned real property located in Loudon County, Virginia, and the initial seller of the property (41992 John Mosby Highway LLC) is a Virginia limited liability company. *See* Ex. 47.

457.    The $10,000,000 that Plaintiffs overpaid Blueridge Group with Casey Kirschner's assistance, for the Blueridge Property, and the $5,000,000 from that corpus the TM Defendants received also qualify for pretrial attachment under Virginia law.

458.    Casey Kirschner and Blueridge Group inflated the price of the transaction— unknowingly to Plaintiffs, who believed that they were paying a price that was negotiated in the absence of fraud or self-dealing.

459.    ███████████████████████████████████████████

████████████

460.    This type of manipulation is precisely the types of action that the Fourth Circuit has recognized as supporting a detinue claim under Virginia law.  *See Cohen*, 152 F.3d at 326.

461.    The fraudulent Direct Purchase conduct resulted in the RICO Defendants obtaining a specific amount of money from the Plaintiffs.

462.    The property for which Plaintiffs now seek attachment is Virginia property recoverable in detinue under Virginia law.

## COUNT III
## Fraud

463.    Plaintiffs incorporate all preceding paragraphs by reference.

464.    This count is against the RICO Defendants.

465.    In Virginia, a party "alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Thompson v. Bacon*, 425 S.E.2d 512, 514 (Va. 1993).

466.    In the alternative for the TM Defendants, under Washington law "[t]he elements of fraud include: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." *Adams v. King Cty.*, 192 P.3d 891, 902 (Wash. 2008) (*en banc*) (citation omitted).

467.    The RICO Defendants made false representations of an existing fact because they represented and warranted to Amazon that:  (i) they did not pay or receive any undisclosed referral or other fees to third parties in relation to the Virginia Lease Transaction sites, the White Peaks Purchase or, on information and belief, the Blueridge Transaction; and (ii) the Lease Transactions,

the White Peaks Purchase and, on information and belief, the Blueridge Transaction were competitive fair market deals executed in Amazon's best interests and in compliance with all relevant laws and Amazon's Code of Conduct.

468.     The facts that the RICO Defendants misrepresented or omitted were material.  As noted, a central component of the Lease Transactions was the parties' agreement that Amazon's contract partners had "no" undisclosed special arrangements or compensation commitments to third parties, and that employees responsible for ensuring the execution of those transactions would comply with all relevant laws and codes of conduct.  Amazon's execution of the White Peaks transaction was expressly premised on the Company's reasonable understanding that it was paying a competitive market price in an arms-length transaction, instead of one unlawfully inflated by millions of dollars due to the RICO Defendants' fraud and kickback scheme.  And on information and belief, Casey Kirschner presented and the Company reasonably relied on the fact that the Blueridge Transaction was a competitive market price in an arm-length transaction, instead of one that contained a hidden $10 million fee to an interloper.

469.     The RICO Defendants knowingly and intentionally made the above and other misrepresentations or omissions to Plaintiffs to induce them to enter into the Lease Transactions, the White Peaks Purchase and, on information and belief, the Blueridge Transaction that Defendants knew involved prohibited and/or undisclosed payments.  The RICO Defendants knew at the time they represented they had no undisclosed third party arrangements concerning the Lease Transactions with Amazon that they would channel payments through Northstar's kickback ("Independent Contractor") agreement with Villanova Trust, which in turn resulted in payments to former Amazon TMs, including Casey Kirschner and Nelson, and others in violation of applicable laws and Amazon's Code of Conduct, and, on information and belief, inflated many

contracts governing the affected Virginia real property sites above their competitive market price, injuring Amazon by inflating the prices it committed to pay for these transactions. The RICO Defendants likewise intentionally sold the White Peaks property and the Blueridge Property to Amazon at prices they knew were not the competitive market prices represented to Amazon in accordance with its procurement standards. Amazon was not and could not reasonably have been made aware of these misrepresentations and omissions.

470.    The RICO Defendants made these misrepresentations and omissions with the intent to mislead Amazon and fraudulently induce it to award them lease and purchase contracts (on all of the Virginia Leased Transaction properties, the White Peaks Purchase and, the Blueridge Property) so they could reap millions of dollars in unlawful fees and other payments, at Amazon's expense.

471.    Plaintiffs had a right to and did rely on the RICO Defendants' misrepresentations and omissions to their detriment. Amazon entered into the Lease Transactions in justifiable reliance on the RICO Defendants' misrepresentations that no undisclosed fees would be paid on the transactions, that the transactions were in Amazon's best interests and in compliance with Amazon's Code of Conduct, and that the price Amazon paid for the Leases, the White Peaks Purchase and the Blueridge Transaction were competitive market prices.

472.    Indeed, "Amazon would not, under any circumstances, have approved [these] real estate transactions . . . had [it] been aware of the undisclosed conflicts of interest and 'referral' agreement arrangement between Northstar and Christian Kirschner/Villanova Trust."  Dkt. 44 ¶ 20.

473.    And the RICO Defendants knew that Amazon would not have proceeded with the transactions had Amazon known of the payments channeled to Amazon employees and their relatives.

474.    As a direct result of Amazon's justifiable and reasonable reliance on the RICO Defendants' material misrepresentations and omissions, Amazon sustained at least tens of millions of dollars in damages, including but not limited to the inflated purchase price on the White Peaks property and the Blueridge Property and the costs and fees it paid to members of the Lease Transaction Enterprise on contracts they procured through fraud and kickbacks which artificially inflated the price of the transactions.

475.    Plaintiffs' justifiable and reasonable reliance on the RICO Defendants' misrepresentations and/or omissions resulted in damages to Plaintiffs.

## COUNT IV
## Tortious Interference with Contractual and/or Business Relations

476.    Plaintiffs incorporate all preceding paragraphs by reference.

477.    This count is against the RICO Defendants.

478.    In Virginia, the elements of tortious interference are:  "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."  *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015).

479.    In the alternative for the TM Defendants, under Washington law "[a] claim of tortious interference requires (1) the existence of a valid contractual relationship of which the defendant has knowledge, (2) intentional interference with an improper motive or by improper

means that causes breach or termination of the contractual relationship, and (3) resultant damage." *Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship*, 242 P.3d 1, 13 (Wash. Ct. App. 2010).

480.    Plaintiffs entered into contractual relationships and/or business expectancies with the Northstar Defendants, their affiliates, and other partners as alleged herein.

481.    The RICO Defendants had knowledge of these contracts, relationships, or business expectancies.

482.    With improper motives and by improper means, the RICO Defendants acted intentionally to induce or cause a breach or termination of Plaintiffs' contractual relationships or business expectancies by, among other things, fraudulently and unethically charging fees that were not authorized by Plaintiffs and/or were affirmatively prohibited by Plaintiffs' contracts and/or business policies and practices, and otherwise intentionally engaging in unlawful conduct that impeded or injured Plaintiffs' contractual or business relationships with non-defendant parties.

483.    Plaintiffs have been harmed by, and are suffering from ongoing and imminent threats of additional harm from, the RICO Defendants' tortious interference with Plaintiffs' contractual and/or business relations as detailed above and in the Application for a Temporary Restraining Order that accompanied Amazon's first Verified Complaint.  Injury and damages include, but are not limited to:  irreparable harm to the business relationships at the affected Virginia real property sites; immediate economic damages resulting from inflated and fraudulent transaction costs and non-competitive bidding; damages associated with replacing Northstar and other Defendant-affiliated entities at the affected sites, which transition involved substantial business time, attorneys' fees, and site responsibilities; and damages caused by site disruption, development delays, and the associated loss of goodwill, and reputational harm.  Although many of these harms are compensable in money damages, the injury to Amazon's ongoing business and

business relationships is not, and regardless injunctive relief is necessary to prevent the RICO

Defendants from spoliating evidence and assets essential to recovery of monetary relief.

**COUNT V**
**Civil Conspiracy**

484.     Plaintiffs incorporate all preceding paragraphs by reference.

485.     This count is against the RICO Defendants.

486.     Under Virginia law, a common law claim of civil conspiracy lies where "a plaintiff

sustains damages as a result of an act that is itself wrongful or tortious."   *Dunlap v. Cottman*

*Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014).  Virginia law also recognizes a statutory

claim of civil conspiracy where "two or more persons who combine, associate, agree, mutually

undertake or concert together for the purpose of (i) willfully and maliciously injuring another in

his reputation, trade, business or profession by any means whatever or (ii) willfully and

maliciously compelling another to do or perform any act against his will, or preventing or hindering

another from doing or performing any lawful act."  Va. Code § 18.2-499(A).

487.     As alleged in Paragraphs 358 to 483 herein, the RICO Defendants have conspired

to engage in fraud, tortious interference with contractual and business relationships, and unlawful

racketeering and enterprise activity against Plaintiffs and others.

488.     Under the Virginia statutory claim for civil conspiracy, Plaintiffs are entitled to

"recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee

to plaintiff's counsel."  Va. Code § 18.2-500(A).  Amazon is also entitled to "loss of profits."  *Id.*

489.     The statute further provides for equitable relief, stating that the "court shall have

jurisdiction to . . . issue injunctions pendente lite and permanent injunctions and to decree damages

and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel."

Va. Code § 18.2-500(B).

490.     In the alternative for the TM Defendants, under Washington law "[t]o establish a common law claim for civil conspiracy," a plaintiff is "required to prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." *Bonneville v. Pierce Cty.*, 202 P.3d 309, 318 (Wash. Ct. App. 2008) (quotation marks omitted).

## COUNT VI
## Breach of Contract

491.     Plaintiffs incorporate all preceding paragraphs by reference.

492.     This count is against the RICO Defendants.

493.     Under Virginia law, "the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006).

494.     In the alternative for the TM Defendants, under Washington law "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract, (2) breach of that contract, and (3) damages resulting from the breach." *Karpenski v. American General Life Companies*, LLC, 999 F. Supp. 2d 1235, 1250 (W.D. Wash. 2014).

495.     Plaintiffs and their affiliates executed contracts with the RICO Defendants stating, among other things, that the TM Defendants did not have any third party broker, finder, or similar referral contracts or arrangements in relation to the Virginia Lease Transaction sites, the White Peaks Purchase or, on information and belief, the Blueridge Transaction, and that the Lease Transactions, the White Peaks Purchase and, on information and belief, the Blueridge Transaction

were competitive, fair market deals executed in Amazon's best interests and in compliance with all relevant laws and Amazon's Code of Conduct.

496.    The Lease agreements between Amazon and the Northstar-affiliated landlord LLCs for the Virginia Lease Transaction sites warranted that:  (i) there "are no management agreements, service, maintenance or *other contracts* . . . relating to the Project . . . other than those" that were "disclosed in writing" to Amazon; (ii) the Northstar parties "dealt with *no brokers, finders or the like* in connection with this transaction,"; and (iii) Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting, or *professional fees and costs* incurred in connection with lease negotiations."  Ex. 24 at 7, 207, 209; MacDonald Decl. ¶ 32.

497.    Further, in signing each Lease Defendants warranted that "[n]o . . . agreements, oral or written, have been made by Landlord [Defendants] . . . which are not contained in the . . . Lease Documents."  Ex. 24 ¶ 33. In the immediately preceding paragraph titled "Brokers," Northstar "represent[ed] and warrant[ed] that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth [at the start of the] Lease."  *Id.* ¶ 34.

498.    In all of Defendants' Leases, the "Brokers" line on page 1 states "N/A," *id.* at 1.

499.    The RICO Defendants knew at the time they induced Plaintiffs to sign contracts concerning the Lease Transaction sites that they had previously executed a "referral" agreement as part of the kickback scheme and would in fact charge undisclosed and prohibited amounts to Amazon, including to inflated commissions, unauthorized site fees, and kickback payments they funneled through Villanova Trust.  Amazon has been damaged in amounts totaling at least $50

million as a result of the RICO Defendants' knowing breach of their contract provisions and warranties.

500.    Plaintiffs also executed a CNIAA Agreement with Casey Kirschner that provides, among other things, that:  (i)  Amazon "has been induced to employ [the TM Defendant] by [the TM Defendant's] representation that [he] will abide by and be bound by each of the convenants and restraints in th[e] Agreement", Ex. 56 § 9 (Kirschner CNIAA); *see also* Ex. 56 Recitals A–D (Kirschner CNIAA); (ii) any breach of the Agreement may cause Amazon irreparable harm for which there is no adequate remedy at law, Ex. 57§ 7.4 (Kirschner CNIAA); and that (iii) Defendant Casey Kirschner will "hold all Confidential Information in strictest confidence and will not acquire, use, publish, disclose, or communicate any Confidential Information except as required in connection with [their] work without the prior written approval of an authorized officer of Amazon," Ex. 56 § 3.1 (Kirschner CNIAA).

501.    Plaintiffs also executed a CNIAA Agreement with Nelson that provides, among other things, that:  (i)  that Nelson is "entering into this Agreement . . . as a condition of [his] employment" with Amazon, "recogniz[ing] that the restrictions set forth in Sections 2 and 3 of t[he] Agreement may seriously limit [his] future flexibility in many ways," Ex. 57 Recital and § 4(a) (Nelson); (ii) "[a]ny breach of this Agreement may cause the Company irreparable harm for which there is no adequate remedy at law," Ex. 57 § 6 (Nelson); and that (iii) TM Defendant Nelson "shall not, directly or indirectly, at any time . . . use or cause to be used any" non-public "Confidential Information" acquired from or during employment with the Company "in connection with any activity or business except the business of the Company, and shall not disclose such Confidential Information to any individual, partnership, corporation, or other entity unless

such disclosure has been specifically authorized in writing by the Company, or except as may be required by any applicable law."  Ex. 57 § 2(b) (Nelson).

502.  These CNIAA Agreements further warrant that, during employment with Amazon and "for 18 months" thereafter, the TM Defendants "will not, directly or indirectly," either "on [their] own behalf or" otherwise, Ex. 56 § 4 (Kirschner CNIAA); Ex. 57 § 3(c) (Nelson CNIAA):

| CASEY KIRSCHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| (i) engage in or support the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by Amazon (or intended to be sold, offered, or otherwise provided by Amazon in the future) that Employee worked on or supported, or about which Employee obtained or received Confidential Information"; | (i)  "knowingly  (i)  accept  or  solicit employment . . . a consulting assignment . . . investment capital, directly or indirectly, from any individual or entity . . . from which the Company has accepted investment capital, or with which, prior to the Termination Date, the Company  has  held  serious  discussions regarding  the  possibility  of  securing investment capital ("Investors or Prospective Investors"),  provided,  however,  that  this Section 3(c)(i) shall not apply to Investors or Prospective Investors that are introduced to the Company through the efforts of the Employee; or |
| (ii) "solicit business from any Customer of any product or service that Employee worked on or supported, or about which Employee obtained or received Confidential Information"; | (ii) accept or solicit employment with, or . . . a consulting assignment with, or . . . business from any individual or entity that was a customer or client of the Company prior to the Termination Date, or with which the Company had engaged in serious discussions prior to the Termination Date related to the possibility that such individual or entity might become a customer or client of the company (a "Current or Prospective Customer"), if the product or service provided by the Employee to such Current  or  Prospective  Customer  is substantially the same as a product or service offered by the Company to such Current or Prospective Customer, and such acceptance or solicitation  would  be  competitive  with  or otherwise deleterious to the Company's own business relationship or anticipated business |
| (iii) "encourage any Customer or Business Partner to cease doing business with Amazon or to terminate or limit an existing relationship or arrangement with Amazon"; | |
| (iv) "solicit or otherwise encourage any employee, contractor, or consultant of Amazon ("Amazon  Personnel")  to  terminate  any employment or contractual relationship with Amazon" or "disclose information to any other individual or entity about Amazon Personnel that could be used to solicit or otherwise encourage Amazon Personnel to form new business relationships with that or another individual or entity"; or | |
| (v) "otherwise interfere with the performance by current or former Amazon Personnel of | |

| CASEY KIRSCHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| their obligations or responsibilities to Amazon." Ex. 56 § 4. | relationship with such Current or Prospective Customer; or<br><br>(iii) accept or solicit business from any retail market sector, segment, or group that the Company has solicited, targeted, or accepted business from prior to the Termination Date, or has actively planned, prior to the Termination Date, to solicit, target, or accept business from (the "Target Market"), if the product or service provided or offered by the Employee to such Target Market is substantially the same as a product or service provided or offered by the Company to the Target Market, and such acceptance or solicitation would be competitive with or otherwise deleterious to the Company's own business activities, or anticipated business activities, related to the Target Market; or<br><br>(iv) enter into or propose to enter into any business arrangement with any entity with which, prior to the Termination Date, the Company was involved in substantially the same business arrangement, or with which, prior to the Termination Date, the Company had held discussions regarding the possibility of entering into such an arrangement, if such arrangement would be competitive with or otherwise deleterious to the interests of the Company. Ex. 57 §§ 3(c)(i)-(iv). |

503.    The TM Defendants breached all and continue to violate aspects of all of these provisions in the course of conducting their unlawful pay-to-play scheme for Amazon real estate business, including by participating in the RICO Enterprise.

504.    These breaches have not been cured and have caused Amazon to suffer irreparable harm in the form of damage to its good will, business relationships, and reputation.

505.    Defendants' breaches have also caused Amazon to suffer pecuniary harm and damages in amounts to be determined at trial.

## COUNT VII
## Unjust Enrichment and Constructive Trust

506.    Plaintiffs incorporate all preceding paragraphs by reference.

507.    This count is against the RICO Defendants.

508.    Under Virginia law, there is "a three-part test to govern unjust enrichment claims: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 650 (Va. 2020).    The existence of a contract does not bar a claim for unjust enrichment "where the benefit received was outside the scope of the contract." *Id.* at 648 (quotation marks omitted); *see also, e.g.*, *id.* (the "existence of contract d[oes] not bar [a] claim for unjust enrichment based on allegation that fees charged were illegal").  A claim of unjust enrichment "is recognized as equitable," and "a constructive trust . . . is a tool of equity to prevent unjust enrichment." *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 497–98 (4th Cir. 1999) (quotation marks omitted); *see also Cooper v. Cooper*, 457 S.E.2d 88, 92 (Va. 1995) ("A constructive trust is appropriately imposed to avoid unjust enrichment of a party.").

509.    In the alternative for the TM Defendants, under Washington law a "claim of unjust enrichment requires proof of three elements—(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Norcon Builders, LLC v. GMP Homes VG, LLC*, 254 P.3d 835, 844 (Wash. Ct. App. 2011) (quotation marks omitted).  Further, "[a] constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on

the ground that he would be unjustly enriched if he were permitted to retain it." *Baker v. Leonard*, 843 P.2d 1050, 1055 (Wash. 1993) (en banc).

510.    Plaintiffs conferred a benefit on the RICO Defendants by paying them millions of dollars in fees and costs on the nine lease transactions detailed herein.  These benefits were undisclosed and outside of the scope of the contracts governing the lease transactions, and they were at Amazon's expense.

511.    The RICO Defendants had actual knowledge of these benefits.

512.    Defendant Watson's signature appears on each of the contracts that served as vehicles for the delivery of the benefits.  *See, e.g.*, Ex. 24.

513.    Defendant Watson and Northstar intentionally wired millions of dollars of these benefits to Defendant Villanova Trust, Ex. 11, who on information and belief subsequently disbursed some or all of these benefits to Christian Kirschner and the TM Defendants.

514.    Further, Amazon uncovered multiple files in the recycle bin of Casey Kirschner's Amazon-issued computer establishing his and his co-conspirators' knowledge of the benefits conferred, including a spreadsheet documenting certain Amazon real estate development fees that were expressly designated for prohibited payments to the RICO Defendants as a result of the Lease Transaction portion of the RICO Enterprise.  Ex. 10; Dkt. 57 ¶ 2; Dkt. 44 ¶ 15–16.  The RICO Defendants should have expected to repay Plaintiffs for these benefits because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits and because they intentionally obtained—and intentionally concealed—the benefits through their knowingly illegal and fraudulent Lease Transaction portion of the RICO Enterprise.

515.    The RICO Defendants both accepted and retained these benefits without paying for their value.  To date, the RICO Defendants have refused to return a penny of the benefits Plaintiffs conferred on them.  This renders receipt of the benefits unjust.

516.    The RICO Defendants' misconduct caused Amazon to enter into leases with project budgets that were inflated to cover at least the kickback payments to the RICO Defendants.

517.    But for the misconduct of the RICO Defendants, Amazon would not have entered into any of the contracts at issue or would have entered into leases with accurate budgets.

518.    Plaintiffs also conferred a benefit on the RICO Defendants by paying to White Peaks Capital and NOVA PWC a figure approximately $17,730,000 in excess of the fair market value of the real property in Loudoun County, Virginia, subject to the Direct Purchase portion of the RICO Enterprise—$5,000,000 of which Watson and WDC Holdings subsequently obtained from the White Peaks Capital and NOVA WPC operators in an undisclosed October 2019 settlement, Lorman Decl. ¶ 13, and on information and belief approximately $1,000,000 that the TM Defendants subsequently obtained from these operators using a bank account associated with Johnny Lim and/or E2M Properties, LLC as a fraudulent pass-through.

519.    The RICO Defendants had actual knowledge of these benefits Plaintiffs conferred on them.  White Peaks Capital and NOVA PWC had actual knowledge of the $17,730,000 benefit because they were parties to the original transaction with 41992 John Mosby Highway LLC, Ex. 47 (stating a $98,670,000.00 Purchase Price) and the same-day, inflated transaction with Plaintiffs, Ex. 37 (stating a $116,389,000 Purchase Price).  Watson and WDC Holdings had actual knowledge of this $17,730,000 benefit, Lorman Decl. ¶ 9, and also had actual knowledge of the $5,000,000 benefit because they knowingly obtained it after an undisclosed settlement with the White Peaks Capital and NOVA PWC operators, *id.* at ¶ 13.  On information and belief, the TM Defendants

had actual knowledge of this $17,730,000 benefit and also had actual knowledge of the approximately $1,000,000 benefit because they successfully persuaded one or both of the White Peaks Defendants to wire the $1,000,000 to a bank account associated with Johnny Lim and/or E2M Properties, LLC from which the TM Defendants could and did obtain the monies. The RICO Defendants should have expected to repay the Plaintiffs for these benefits because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits and because they intentionally obtained—and concealed—the benefits through their knowingly illegal and fraudulent Direct Purchase conduct. The RICO Defendants thus received these benefits at Amazon's expense.

520. The RICO Defendants both accepted and retained these benefits without paying for their value. To date, the RICO Defendants have not returned any of the benefits Plaintiffs conferred on them. This renders the RICO Defendants' receipt of these benefits unjust.

521. Plaintiffs also conferred a benefit on the RICO Defendants by paying to Blueridge Group a figure approximately $10,000,000 in excess of the fair market value of the real property in Loudoun County, Virginia, subject to the Direct Purchase portion of the RICO Enterprise, $5,000,000 of which Blueridge then funneled to the TM Defendants for their personal use.

522. On information and belief, the RICO Defendants had actual knowledge of these benefits Plaintiffs conferred on them.

523. On information and belief, the TM Defendants had actual knowledge of the $10,000,000 benefit because Nelson identified the land at issue in the Blueridge Transaction for the express purpose of benefitting from the transaction and Casey Kirschner facilitated the transaction, including the insertion of Blueridge Group into the deal to serve as a conduit for the illegally gained profits.

524.    On information and belief, the TM Defendants had actual knowledge of this $10,000,000 benefit, and also had actual knowledge of the $5,000,000 they knowingly obtained personally.

525.    The Defendants should have expected to repay the Plaintiffs for these benefits because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits and because they intentionally obtained—and concealed—the benefits through their knowingly illegal and fraudulent Direct Purchase conduct.  The RICO Defendants thus received these benefits at Amazon's expense.

526.    The RICO Defendants both accepted and retained these benefits without paying for their value.  To date, the RICO Defendants have not returned any of the benefits Plaintiffs conferred on them.  This renders the RICO Defendants' receipt of these benefits unjust.

527.    The RICO Defendants' misconduct caused Amazon to purchase land whose price was artificially inflated to cover at least the kickback payments to the RICO Defendants.

528.    But for the misconduct of the RICO Defendants, Amazon would have entered into purchase agreements at lower prices.

529.    Plaintiffs request remedies, including, but not limited to, the imposition of a constructive trust over: the accounts and assets identified in the sworn affidavits and exhibits accompanying this complaint, *see* Exs. 14, 30, 40–42; MacDonald Decl. ¶¶ 18, 22, 38, 48–50; additional accounts and assets of the RICO Defendants identified during discovery or the ongoing internal and parallel criminal investigations that contain a portion of the benefits; and other assets identified during discovery or the ongoing investigations that the RICO Defendants' obtained by using the benefits Amazon conferred on them. To the extent the RICO Defendants have intermingled these assets or otherwise made a trust impracticable, Plaintiffs are entitled to

equitable liens on those assets or intermingled accounts.  Plaintiffs also request disgorgement of any profits that the RICO Defendants have received through their use of funds in which the Plaintiffs hold an equitable interest.

## COUNT VIII
## Conversion and Constructive Trust

530.    Plaintiffs incorporate all preceding paragraphs by reference.

531.    This count is against the RICO Defendants.

532.    "Under Virginia law, conversion is any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith." *Fed. Ins. Co. v. Smith*, 44 F. Supp. 2d 507, 517–18 (E.D. Va. 2001) (quotation marks and footnote omitted), *aff'd*, 63 Fed. App'x 630 (4th Cir. 2003).  "It is well-settled that money . . . may be converted." *Id.* at 518 n. 25; *see also, e.g.*, *PGI, Inc. v. Rathe Prods., Inc.*, 576 S.E.2d 438, 443 (Va. 2003). Further, "[a] conversion may be committed by intentionally . . . dispossessing another of a chattel," Restatement (Second) of Torts § 223(a) (1965), which can occur by intentionally "obtaining possession of a chattel from another by fraud or duress," *id.* § 221. *See also id.* § 221 cmt. b ("One who by fraudulent representations induces another to surrender the possession of a chattel to him has dispossessed the other of the chattel [and] taking possession of the chattel given under such circumstances is ineffectual to constitute a consent to the taking.").  In addition, "[o]ne receiving chattel from a third person with intent to acquire a proprietary interest in it is liable without a demand for its return by the person entitled to possession . . . . The mere receipt of the possession of the goods under such circumstances is conversion." *Smith*, 144 F. Supp. 2d at 519 n.27 (quotation marks omitted).

533.    In the alternative for the TM Defendants, under Washington law "[c]onversion . . . occurs when a person intentionally interferes with chattel belonging to another, either by taking or

unlawfully retaining it, thereby depriving the rightful owner of possession." *Davenport v. Wash. Educ. Ass'n*, 197 P.3d 686 (Wash. 2008) (en banc). Further, "[m]oney may be the subject of conversion if the defendant wrongfully received it." *Id.*

534.    The RICO Defendants wrongfully exercised authority over millions of dollars Plaintiffs had and have a right to immediate possession of by inducing Plaintiffs to pay them and/or their affiliates these monies in the form of undisclosed costs and fees on the nine lease transactions detailed herein that they procured by reason of their fraudulent Lease Transaction conduct.

535.    The RICO Defendants wrongfully exercised authority over millions of dollars Plaintiffs had and have a right to immediate possession of.

536.    White Peaks Capital and NOVA WPC induced Plaintiffs to purchase the Virginia property site subject to the Direct Purchase portion of the RICO Enterprise at a price fraudulently inflated by $17,730,000. From that corpus, Defendants Watson and WDC Holdings converted $5,000,000 by executing with the White Peaks Capital and NOVA WPC operators the undisclosed October 2019 settlement, and, on information and belief, the TM Defendants converted $1,000,000 of the inflated price.

537.    Similarly, Casey Kirschner induced Plaintiffs to purchase the Blueridge Property subject to the Direct Purchase portion of the RICO Enterprise at a price fraudulently inflated by $10,000,000. On information and belief, from that corpus, the TM Defendants converted $5,000,000, which they split equally.

538.    Plaintiffs request remedies, including, but not limited to, the imposition of a constructive trust over: the accounts and assets identified in the affidavits and exhibits accompanying this complaint, *see* Exs. 14, 30, 40–42; MacDonald Decl. ¶¶ 18, 22, 38, 48–50; additional accounts and assets of the RICO Defendants identified during discovery or the ongoing

internal and parallel criminal investigations that contain a portion of the converted property; and other assets identified during discovery or the investigations that the RICO Defendants' obtained by using the converted property. To the extent the RICO Defendants have intermingled these assets or otherwise made a trust impracticable, Plaintiffs are entitled to equitable liens on those assets or intermingled accounts. Plaintiffs also request disgorgement of any profits that the RICO Defendants have received through their use of funds in which the Plaintiffs hold an equitable interest.

**COUNT IX**
***Alter Ego*/Piercing the Corporate Veil**

539.    Plaintiffs incorporate all preceding paragraphs by reference.

540.    This count is against the Northstar Defendants.

541.    In Virginia, a court may pierce the corporate veil upon a showing that "(1) the corporation was the *alter ego*, alias, stooge, or dummy of the other entity; and (2) the corporation was a device or sham used to disguise wrongs, obscure fraud or conceal crime." *William v. AES Corp.*, 28 F. Supp. 3d 553, 562 (E.D. Va. 2014) (quotation marks omitted).

542.    With respect to the White Peaks Purchase, NOVA WPC LLC and White Peaks Capital LLC were *alter egos* of former Northstar personnel and Doe Defendants in executing the Direct Purchase portion of the RICO Enterprise. White Peaks Capital LLC was registered to the same address as a former Northstar employee's personal home address, and that former employee was and is the "Managing Director" of White Peaks Capital LLC. Another former Northstar employee signed the purchase agreement between White Peaks Capital LLC and the seller of the White Peaks site (41992 John Mosby Highway LLC), and likewise signed the purchase agreement between NOVA WPC, LLC and Plaintiffs' affiliate.

543.     White Peaks Capital LLC and NOVA WPC LLC were devices or sham entities used to disguise wrongs, obscure fraud, and/or conceal other unlawful activities in connection with the RICO Defendants' sale of the White Peaks site to Plaintiffs for at least a $17 million premium that the RICO Defendants procured based on false premises.

544.     With respect to the Lease Transaction portion of the RICO Enterprise, Defendant Northstar and its affiliates (including the "Sterling" entities 100% owned and controlled by defendant Brian Watson) served as Watson's *alter ego*.  Not only is this evidenced by Watson's signatory authority over Northstar and Sterling entity assets, his commingling of personal funds with Northstar and Sterling funds, and his creation, use and control of Northstar and Sterling entities to further the Lease Transaction portion of the RICO Enterprise, but Watson has represented that they are one and the same in filings with this Court.

## COUNT X
## Agency/Respondeat Superior

545.     Plaintiffs incorporate all preceding paragraphs by reference.

546.     This count is against the Northstar Defendants.

547.     All the RICO Defendants were engaged in commerce through their business dealings.

548.     The RICO Defendants committed civil RICO violations, fraud, tortious interference, civil conspiracy, breach of contract, reformation, unjust enrichment, and conversion, when, in the course of commerce, the RICO Defendants paid, received, or accepted money as part of the kickback scheme and/or other unlawful activities.

549.     Under the doctrine of respondeat superior, an employer is liable for the actions of its employee if the tortious action committed by the employee was done while the employee "was performing the employer's business and acting within the scope of the employment."  *Giant of*

*Md., Inc. v. Enger*, 515 S.E.2d 111, 112 (Va. 1999) (citing *Plummer v. Ctr. Psychiatrists, Ltd.,* 476 S.E.2d 172, 173 (1996)).

550.    In determining whether the employee's act was within the scope of the employment, "the test of the liability of the master for the tortious act of the servant . . . is not whether the tortious act itself is a transaction within the ordinary course of the business of the master, or within the scope of the servant's authority, but whether the service itself, in which the tortious act was done, was within the ordinary course of such business or within the scope of such authority." *Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 265 (Va. 1995) (quotation marks omitted; emphasis in original).

551.    A court "cannot conclude as a matter of law that an act is committed outside the scope of employment when an employee is making money for, and the employer is knowingly accepting, such funds." *Stith v. Thorne*, 488 F. Supp. 2d 534, 552 (E.D. Va. 2007).

552.    The Northstar Defendants are liable under the doctrine of respondeat superior for the acts of their employees, Kyle Ramstetter and Will Camenson in the Direct Purchase portion of the RICO Enterprise.

553.    Northstar employed Ramstetter and Camenson and the work they did was at Northstar's direction.

554.    During the relevant time period, Kyle Ramstetter was employed as an account manager at Northstar.

555.    During the relevant time period, Will Camenson was also employed as an account manager at Northstar.

556.    The Northstar and White Peak Defendants were engaged in commerce through their business dealings.

557.     The White Peaks sale was done within the ordinary course of Northstar's business and within the scope of Ramstetter and Camenson's authority as employees of Northstar.

558.     Indeed, █████████████████████████████████████████████
████████████████████████████████████████████████████

559.     Brian Watson owns and controls Northstar and as chief executive of Northstar, was in a position of control and oversight over Ramstetter and Camenson.

560.     In a recorded discussion between Brian Watson and the White Peaks Defendants, Watson repeatedly emphasized that both Ramstetter and Camenson were employees of Northstar during the Direct Purchase portion of the RICO Enterprise, stating "[y]ou were working for Northstar as a full-time employee," Ex. 9 at 6, "[y]ou are an employee of this company," *id*. at 8, and "Will [Camenson]...who was under you, and you were overseeing him as his manager," *id*.

561.     Brian Watson also threatened to fire Ramstetter and Camenson if they did not "do the right thing and pay [Northstar the White Peaks sale proceeds] immediately." Ex. 9 at 6, 10, 23.  In so doing, Watson threatened to terminate their employment if they did not perform an act within the scope thereof.

562.     Indeed, Watson contrasted the positions Ramstetter and Camenson held at Northstar with the position that another individual ("Don"), who "is not an employee of this company [and] can do whatever he wants to do." *Id.* at 11.

563.     Ramstetter and Camenson were acting within the scope of their apparent authority as WDC/Northstar employees when they negotiated the White Peaks sale with Amazon.

564.     During the recording, Watson stated that: "You were brought in to the Amazon account to work specifically for Amazon on our behalf.". *Id.* at 6.

565.    During the recording, Watson also stated: "[I]f you're an employee of this company, and you're being paid for full-time work, and you're doing deals that would be deals that Northstar is doing . . . ." *Id.* at 11.

566.    Ramstetter and Camenson were aware that proceeds from Amazon's purchase of the White Peaks sale were used to fund a payment to TM Defendant Casey Kirschner, and this knowledge was known or attributable to the Northstar Defendants at the time they demanded and received $5 million in proceeds from the White Peaks sale to Amazon.

567.    Watson and Northstar thus knowingly or recklessly received benefits, including a $5 million payment in the fall of 2019, from the Direct Purchase portion of the RICO Enterprise.

568.    Watson and Northstar, under the doctrine of respondeat superior, are responsible for all damages that resulted from any wrongful acts committed by the White Peaks Defendants and/or their principals, former Northstar employees Ramstetter and Camenson, in the RICO Enterprise at issue in this suit.

## COUNT XI
### Robinson-Patman Act – Antitrust Violation

569.    Plaintiffs incorporate all preceding paragraphs by reference.

570.    This count is against the RICO Defendants.

571.    Federal law prohibits any person from "pay[ing] . . . receiv[ing] or accept[ing] anything of value as a commission, brokerage, or other compensation" to an agent of another party to the transaction.  15 U.S.C. § 13(c).  This prohibition outlaws commercial bribery and kickbacks or other conduct that results in the "bribing of a seller's broker by the buyer."  *FTC v. Henry Broch & Co.*, 363 U.S. 166, 168-69 (1960) (quotation marks omitted); *see also Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 992 (4th Cir. 1990).

572.     Federal law provides a private cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). Antitrust plaintiffs are entitled to the "cost of suit, including a reasonable attorney's fee" and to "threefold the damages," including prejudgment interest, as the court finds appropriate.  *Id.*

573.     The RICO Defendants acted in concert to extract payments and terms from Amazon that would not have been available to them absent the undisclosed and illegal conduct by the TM Defendants as agents of Amazon.  The RICO Defendants conspired and agreed to provide the TM Defendants with payments and other personal benefits in exchange for the TM Defendants steering Amazon contracts and/or other valuable business opportunities and information to them.  In so doing, the RICO Defendants paid, and the TM Defendants "receiv[ed] or accept[ed]" funds or other valuable consideration "as a commission, brokerage, or other compensation" in their capacity as agents for Amazon on the transactions for which the commissions or other consideration was paid.  15 U.S.C. § 13(c).

574.     The RICO Defendants at no time disclosed to Amazon the payments or other benefits that Amazon's counterparties on the company's real estate transactions paid to the TM Defendants in their capacity as Amazon's agents.

575.     As a direct result of this unlawful and undisclosed conspiracy and collusion,  the RICO Defendants' payment of prohibited benefits to the TM Defendants caused Amazon to suffer injury in its business or property in amounts to be determined at trial.

576.     This harm to Amazon is of the type the antitrust laws are designed to prevent.  The RICO Defendants' unlawful and collusive conduct with Amazon's agents (the TM Defendants) on the Amazon transactions in issue not only deprived Amazon of the faithful work and honest services of the TM Defendants, but also resulted in inflated or otherwise anti-competitive real

estate sale and lease transactions that caused economic harm to Amazon both directly and through its distortion of the relevant market for commercial data center sites in Northern Virginia.

577.    The RICO Defendants engaged in this scheme with knowledge or reckless indifference that their collusive conduct would cause these injuries to Amazon and restrain competition in the relevant market through the payment of commissions or benefits in violation of 15 U.S.C. § 13(c).

578.    Amazon is well positioned to enforce Section 15(c)'s prohibition on commercial bribery because, as the TM Defendants' former employer and the victim of their conspiracy internally and with other Defendants in this action, Amazon is uniquely well-positioned to investigate the scope and impact of their unlawful acts on both Amazon's own transactions and the relevant market.

579.    As a result of the RICO Defendants' violations, Amazon is entitled to remedies including but not limited to threefold damages, costs, attorney's fees and other compensatory, injunctive, and punitive relief as the Court finds appropriate.

### COUNT XII
### Preliminary Injunction – Fed. R. Civ. P. 64, 65 & Va. Code § 8.01-622

580.    Plaintiffs incorporate all preceding paragraphs by reference.

581.    This count is against the RICO Defendants.

582.    The RICO Defendants were engaged in commerce through their business dealings.

583.    The RICO Defendants committed civil RICO violations, violations of the Robinson-Patman Act, fraud, tortious interference, civil conspiracy, breach of contract, reformation, unjust enrichment, and conversion, when, in the course of commerce, Defendants paid, received, or accepted money as part of the kickback scheme and/or other unlawful activities

committed by or through the Defendants, including as part of the RICO Enterprise, and/or the TM Defendants' pay-to-play scheme for Amazon real estate business and related opportunities.

584.     Plaintiffs were not aware of the RICO Defendants' unlawful activities including the RICO Enterprise.

585.     Federal Rule of Civil Procedure 65 addresses the authority of a district court to issue "injunctions and restraining orders," and Rule 65(b) states that a district court "may issue a temporary restraining order without written or oral notice to the adverse party or its attorney" where:  "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b).

586.     Federal Rule of Civil Procedure 64 complements Rule 65 in stating that, at "the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."  Fed. R. Civ. P. 64.  The rule goes on to state that the "remedies available under this rule include," among other things, "attachment, garnishment, replevin, sequestration and other corresponding or equivalent remedies," and that such remedies are available "however designated and regardless of whether state procedure requires an independent action."  *Id*.

587.     Virginia law permits a court to award an injunction "whether the party against whose proceedings the injunction be asked resides in or out of" the jurisdiction where the injunction is sought, Va. Code § 8.01-620, and also "to protect any plaintiff in a suit for specific property, pending either at law or in equity, against injury from the sale, removal, or concealment of such property."  Va. Code § 8.01-622.

588.    Virginia law further and expressly permits pretrial attachment if the plaintiff sufficiently shows that the defendant "[i]s converting, is about to convert or has converted his property of whatever kind, or some part thereof, into money, securities or evidences of debt with intent to hinder, delay, or defraud his creditors." Va. Code § 8.01-534(A)(4).

589.    Virginia law also states that "[i]t shall be sufficient ground for an action for pretrial levy or seizure or an attachment if the specific personal property sought to be levied or seized" "[w]ill be sold, removed, secreted or otherwise disposed of by the defendant, in violation of an obligation to the plaintiff, so as not to be forthcoming to answer the final judgment of the court respecting the same." Va. Code § 8.01-534(B)(1).

590.    Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief enjoining Defendants and their affiliates, agents, and assigns from:  (1)  disrupting any direct or indirect business or other relationships or vendor performance at or associated with Plaintiffs' Lease Transaction or other properties in this District; (2)  spoliating, dissipating, converting, misappropriating or depleting any evidence or assets related to the conduct at issue in this suit; or (3) using Amazon confidential information, business opportunities, contracts, funds or other assets in violation of Amazon contracts or company policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

591.    Enter a preliminary and a permanent injunctive relief against the RICO Defendants and their officers, directors, principals, agents, servants, employees, successors, and assigns, and as well as all persons and entities in active concert or participation with them:

  i.    enjoining any interference with Plaintiffs' ongoing transactions or relationships at the Lease Transaction or White Peaks sites or other sites in this District or elsewhere;

ii.   enjoining the unauthorized use or retention of confidential information, including means proprietary or confidential information of Amazon in whatever form, tangible or intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets, including but not limited to: business and financial information; Amazon techniques, technology, practices, operations, and methods of conducting business; information technology systems and operations; algorithms, software, and other computer code; published and unpublished know-how, whether patented or unpatented; information concerning the identities of Amazon's business partners and clients or potential business partners and clients, including names, addresses, and contact information; customer information, including prices paid, buying history and habits, needs, and the methods of fulfilling those needs; supplier names, addresses, and pricing; and Amazon pricing policies, marketing strategies, research projects or developments, products, legal affairs, and future plans relating to any aspect of Amazon's present or anticipated businesses;

iii.  enjoining any and all of the activity alleged herein, any acts causing any of the injury complained of, and any acts assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activity complained of herein or from causing any of the injury complained of herein;

iv.   enjoining Defendants from using or controlling or in any way disposing, transferring, concealing, wasting or spoliating any evidence, assets, or instrumentalities of the RICO Enterprise as well as any other unlawful activity alleged or addressed herein, including the specific assets listed in the Declaration and Exhibits accompanying this complaint.  *See* Exs. 14, 30 40–42; MacDonald Decl. ¶¶ 18, 22, 38, 48–50;

v.    ordering Defendants to divest themselves of any interest, direct or indirect, of any interest connected to the RICO Enterprise;

vi.   prohibiting the Defendants from engaging in future conduct similar to that the RICO Enterprise engaged in; and

vii.  ordering the dissolution or reorganization of all trusts, LLCs, and other enterprises established in furtherance of the RICO Enterprise.

592.  Impose a constructive trust on the assets and instrumentalities of the unlawful enterprise and other misconduct alleged or asserted herein.

593.  Impose an equitable lien on the assets and instrumentalities of the unlawful enterprise and other misconduct alleged or asserted herein.

594.  Enter judgment on all counts herein in favor of Amazon and against the Defendants.

595.     Declare that Defendants' conduct has been willful and that Defendants have acted with fraud, malice and oppression.

596.     Enter a permanent injunction enjoining Defendants, their assignees, and anyone else acting in concert with them from profiting from or otherwise monetizing their relationship with Amazon or any of the projects or properties described herein, including by marketing or otherwise leveraging the existence of a relationship with Amazon to promote future business activities.

597.     Enter judgment awarding Amazon actual damages from Defendants of at least the amounts identified in the Preliminary Injunction entered by this Court on June 5, 2020 (Dkt. 57) and further damages adequate to compensate Amazon for injuries sustained as a cause of the RICO Defendants' criminal enterprise as alleged herein, including but not limited to interest and costs, in an amount to be proven at trial.

598.     Enter judgment disgorging the Defendants' profits and other ill-gotten gains.

599.     Enter judgment awarding statutory treble damages as well as other enhanced, exemplary, and/or special damages, in amounts to be proven at trial.

600.     Enter judgment awarding all reasonable attorneys' fees and costs.

601.     Grant Amazon any and all other relief that the Court deems just and proper.

Dated: September 18, 2020       Respectfully submitted,

       *s/ Luke M. Sullivan*
       Elizabeth P. Papez (*pro hac vice*)
       Patrick F. Stokes (*pro hac vice*)
       Claudia M. Barrett (*pro hac vice*)
       Travis S. Andrews (Va. State Bar No. 90520)
       Luke Sullivan (Va. State Bar No. 92553)
       GIBSON, DUNN & CRUTCHER LLP
       1050 Connecticut Avenue, N.W.
       Washington, D.C. 20036-5306
       Telephone:  (202) 955-8500
       Facsimile:  (202) 467-0539
       epapez@gibsondunn.com
       pstokes@gibsondunn.com
       cbarrett@gibsondunn.com
       tandrews@gibsondunn.com
       lsullivan@gibsondunn.com

       *Counsel for Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system. I will send then send the document and a notification of such filing (NEF) to the following parties via U.S. mail to their last-known address:

Jamie Hubbard
Stimson Stancil LaBranche Hubbard
1652 Downing Street
Denver, CO 80218
*Counsel for Defendants White Peaks Capital LLC and NOVA WPC LLC*

Villanova Trust
c/o Christian Kirschner, Trustee
3924 Wallace Lane
Nashville, TN 37215

AllCore Development LLC
6870 W 52nd Avenue, Suite 203
Arvada, CO 80002

Finbrit Holdings LLC
6870 W 52nd Avenue, Suite 203
Arvada, Colorado 80002

NSIPI Administrative Manager
1999 Broadway, Suite 3500
Denver, CO 80202

Sterling NCP FF, LLC
1999 Broadway, Suite 3500
Denver, CO 80202

Manassas NCP FF, LLC
1999 Broadway, Suite 3500
Denver, CO 80202

Cheshire Ventures LLC
6870 W 52nd Avenue, Suite 203
Arvada, Colorado 80002

 *s/Luke M. Sullivan*
Luke Sullivan (Va. State Bar No. 92553)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
lsullivan@gibsondunn.com

*Counsel for Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc.*

## VERIFICATION OF FIRST AMENDED COMPLAINT

I, Luke M. Sullivan, hereby verify, under penalty of perjury, as follows:

1.  I am over the age of 18 years.  I am an attorney licensed to practice law in the Commonwealth of Virginia and in the District of Columbia.  I am an attorney at the law firm of Gibson, Dunn & Crutcher, LLP, and counsel of record for Amazon.

2.  I have personal knowledge of the factual bases relied upon to prepare this Verified Second Amended Complaint, and if called upon to do so, I could and would competently testify thereto.

3.  I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  September 18, 2020

_s/ Luke M. Sullivan_
Luke M. Sullivan